# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

---

David E. Patton
*Executive Director and
Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

October 8, 2014

Ms. Zainab Ahmad and Ms. Celia Cohen
Assistants United States Attorney
United States Attorney's Office
271 Cadman Plaza East, 4th Floor
Brooklyn, N.Y. 11201

Mr. Adam Johnson
Supervisory Staff Attorney
CLC New York
Metropolitan Correctional Center
150 Park Row
New York, N.Y. 10007

<u>U.S.A. v. Alhassane Ould Mohamed, 13 CR 0527 (WFK)</u>

Dear Ms. Ahmad, Ms. Cohen, and Mr. Johnson:

### Preliminary Statement

We set forth in this letter objections to the Special Administrative Measures ("SAMs") of July 15, 2014, imposed upon our client, Mr. Alhassane Ould Mohamed, and make recommendations about modifications. We do so now in light of our experience with the SAMs as actually put into practice by and interpreted by the government, including the Bureau of Prisons ("BOP"). We direct this letter to whoever has authority to modify the SAMs, whether the Assistants U.S. Attorney ("AUSAs"), the Metropolitan Correctional Center ("MCC"), or the Office of Enforcement Operations ("OEO"), Criminal Division. If modifications require the decision, input or approval of the OEO, Criminal Division, we ask that you forward them this letter.

Regardless of the overall legitimacy of the SAMs (and we reserve the defendant's rights to make any and all further objections), we assume in this letter that the purported purpose is

1

what the SAMs says it is: to avoid a "substantial risk that [Mr. Mohamed's] communications or contacts with persons . . . result in death or serious bodily injury to persons, or substantial damage to property . . . ." SAMs, at 1; see also id. at 4 (the SAMs "are appropriate" because of "the likelihood that Mohamed may attempt to use his terrorist connections to retaliate against government witnesses . . . ."); 5 (referring to "the SAM's intent of significantly limiting the inmate's ability to communicate . . . information with intent to harm others."); 11 (indicating that the SAMs should keep the inmate from discussing "illegal activity" or "the soliciting of or encouraging of acts of violence . . . ."); 14 (similar to p. 11); 17 ("The SAM . . . are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity.") The objections we make and the modifications we propose do not interfere with the government accomplishing its stated goal.

Although the government describes its measures as the least restrictive alternatives, see SAMs, at 17 ("[T]hese measures are the least restrictive that can be tolerated . . . ."), the SAMs here block, hamper and create an obstacle path to counsel's ability to represent Mr. Mohamed; jeopardize his mental health, well-being and stability; and risk creating his incompetence. They also violate due process and the attorney-client and work-product privileges. Finally, they are also often obscure, failing the test of clarity and precision necessary for a document of this sort.

Since so many of the provisions are illogical, unnecessary and not tailored to Mr. Mohamed's specific circumstances (rather appearing often to be boilerplate lifted from other SAMs relating to totally different defendants), we set forth not only objections. We also set forth solutions. We hope that these solutions can help create conditions of confinement that meet the government's concerns while not violating Mr. Mohamed's rights.

## Objections to Specific SAMs

**§2.a., p. 6, and §2.h.iii., p. 9 (mislabeled as i rather than iii):** Section 2.a., p. 6 requires "the inmate's attorney and precleared staff to acknowledge the restriction that they will not forward third-party messages to or from the inmate." Section 2.h.iii, p. 9 bars counsel and his staff from "forward[ing] third-party mail to or from the inmate."

Section 2.a., p. 6 is both vague and overbroad, and section 2.h.iii, p. 9 is overbroad. First, the first provision leaves obscure what "messages" are. Second, both provisions presumptively target political communications but may also bar counsel from using information obtained from the defendant in representing him and from conveying personal, non-political information to family members.

The biggest problem is that §2.a., p. 9 interferes with counsel's ability to represent their client effectively. To develop a defense, counsel must use information that clients provide, and pass that information on to investigators, researchers, and experts. Counsel should not have to fear that if they use information, which otherwise they would use in the normal course, they face

2

sanctions or prosecution for violating the SAMs. Nor, in representing clients, should counsel have to forego the use of valuable information that their clients provide.

Another problem is that both provisions interfere with Mr. Mohamed's ability to communicate with his family. For a man now in solitary confinement, such contact, whatever form it may take, is crucial for his mental well-being. Family contact is critical for normal human relations. Furthermore, for a man who is illiterate, or semi-literate at best, counsel plays an indispensable role in maintaining Mr. Mohamed's contact with his family. Finally, counsel's role in maintaining that contact is all the more critical where, as here, the client's family lives abroad and phone connections between here and his family in Mali are bad.

Since Mr. Mohamed's transport from Mali to the United States, he has had no contact with his family. While we have finally managed to reach immediate family members on a regular basis, the SAMs seem to forbid us from telling them anything beyond the fact that we have met with him. Ordinarily, when a client cannot contact his immediate family we let the immediate family members know the basics about his well-being, i.e., that he says that he is in good health and spirits, that he wants them to deposit money in his commissary account, and that he sends his love and does not want them to worry. The SAMs seem to prevent us from sending even simple messages, human messages, like these, which could alleviate unnecessary worry on the part of our client and his family alike.

The concern that messages to family members may be a disguised political messages is no answer. The government has provided no evidence that Mr. Mohamed has ever used codes or that he intends to do so now. The possibility is particularly remote for an illiterate, or semi-literate, man. Defense counsel understand the obligation not to pass on political messages, are sophisticated enough to be alert to the risk, and doubt that Mr. Mohamed is in a position to manipulate them. Furthermore, defense counsel would never pass on information that they themselves do not understand. Finally, defense counsel would not simply pass on untranslated messages. There is no reason why the SAMs cannot accommodate defense counsel facilitating the communication of personal messages, unrelated to politics, with immediate family members as part of defense counsel's general attempts to establish and maintain trust with their client and to watch out for his mental health.

**§2.d., p. 7:** This provision states: "The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff."

Section 2d., p. 7 prohibits anyone, except the inmate's attorney, from disseminating the contents of the inmate's communications. The prohibition is again both vague and overbroad. The meaning of the critical verb "disseminate" is unclear and the restriction on dissemination to Mr. Mohamed's counsel personally is impractical, if not impossible, so long, that is, that counsel strive to provide their client with effective assistance. Investigators, experts and researchers may

3

need to rely on information obtained from Mr. Mohamed and incorporate that information into their further inquiries. Are they barred from doing so? Do defense counsel risk accusations of violating the SAMs, for example, if they instruct investigators to interview prospective witnesses and pursue lines of inquiry based on information obtained from Mr. Mohamed? Is the alternative that counsel must act as their own investigators, experts and researchers, or risk violating the SAMs?

The last alternative, i.e., that counsel act as their own investigators, experts and researchers, is impossible in the present circumstances. The offense took place in Niger, which is poor and unstable. The arrest took place in Mali, which is war torn. Travel to much of both countries is unsafe. Research and investigation will require knowledge of French and Arabic, as well as Tamasheq, Songhai, Hausa, and Zarma – languages beyond the ken of defense counsel. If barred from providing investigators, experts and researchers with any information from Mr. Mohamed, defense counsel cannot provide the effective assistance of counsel required by the Sixth Amendment.

There is another problem. In undertaking investigations and developing a legal defense, with the complex evolution of such processes, especially in a complicated case such as this one, how is counsel supposed to segregate the sources of information, both information obtained from Mr. Mohamed as opposed to from other sources, and information obtained before the imposition of the SAMs as opposed to thereafter?

**§2.a. fn.2, p. 6:** This provision defines "precleared staff" as "a co-counsel, paralegal, or investigator who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/EDNY, who has successfully been cleared by the FBI and USA/EDNY, and who has received a copy of the inmate's SAM and has agreed . . . to adhere to the SAM restrictions and requirements."

The definition of "precleared staff" is overly restrictive by excluding staff at Federal Defenders of New York, Inc. ("FDNY"), who are not co-counsel, paralegals or investigators, and by excluding outside experts, or the like, who FDNY might retain. There is no rational basis for this restriction since any staff who is actively assisting counsel must still submit to the background check and be cleared. Furthermore, the restriction denies equal protection of the law, discriminating against the defense and in favor of the prosecution by creating bureaucratic obstacles that only the defense, not the prosecution, must face, and thus providing the prosecution with an unfair advantage. Finally, the imposition of such bureaucratic obstacles burden the defendant's Sixth Amendment right to effective assistance of counsel. The irrationality of the provision, its denial of equal protection, and its burden on the Sixth Amendment are all even more egregious because a case as complicated and unusual as this one calls for a series of atypical experts and consultants, of the kind that no law office would have in house.

4

The problem is hardly theoretical. This irrational and overly restrictive provision has already created a substantial delay in undertaking a psychological evaluation of Mr. Mohamed, which still has not occurred.

**§§2.e. and f., p. 7:** Section 2.e. allows precleared paralegals to meet with the inmate without the presence of the inmate's attorney but §2.f. does not allow an investigator to do so. There is no reasoned basis for barring an investigator from meeting alone with the defendant. Both paralegals and investigators need preclearance, which provides the necessary assurance of trustworthiness. See §2.a., fn, 2, p. 6. There is no reason to believe that the title of investigator or an investigator's function is qualitatively different from a paralegal's for purposes of abiding by SAMs or creates any reason why an investigator cannot meet alone with the defendant. For similar reasons, these provisions are unreasonable to the extent that they bar outside experts, such as mental health professionals, from meeting alone with the defendant.

**§§2.g.ii., p. 8, and 2.b.ii., p. 7:** Section 2.g.ii. allows the inmate to initiate legally privileged telephone calls. But that right is rendered null and void because §2.b.ii limits the attorney to using an interpreter who "shall be in the physical and immediate presence of the attorney – *i.e.*, in the same room. The attorney shall not patch through phone calls, or any other communication, to or from the inmate."

As matters now stand, Mr. Mohamed could rarely call counsel since FDNY does not have a French or Arabic interpreter on staff or regularly in the office.

A simple modification could solve the problem. Section 2.b.ii should be modified to eliminate the words "physical and," and the words "*i.e.*, in the same room," and should add at the end that "the attorney may talk with the inmate with an interpreter who participates by conference call after the interpreter has represented to the attorney that nobody else is listening in on the conversation or is in earshot of the interpreter." Accord. §2.g.ii.(1)("The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate."). This proposed modification provides the protection that the government seeks since any interpreter who the government has precleared to work on the case is trustworthy.

**§2.g.ii.(3)(a), fn. 4, p. 8, and §2.g.ii.(3)(d), fn. 5, p. 9:** We object to these provisions to the extent that they permit federal authorities to hear, record or otherwise have access to attorney-client privileged communications.

Footnote 4 excludes "officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities" from the definition of a "third party," and thus from the prohibition on third parties "overhear[ing]" attorney-client privileged phone calls. See §2.g.ii.(3)(a). Footnote 4 adds that "[t]his section does not allow monitoring of attorney-client privileged communications." Similarly, footnote 5 allows federal authorities to record or preserve but not to monitor attorney-client privileged communications.

The drafting is either sloppy or foxy. If §2.g.ii.(3)(a) uses the verbs "overhear" and "monitor" as synonyms, then the prohibition against federal authorities listening in on privileged communications is clear. But if the section implicitly distinguishes overhearing from monitoring, the distinction is obscure. Similarly, §2.g.ii.(3)(d) in combination with footnote 5 allows federal authorities to record or preserve attorney-client privileged communications but leaves obscure if, and if so, under what circumstances and with what notice to the defendant and counsel, any government authority may listen to such communications.

We object to the violation of the attorney-client privilege and the Sixth Amendment. We ask for clarification of the meanings of these provisions. And we ask for notification of any time, in the past or future, that the government has overheard or monitored in any way attorney-client communications.

**§2.g.ii.(3)(a), fn. 4, p. 8; and §2.g.ii.(3)(d), fn. 5, p. 9; §3.c.iii., 3.d.ii., and 3.d.iii., all on p. 11:** To the extent that the government construes these, or any other provisions, to allow it to monitor, overhear or in any way listen to Mr. Mohamed's phone calls, whether privileged or non-privileged, we make three requests. The underlying principle for these three requests is that the SAMs may serve their function of assuring security without the government misusing, manipulating or exploiting the SAMs to gain an unfair litigation advantage.

First, we ask for a regular accounting of every one who has heard the phone conversation, whether live or on tape, including each person's name and position. Second, we ask that those people who hear such phone conversations exclude any and all agents or other government employees engaged in, consulted with, or otherwise involved in prosecuting the federal case. Third, we ask that the contents of such phone conversations not be passed on to the prosecution.

**§2.h., p. 9:** This provision allows counsel to "provide the inmate with, or review with the inmate, documents related to his defense . . . so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator."

We object to this provision because the subordinate clause "if translation is necessary" is ambiguous, possibly mandating the translation of all documents reviewed with Mr. Mohamed because he does not speak English. The clause may imply that counsel cannot provide Mr. Mohamed with anything in English and must arrange for translations into French or Arabic of all documents reviewed with him. We suspect that the problem results from poor drafting, in which case we ask simply for clarification. In the alternative, we can arrange for the translations and send the government the bill.

**§2.h.i., p. 9:** This provision states: "None of the materials provided [by counsel to Mr. Mohamed] may include inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/EDNY and FBI."

6

We object to this provision as vague. The problem is that much material relating to the government's allegations involve groups that the government claims use violence. Under the heading "Mohamed's Terrorist Connections," the government's Memorandum setting forth the SAMs names six such groups. See SAMs, at 3-4. Does §2.h.i. bar counsel from reviewing that portion of the SAMs with their client? Does this provision bar such review even though the SAMs implies that the government must have reviewed those pages with him as part of their notice to him? See id. at 4. Does this provision bar counsel from sharing with their client the results of any investigation that they might undertake to respond to the government allegations? The interpretation that the government may refer to inflammatory material but defense counsel cannot review with their client material that describes such groups would deny Mr. Mohamed equal protection of the law, due process, and the Sixth Amendment right to effective assistance of counsel.

The possible answer that counsel need only preclear any such materials with the USA/EDNY and FBI worsens the problem by also trenching on the work-product privilege. That solution gives the government an unfair advantage by granting it clues to defense strategy.

Another problem is whether the government takes the position that this provision bars counsel from reviewing with their client certain material that the government itself has produced in discovery. We ask that the government state whether it has precleared all discovery material for review by the defendant.

The bottom line is that defense counsel would obviously not provide their client with material for the purpose of inciting him to commit further crimes. Doing so would violate the SAMs and, even without the SAMs, would violate professional ethics. But defense counsel should be able to provide their client and review with him material related to the offenses that the government has charged and the allegations that the government has made.

**§3.a.i., p. 10:** This provision includes within its definition of "immediate family members" the defendant's "spouse." The singular should be changed to the plural.

**§3.a.ii, p. 10:** This provision sets "a minimum of one call per month" between Mr. Mohamed and his immediate family members. For a man in solitary confinement, phone calls with family are important. The minimum of one per month is too few.

**§3.b.iv, p. 11:** This provision requires that Mr. Mohamed's phone calls with immediate family members "be in English unless a fluent . . . approved interpreter/translator is available to contemporaneously monitor the telephone call," in which case "[a]rranging for an interpreter/translator may require at least fourteen (14) days advance notice."

The problem is that this provision unduly burdens someone, like Mr. Mohamed, who does not speak English. Since the BOP is already on notice that Mr. Mohamed will always need an interpreter for phone calls with immediate family members, and since coordinating phone

calls with family members abroad in a poor country like Mali is already hard enough, the arrangements for an interpreter/translator should require no more than seven (7) days advance notice.

§3.c.ii., p. 11: This provision requires the USMS/BOP/DF to "verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communications of the SAM restrictions. The USMS/BOP/DF is only required to notify the inmate's communication recipient in English."

We object to the last sentence of this provision to the extent the government construes it as barring Mr. Mohamed's phone calls with family members because they cannot understand SAMs restrictions explained to them in English. We assume that Mr. Mohamed's family members speak the same languages as he does, i.e., French and Arabic, not English.

We add that we cannot fathom the purpose of the last sentence. The government will have an interpreter present "to contemporaneously monitor the telephone call." See §3.b.iv., p. 11. Why can't such an interpreter "notify the inmate's communication recipient" in the language of the imminent phone call, whether in French or Arabic or both? Perhaps, the government's position is that it need only inform the family members of the SAMs restrictions in English, regardless of whether they understand. If so, the approach seems silly, but that is the government's business. If not, the government should eliminate the provision's last sentence. The bottom line is that the SAMs cannot prevent a defendant from speaking with immediate family members because they do not speak English.

§3.g.i., p. 13: In our letter of September 3, 2014, we objected to the government's interpretation that counsel could not assist Mr. Mohamed, who is illiterate or semi-literate, in taking dictation of a letter to his family, thereby simply reducing to writing the letter he composed in his head (the only place he can compose a letter), and then providing the hard copy to him for sending to his family. We renew our objections and requests – to which nobody has responded – whether the government has reconsidered its interpretation, as it should, or made a modification to the SAMs, to facilitate the reasonable procedure we have proposed.

§3.c.iii., 3.d.ii., and 3.d.iii., all on p. 11: These provisions provide for documentation of each of Mr. Mohamed's phone calls with his family, the contemporaneous recording of those phone calls, and a copy of each recording "on a single, individual cassette tape or compact disk (per call) . . . ."

We request for all past and future phone calls copies of the documentation, including transcripts and translations, and the respective cassette tapes or compact disks.

§3.g.iii., p. 13: This provision requires the Warden or his or her designee to copy all non-legal mail, forward it "to the location designated by the FBI," and await a government analysis and approval before delivering it to Mr. Mohamed.

We request that defense counsel be provided copies of the non-legal mail and be informed if, and when, the mail is delivered to Mr. Mohamed.

**§3.g.iv.(2), p. 14:** This provision requires the government to forward non-legal mail to Mr. Mohamed "after a review and analysis period of" a "reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation."

This provision is contradictory in requiring a "reasonable time" and allowing that time to last up to sixty days, which is not reasonable, especially if the mail is in French or Arabic, both languages for which translators and interpreters are readily available. There is no reason why the time period should not be the same "fourteen (14) business days for mail that is written entirely in the English language." See §3.g.iv.(1), p. 13.

**§3.g.v., p. 14:** According to this provision, the government will notify the inmate "in writing of the seizure of any mail" based on the government's determination that the mail contains "overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM . . . ."

We request that the government copy defense counsel on any such notification. There are two reasons for this request. First, copying defense counsel will help assure that Mr. Mohamed actually receives notice, which is otherwise doubtful since he is illiterate or semi-literate. Second, seizure of mail under such circumstances implicates the prosecution of the case and is necessary for counsel to know in order to provide effective representation.

**§3.f., p. 12:** This provision limits Mr. Mohamed's non-legal visits to his immediate family members. Since all of Mr. Mohamed's immediate family members live in Africa, and since there is no realistic expectation that any of them can travel to the United States, this provision, as a practical matter, prevents Mr. Mohamed from any non-legal visits, further limiting the human interactions that are so necessary for mental health.

There is an alternative. Defense counsel can work with the government to find a mutually agreeable charitable organization that can send precleared volunteers on a regular schedule to visit Mr. Mohamed for the purpose of conversations and activities unrelated to the case or politics.

**§3.g., p. 12:** This provision limits non-legal mail "to only the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities."

This provision is both over-inclusive and under-inclusive. It is over-inclusive to the extent that it includes the U.S. Attorneys' Offices and other federal law enforcement entities, which could encourage U.S. Attorneys' Offices or other federal law enforcement entities to

engage in ex parte communications with Mr. Mohamed and violate, interfere with, or otherwise erode his Sixth Amendment rights. The provision is under-exclusive in excluding entities that Mr. Mohamed may have legitimate reasons to contact, such as the Red Cross or Red Crescent, or the Embassy or Consulate of Mali.

In regard to non-legal mail to and from the Embassy or Consulate of Mali, this provision contradicts §12, p. 17, which "allow[s] Consular communications . . . consistent with USSMS/BOP/DF policy" and in compliance "with the U.S. Department of State (DOS) Consular notification and access requirements." The DOS's "Consular Notification and Access, Instructions for Federal, State, and Local Law Enforcement and other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them" states: "Foreign consular officers must be given access to their nationals and permitted to communicate with them. Such officers have the right to visit their nationals, to converse and *correspond* with them, and to arrange for their legal representation." (P. 10; emphasis added.)

**§6.b., p. 14:** This provision limits Mr. Mohamed "from communicating with any other inmate by making statements audible to other inmates . . . ."

There are three points to make about this provision – which enforces solitary confinement with a vengeance.

First, this provision is inhumane. Human interaction is normal, healthy and necessary. Its deprivation is cruel and damaging to Mr. Mohamed's mental health.

Second, there is no reason to believe that Mr. Mohamed would, or could, pass on messages to other inmates, especially since there is no reason to believe that he knows any other inmates or that he would have contact with any inmate who spoke either French or Arabic.

Third, this provision may be construed to put the onus on Mr. Mohamed to avoid contact with other inmates whereas the BOP should be in control of the location of inmates, especially if it chooses, as here, to isolate one.

The government should eliminate this cruel provision altogether. In the alternative, the government should clarify that this provision imposes no obligation on Mr. Mohamed. There is a reasonable alternative. The government should assure that Mr. Mohamed regularly has contact with other inmates, even if under a highly controlled setting that addresses security threat concerns, to assure that he has the human contact necessary for human existence.

**§§7.a., and 7.b., p. 15:** Section 7.a states.: "The inmate shall be kept separated from other inmates as much as possible while in the cellblock area." Section 7.b. states: "The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area."

In addition to the objections stated above for §6.b., p. 14, we object to these two provisions to the extent that they are construed to impose an obligation on Mr. Mohamed rather than to set forth directives to the MCC.

### Conclusion

For the reasons set forth above, we ask that the government respond to our objections and modify the SAMs along the lines requested above. We would also welcome discussions with the goal of coming up with conditions of confinement that both address the government's security concerns underlying the SAMs and protect Mr. Mohamed's mental and physical health and overall well-being while he awaits trial.

Sincerely,

Douglas G. Morris, Esq.
Assistant Federal Defender
718-330-1209 (W)
718-855-0760 (FAX)
douglas_morris@fd.org

cc: Ms. Mildred Whalen, Esq.

Clerk of the Court

Mr. Mohamed Ould Alhassane

11