ZA:CAC/SPN
F.#2012R00596

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

                                        <u>MEMORANDUM OF LAW</u>

     - against -                         13-CR-527 (WFK)

ALHASSANE OULD MOHAMED,
         also known as "Cheibani,"

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO VACATE OR
<u>MODIFY SPECIAL ADMINISTRATIVE MEASURES</u>

                                   LORETTA E. LYNCH
                                   United States Attorney
                                   Eastern District of New York

Zainab Ahmad
Celia A. Cohen
Samuel P. Nitze
(Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant's Motion to Vacate or, in the Alternative, Modify Special Administrative Measures (SAMs) dated January 29, 2015 ("Def. Br.").   The defendant argues that the SAMs should be vacated or modified on the grounds that the SAMs do not serve their stated purpose, are inhumane, and violate the defendant's constitutional rights under the First, Fifth, and Sixth Amendments.   As set forth below, these claims should be rejected on jurisdictional grounds because the defendant has failed to exhaust his administrative remedies.   Furthermore, his claims are meritless because the SAMs comply with 28 C.F.R. § 501.3, and do not infringe upon any of the defendant's constitutional rights.   Indeed, if there were ever a case warranting SAMs, it is this one: the defendant was (1) involved in 8 murders, and several attempted murders, including the instant charges; (2) has twice escaped from prison; (3) has ties to the terrorist groups Boko Haram, Movement for Unity and Jihad in West Africa (MUJAO) and al-Qaeda in the Islamic Maghreb (AQIM) and (4) has admitted his membership in the violent rebel group, the National Movement for the Liberation of Azawad (the "Azawad Movement"). There is no question that there is a substantial risk that the defendant's communications or contacts with persons associated with these groups could result in death or serious bodily injury to persons, including potential witnesses in this case.   Accordingly, and for the reasons set forth below, the defendant's motion should be denied.

2

<u>BACKGROUND</u>

I.          <u>The Charged Offenses</u>

The defendant, a Malian national, was indicted on September 13, 2013 by a grand jury in the Eastern District of New York for the December 23, 2000 murder of American diplomat William Bultemeier and attempted murder of Marine Corps Staff Sergeant Christopher McNeely in Niamey, Niger.   The charged murder and attempted murder took place early in the morning as a group of employees of the U.S. Embassy in Niger, including Bultmeier and McNeely, left a restaurant in Niamey and returned to their cars.   As Bultmeier approached his car, the defendant, brandishing a pistol, along with an accomplice who carried an AK-47 assault rifle, accosted Bultemeier.   The defendant demanded that Bultemeier hand over the keys to the vehicle, a white Toyota Land Cruiser with diplomatic plates.   When Bultemeier did not immediately comply, the defendant shot him.   After Staff Sergeant McNeely ran to Bultemeier's aid and attempted to provide him with medical help, the defendant's accomplice fired his assault rifle at McNeely and Bultemeier, hitting them both. The defendant searched through Bultemeier's pockets as he lay bleeding on the ground, found the car keys, and drove away with his accomplice.   Bultemeier died of the gunshot wounds he sustained in the attack.   Staff Sergeant McNeely was evacuated from Niger and survived.

Following the shooting, the defendant and his accomplice drove the stolen vehicle to Mohamed's hometown of Gao, in northern Mali.   The next day, after removing certain parts from the vehicle, he sold it to an individual, who then resold it to others in Timbuktu, Mali.   Malian police officials arrested those individuals in possession of the stolen vehicle in Timbuktu three days after it was stolen, on December 26, 2000.   Subsequent

forensic testing revealed the presence of the defendant's DNA inside the vehicle.   After learning from the individuals in Timbuktu where they had obtained the car, the police in Gao arrested the defendant and searched his home, where they discovered items belonging to the stolen diplomatic vehicle, including its luggage rack, front bumper, and antenna, all hidden outside.

In May 2002, while the investigation into his crimes was still ongoing, the defendant escaped from Malian custody.   He remained at large for several years.   In December, 2009, the defendant was involved in a brutal attack on a convoy of Saudi Arabian officials in Niger.   Specifically, the defendant and two other assailants, all armed with AK-47 assault rifles, approached a hunting party comprising six Saudi Arabian nationals and two Malian guides that had stopped on the side of the road near Diomballa, Niger, for morning prayer.   The three assailants bound and blindfolded all six Saudi Arabian nationals and stole money and valuables from their vehicle.   When one of the victims attempted to resist, the three assailants fired upon the group, killing four Saudi nationals and seriously injuring the other two. They then disabled the victims' vehicles and fled the scene.   The defendant was arrested in Mali for his involvement in these murders on February 2, 2010, and extradited to Niger in May 2010.   He was convicted in Niger of the murder of four Saudi nationals and sentenced to twenty years' imprisonment.

In June 2013, the defendant escaped custody again, this time from Nigerien prison. Several inmates, including the defendant, launched an assault that was coordinated with several armed militants outside of the prison and spearheaded by the terrorist group Boko Haram, a Nigeria-based militant group with links to al-Qaeda in the Islamic Maghreb (AQIM)

4

that is responsible for thousands of deaths in northeast and central Nigeria over the last several years, including targeted killings of civilians.   After killing three Nigerien guards, the defendant and approximately 21 other inmates escaped.   The defendant remained at large until he was apprehended by French forces in Northern Mali in late November 2013.

The United States filed an extradition request with the Malian government in December 2013, and Mali ordered the defendant extradited to the United States in February 2014.   The defendant arrived in the Eastern District of New York on March 12, 2014.

II.   The Defendant's Terrorist Connections

In addition to his association with Boko Haram mentioned above, the defendant has admitted his membership in the National Movement for the Liberation of Azawad (the Azawad Movement), a violent rebel group that has waged multiple attacks on the governments of Mali and Niger, and his close connections with the West Africa-based designated foreign terrorist groups Movement for Unity and Jihad in West Africa (MUJAO) and AQIM.

At the time of his 2013 arrest in Mali, the defendant was traveling with three members of the Azawad Movement.   The group had three Kalashnikov rifles, one PK machine gun, and over $20,000 in cash with them at the time of their capture.   During his post-arrest interview by FBI agents, the defendant described himself as a "blood brother" to the Azawad Movement and claimed he was traveling with Azawad members because he had sought their protection.   The defendant also stated that he was very close with leaders of the designated terrorist group MUJAO in Mali and Niger, many of whom he had known since childhood (although he claimed not to have had recent contact with them).   According to the State Department, MUJAO, created in September 2011 as a splinter group of AQIM, has conducted

5

several violent terrorist attacks and kidnappings in the Sahel region, including the October 2011
abduction of three aid workers from a refugee camp in western Algeria; a March 2012 suicide
attack on a police base in Algeria; a June 2012 attack in Algeria; and the April 2012 kidnapping
of several Algerian diplomats in Gao, Mali.

    The defendant also admitted during his interrogation that he knew, and had been
in recent communication with, Mokhtar Belmokhtar, a former senior leader within AQIM.
Belmokhtar currently leads the al-Qaeda controlled designated terrorist group, al-Mulathamun
Battalion.   At the time Belmokhtar announced the formation of the al-Mulathamun Battalion,
he stated it that it was made up of AQIM's best fighters and announced that it would fight
against Western interests.   Soon thereafter, Belmokhtar claimed responsibility, on behalf of
al-Mulathamun Battalion, for the January 2013 attack on a gas facility near In-Amenas,
Algeria.   The group's four-day siege of the facility resulted in the deaths of 38 people,
including three U.S. citizens.   Notably, the defendant admitted that in November 2012,
Belmokhtar promised him five hundred million francs in exchange for his assistance in a
terrorist attack in the city of Niamey.   In furtherance of that scheme, while he was in prison in
Niger, the defendant tasked two individuals with taking photographs of various attack targets in
Niamey, including the airport, the beach, an Olympic sized public pool and various restaurants
and nightclubs.   The purpose of selecting these particular targets was that they are locations
frequented by Westerners in Niger.

    According to the State Department, the al-Mulathamun Battalion and MUJAO
jointly conducted twin suicide bombings in Niger in May 2013 that killed approximately 20
people.   In August 2013, MUJAO and the al-Mulathamun Battalion announced their merger

6

and formation of a new joint group, al-Murabitoun, which has also been designated as a foreign terrorist organization.   The State Department has stated that the "al-Murabitoun extremist group constitutes the greatest near-term threat to U.S. and Western interests in the Sahel."

In his post-arrest interview, the defendant also admitted that he was aware that members of MUJAO had joined with AQIM and had jointly attacked Malian government facilities in the region of Gao, Mali, Mohamed's hometown and the area where he was captured in November 2013.

III.    The SAMs

On July 15, 2014, the Attorney General approved the imposition of SAMs, pursuant to 28 C.F.R. § 501.3, based on the substantial risk that the defendant's communications or contacts with people inside or outside of the prison could result in death or serious bodily injury, or substantial damage to property that would entail the risk of death or serious bodily injury.   See Origination of Special Administration Measures Memorandum, dated July 15, 2014, attached as exhibit A at 4.   This finding was based on the defendant's deep and current ties to various terrorist organizations, his demonstrated violent tendencies, the at-large status of his co-conspirators, and the likelihood that the defendant may attempt to use his terrorist connections to retaliate against government witnesses.   See Ex. A. at 4.   The SAMs set forth a number of provisions designed to mitigate the risk posed by the defendant by restricting his access to the mail, the media, the telephone, and visitors.   In general, the SAMs limit contacts and communications between the defendant and other persons based upon a determination that such communications or contacts could result in death or serious bodily injury to others.   See Ex. A at 4-5, ¶ 1c.

7

Notwithstanding the limits regarding third-party contacts, the SAM restrictions clearly permit counsel and precleared staff, who have signed affirmations, to communicate with the defendant in a variety of ways to prepare his defense.   See id. at 7, ¶ 2c ("Attorney/Client Privileged Visits"); at 7, ¶ 2e ("Unaccompanied Attorney's Precleared Paralegal(s) May Meet With Client"); at 7, ¶ 2f ("Simultaneous Multiple Legal Visitors"); at 7, ¶ 2g ("Legally Privileged Telephone Calls"); at 9, ¶ 2h ("Documents Provided by Attorney to Inmate"); at 10, ¶ 2i ("Legal Mail").   By signing the affirmation, counsel and counsel's staff would agree not to forward third-party messages to or from the defendant.   See id. at 5, ¶ 2a. The SAM restrictions further provide, however, that counsel for the defendant "may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff." See id. at 7, ¶ 2d.[1]

IV.   Defense Counsel's Prior Objections to the SAMs

On October 8, 2014, the defendant filed a letter raising several objections to the SAMs and seeking clarification of the scope of its provisions.   (Attached as Exhibit B).   In that letter, the defendant raised many of the points at issue in the instant motion.   Specifically, he argued that the language set forth in the SAMs was overbroad or vague, and that many of the provisions were too restrictive and curtailed defense counsel's ability to adequately represent their client.

---

1        Although under certain extreme circumstances the monitoring of attorney-client communications is permissible pursuant to 28 C.F.R. § 501.3(d), the SAMs at issue do not provide for any such monitoring.

The government met with the defense counsel on October 25, 2014 to discuss the issues raised by counsel in hopes of addressing their concerns while continuing to protect the government's security interests.   The government responded to the defendant's letter formally, in writing, on November 14, 2014.   (Attached as Exhibit C)   In its letter, which was reviewed by the Bureau of Prisons ("BOP") and the Office of Enforcement Operations ("OEO"), the government clarified the meaning of various SAMs provisions, and explained how the SAMs limitations are not intended to, nor do they actually, curtail the ability of counsel to appropriately prepare a defense.   Specifically, the government clarified that defense counsel can share information necessary to prepare the defense with investigators, researchers and experts without violating the SAMs.   The government explained that sharing such information in furtherance of preparation of a defense does not constitute "forwarding" messages as prohibited under the SAMs.   In addition, the government noted that counsel is obviously free to share observations about the defendant's health, spirits or general well-being with the defendant's family members without running afoul of the third party messages provision of the SAMs.   The government also explained that the provision barring "inflammatory materials" does not prevent defense counsel from sharing material related to building a defense.   Overall, the government indicated its willingness to work with defense counsel to ensure that the defendant's concerns were addressed to the fullest extent possible.

9

In addition, the government urged defense counsel to notify the government promptly if:

- They ran into any difficulty securing clearance for personnel other than the pre-cleared staff already covered by the SAMs.

- They wished to send a staff investigator to meet with the defendant alone, without sending a paralegal.

- In actual practice, the implementing agencies exceeded or regularly used all of the time allotted to arrange for an interpreter to monitor calls with family members.

- There was any difficulty securing access or otherwise making use of the allowances set forth in the SAMs.

<u>ARGUMENT</u>

I.      The Court Lacks Jurisdiction to Entertain Defendant's Motion Because He Has <u>Failed to Exhaust His Administrative Remedies as Required by the SAMs</u>

Prior to bringing a motion to vacate an order imposing SAMs in federal court, a defendant must exhaust his administrative remedies within the BOP system.   The authority to impose SAMs stems from the Attorney General's authority over the federal penal system, which has been delegated to the Bureau of Prisons.   <u>See</u>, <u>e.g.</u>, 18 U.S.C. §§ 3621, 4401(b), 4042.   The BOP establishes the conditions of confinement for all persons in its custody pursuant to BOP regulations and policies.   <u>See</u> Declaration of Regina Eldridge, attached as Exhibit D at ¶¶ 13 and 14 ("Eldridge Decl.)."   The regulations govern inmate communications and contacts, among other conditions of confinement.   The severity of the conditions of confinement depends upon where the prisoner is housed by the type of crime for which an individual is being incarcerated.   The Bureau of Prisons may impose SAMs based on violence or terrorism-based concerns pursuant to 28 C.F.R. § 501.3.

The Prison Litigation Reform Act ("PLRA") expressly states that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).   The Supreme Court has held that the exhaustion requirement of the PLRA is mandatory.   Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Booth v. Churner, 532 U.S. 731, 739 (2001).   The exhaustion of remedies requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes.   Porter, 534 U.S. at 532.   The Supreme Court noted that Congress described the cases covered by the exhaustion requirement as "actions brought with respect to prison conditions."   Id. at 525.   The Court reasoned that Congress enacted the broad reaching exhaustion requirement "to reduce the quantity and improve the quality of prisoner suits," noting that this would give corrections officials "time and opportunity to address complaints internally before allowing the initiation of a federal case."   Id.; accord United States v. Al-Marri, 239 F.Supp.2d 366, 367 (S.D.N.Y. 2002) ("[t]he Supreme Court's decision in Porter . . . makes clear that courts should not intervene in matters regarding prison conditions until corrections officials had had the time and opportunity to address such complaints internally.").

Here, the defendant has not taken any steps to exercise his rights under the Administrative Remedy Program.   See Eldridge Decl., Ex. D at ¶¶ 13 and 14.   The defendant's laundry list of challenges to a number of the specific SAM restrictions are precisely the kind of claims contemplated by the Administrative Remedy Program, and hence, as other courts have found, they are more effectively and efficiently addressed in the first instance by the

BOP.    The exhaustion of administrative remedies is not a mere procedural hoop through

which a defendant must jump.   Rather, the administrative process established by the

Administrative Remedy Program serves as a meaningful mechanism by which potential

modifications to or clarifications of SAM restrictions may be implemented to resolve, clarify or

limit conflicts.

Although several district courts have held that a defendant can challenge a SAMs

directly with the federal court, the Second Circuit has held otherwise.   See United States v.

Yousef, 327 F.3d 56, 165 (2d Cir. ) (2003) ("Yousef must exhaust his administrative remedies

under the Bureau of Prisons Administrative Remedy Program with regard to whatever special

administrative measures are imposed on him.").   And the requirement for an inmate to exhaust

administrative remedies under this statute has been upheld by the Supreme Court on two

occasions and endorsed by other appellate courts that have considered the

question.   See Porter, 534 U.S. 516; Booth, 532 U.S. 731; accord United States v. Ali, 528 F.3d

210, 244 (4th Cir. 2008) ("The defendant must exhaust his administrative remedies before

challenging the SAMs in federal court."); Yousef v. Reno, 254 F.3d 1214, 1221-22 (10th Cir.

2001).   Thus, based on the holdings of the Supreme Court and the Second Circuit, as well as

the plain language of the PLRA, the defendant must first seek all redress available from the

Bureau of Prisons before bringing this challenge to the Court.   The Court should therefore

dismiss the defendant's motion without prejudice to allow for the exhaustion of administrative

remedies.

II.    The SAMs Do Not Violate the Defendant's Constitutional Rights

The defendant claims that the SAMs infringe upon his constitutional rights of

12

due process and hinder his ability to prepare his own defense.   See Def. Br. at 28-38.   But the Second Circuit has rejected nearly identical claims in the past, see United States v. El-Hage, 213 F.3d 74 (2d Cir. 2000), and the government respectfully submits that this Court should do the same here.

It is well-settled that conditions of pretrial detention pass constitutional muster so long as they are administrative rather than punitive in nature.   See United States v. Salerno, 481 U.S. 739, 746-51 (1987); Bell v. Wolfish, 441 U.S. 520, 535-40 (1979).   To determine whether a condition of confinement infringes upon a constitutional right, the Court must determine whether the regulation is reasonably related to a legitimate penological interest.   See Turner v. Safley,482 U.S. 78, 89 (1987) (upholding regulations of inmate-to-inmate communications as reasonably related to legitimate security concerns); El-Hage, 213 F.3d at 81 (upholding similar SAM restrictions for pretrial detainee as constitutional); United States v. Felipe, 148 F.3d 101, 110 (2d Cir. 1998) (upholding similar SAM restrictions-type order as reasonable and finding no due process violation); United States v. Sattar, 272 F. Supp. 2d 348, 369 (S.D.N.Y. 2003) (upholding requirement of affirmation from an attorney as a reasonable measure for effectuating SAM restrictions).

In Turner, the Supreme Court identified four factors for evaluating whether a regulation relating to confinement is reasonable:   (1) whether a valid, rational connection exists between the regulation and the purported government interest; (2) whether alternative means of exercising a constitutional right remain available to a prisoner; (3) whether accommodation of the right asserted by the prisoner will have a significant impact on the prisoner's fellow inmates, prison staff, or prison resources; and (4) whether there is an absence

13

of ready alternatives to the regulation.   Turner, 482 U.S. at 89-91; see also El-Hage, 213 F.3d

at 81 (recognizing four-factor test in Turner as the standard by which the SAM restrictions

should be reviewed).   The Court in Turner made clear that the last factor is not a "least

restrictive alternatives" test: "prison officials do not have to set up and then shoot down every

conceivable alternative method of accommodating the claimant's constitutional complaint.

But if an inmate claimant can point to an alternative that fully accommodates the prisoner's

rights at de minimis cost to valid penological interests, a court may consider that as evidence

that the regulation does not satisfy the reasonable relationship standard."   482 U.S. at 90-91.

   The Turner Court further recognized that prison administrators must be afforded

deference in managing detention facilities as "courts are ill equipped to deal with the

increasingly urgent problems of prison administration and reform."   Turner, 482 U.S. at 84

(quoting Procunier v. Martinez, 416 U.S. 396, 405-06 (1974)).   This deference can have

particular significance when the restrictions at issue have been implemented for security

purposes.   See e.g., Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).

   An analysis of the four factors in this case demonstrates that the SAM

restrictions are reasonable and neither impinge on the defendant's due process rights nor

prejudice his ability to prepare his own defense.   First, as detailed above, pursuant to 28 C.F.R.

§ 501.3, the Attorney General may direct the BOP to implement SAM restrictions that are

reasonably necessary to protect persons against the risk of death or serious bodily injury

pursuant to the Attorney General's finding that a prisoner's communications or contacts with

persons could result in death or serious bodily injury to persons.   In this case, the Attorney

General directed the BOP to implement special administrative measures with respect to the

14

defendant because he found that there was a substantial risk that the defendant's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons.   As set forth above, the defendant has demonstrated that he has the ability to communicate with multiple terrorist groups, one which assisted in his most recent escape from prison.   Accordingly, based upon the Attorney General's findings in this case and the facts set forth above, there is a legitimate governmental interest in limiting the defendant's contacts and communications.

Moreover, there is a valid, rational connection between the SAM restrictions and the government interest in limiting the defendant's contacts and communications.   The SAM restrictions are both reasonable and necessary, and do not, contrary to the defendant's claim, restrict the attorney-client relationship.   It should be noted that the SAM restrictions were not imposed because of any actions by the defendant's counsel and are not intended to imply any wrongdoing on their part, nor is such wrongdoing a prerequisite to imposition of SAM restrictions.   In fact, compliance with SAM restrictions is highly dependent upon the honesty and integrity of counsel and their staff, and in this instance in particular, the government has the highest regard for defense counsel.   As detailed above, the SAM restrictions are intended to prevent dangerous communications between the defendant and third parties by putting all parties on notice of the heightened security concerns relating to communications to and from the defendant, which require extra diligence, particularly when disseminating any such communications.   Under the circumstances of this case and because of the security concerns, the imposition of restrictions on the defendant's contacts and communications is reasonable and

15

warranted.   Moreover, the affirmation required by the SAM restrictions for defense counsel

and their staff provides a reasonable measure for ensuring that the SAM restrictions are

effectuated, while permitting the representation to proceed undisturbed.

           The conditions of the defendant's confinement are also reasonably related to the

purpose of inhibiting his ability to harm others outside and inside prison.   Specifically, the

challenged communication restrictions are reasonably necessary to ensure that others do not

pass on, whether intentionally or inadvertently, forbidden messages from the defendant to third

parties.   The courts have long recognized this concern as a legitimate justification for special

administrative measures under section 501.3(a).   See Safely, 482 U.S. at 93 ("In any event,

prisoners could easily write in jargon or codes to prevent detection of their real

messages."); United States v. Hammoud, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation

that seems innocuous on one day may later turn out to be of great significance, particularly if

the individuals are talking in code."); United States v. Johnson, 223 F.3d 665, 673 (7th Cir.

2000) ("And we know that anyone who has access to a telephone or is permitted to receive

visitors may be able to transmit a lethal message in code."); United States v. Salameh, 152 F.3d

88, 108 (2d Cir. 1998) ("Because Ajaj was in jail and his telephone calls were monitored, Ajaj

and Yousef spoke in code when discussing the bomb plot."); United States v. Ali, 396

F.Supp.2d 703, 709 (E.D.VA 2005) (taking note that "al-Qaeda trains its followers to use a

variety of means to communicate with their confederates from prison").   Thus, defense

counsel's argument that the SAMs restrict them from communicating messages they perceive

to be innocuous on the defendant's behalf is rebutted by the prospect that those seemingly

innocuous messages are, in fact, coded communications, whose dangerous intent will be clear

to the recipient if not the messenger.

Notably, the Second Circuit has affirmed similar conditions of confinement by limiting a defendant's contacts to prison employees, defense counsel and five approved individuals even where a defendant was not alleged to have made any illegal communications from prison, because such restrictions serve the regulatory purpose of preventing the defendant from communicating with his unconfined co-conspirators.   United States v. El-Hage, 213 F.3d 74, 82 (2d Cir. 2000).   Therefore, because the SAMs Authorization Memorandum provides ample evidence of the defendant's connections to terrorism, his history of violating prison rules and demonstrates a clear rational relationship between the challenged restrictions and the legitimate governmental purpose of safeguarding the public and preventing acts that could lead to death or serious bodily injury, the SAMs is reasonably necessary to prevent legitimate and serious concerns.

III.     The SAMs Are Not Vague or Ambiguous

The defendant's claims that the SAM restrictions are ambiguous and vague should be similarly rejected.   See Def. Br. at 25, 30-37.   In his motion, the defendant injects vagueness into the plain language of the restrictions and then complains about the very vagueness he created.   First, the defendant claims that the provision allowing for attorneys only to disseminate the defendant's communications to third parties is ambiguous because it is unclear whether defense team members can make use of such information.   Def. Br. at 25, 33. But the SAMs provision is plain that the issue concerns the dissemination of the information, but does not restrict the defense team from using such information to further the defense.   And there is nothing in the SAM restrictions that suggest otherwise.   Rather, the SAMs place restrictions on how and to whom the defendant's messages may be disseminated to others, but

17

as long as those restrictions are adhered to, the SAMs place no limitations on how those individuals to whom counsel disseminates the information may use it.

Second, the defendant claims that the term "messages" is not defined, but does not explain why the dictionary definition does not supply sufficient clarity.   Id. at 25, 36.   As the government has made clear to defense counsel, observations about the defendant can certainly be shared with his family, however, specific messages (i.e., verbal, written or recorded communications) cannot be shared with third parties as specifically set forth in the SAMs.

Third, the defendant claims that the prohibition against "inflammatory material" includes barring the defendant from access to material produced in discovery or necessary for investigative purposes.   Id. at 25.   But this purported prohibition does not exist: there is nothing in the SAM restrictions that bars the defendant from reviewing material produced in discovery or material that is necessary for defense investigation, and to claim otherwise belies common sense.   Finally, the SAMs restrictions specifically state that the government is not authorized to monitor privileged attorney-client communications, and there is nothing ambiguous about that clause other than the defendant's illogical reading of the language.   Id. Accordingly, because the SAM restrictions are clear on their face, and because the government provided the above referenced explanations to defense counsel in its November 14, 2014 letter, the claims that the SAM restrictions are ambiguous are disingenuous.

IV.   The SAM Restrictions Are Prisoner-Specific

The defendant claims that the SAM restrictions are not specific to his circumstances, and thus should be vacated.   Def. Br. at 26-28.   But the SAM restrictions imposed on the defendant specifically address the concerns outlined by the Attorney General in

the original memorandum, dated July 15, 2014.   <u>See</u> Ex. A.   The defendant has a history of

extreme violence that demonstrates that he will stop at nothing to obtain his freedom and to

further his own interests.   Putting aside the murder and attempted murder that the defendant is

charged with, the defendant has demonstrated that his communications could result in death or

serious bodily injury to others.   For example, the defendant twice escaped from prison.   While

he was at large, he was involved in the shooting of Saudi nationals, during which four were

murdered.   Three years after being arrested and convicted of those murders, the defendant

again escaped custody based on his connection to the terrorist group Boko Haram, a

Nigeria-based militant group with links to AQIM.   During his escape, the defendant and other

inmates killed three Nigerien guards with weapons that had been smuggled into the prison.

The defendant also admitted to his membership in the Azawd Movement, and his close ties to a

senior leader in AQIM, an organization that specifically targets westerners.   Most recently, the

defendant admitted that he attempted to assist that terrorist leader, Mokhtar Belmokhtar, in

conducting a terrorist attack in Niamey, Niger.   In short, the defendant's criminal history

combined with his ties to terrorist organizations demonstrates that the defendant has the means

and the desire to communicate with and conduct violent criminal acts with these terrorist groups

and other criminals.   In addition, the defendant now knows who the witnesses are against him

in the present case, and several of those witnesses reside in the countries of Mali, Niger and

Algeria where the terrorist groups with which the defendant is affiliated have set up their home

bases.   Communications between the defendant and members of those groups who remain

loyal to him and committed to violence could cause witnesses tampering and/or harm to the

witnesses.[2]   Accordingly, the SAM restrictions are specifically tailored to address the defendant's extremely serious and dangerous past behavior.

The defense attempts to distinguish this case from others on the grounds that the defendant here has not done something specific since his arrest to warrant SAM restrictions. But that is irrelevant.   There is nothing in the SAM regulations or the applicable laws that suggest that SAMs may only be imposed based on post-arrest, rather than pre-arrest, conduct. The reason that SAM restrictions were imposed in this case included the defendant's pre-arrest behavior and ability to cause death or injury to others.   In the cases cited by the defendant, such In re Basciano , 542 F.3d 950 (2d Circ. 2008) and United States v. Tsarnaev, 13-CR-10200-GAO (D. Mass. 2013), both of the defendants were charged with heinous crimes. Yet other than the crimes themselves, there was nothing in the defendants' past that specifically warranted SAM restrictions.   Once the defendant Basciano ordered murders while in prison and once defendant Tsarnaev passed an incendiary message to the media, also while in prison, the SAM restrictions were warranted.   But in the instant case, the defendant has already proved that SAM restrictions are necessary against him given his past behavior.   The government should not have to wait for the defendant to undertake further violent actions in order to justify requesting SAM restrictions.   Rather, SAM restrictions are designed to prevent death or serious injury, and the Court should uphold them in this case because the defendant's history, characteristics and prior conduct demonstrate that he is likely to seek to cause such harm to others.

---

2       The defense claims that SAM restrictions are not necessary because the defendant is not a leader who can issue orders.   But, as set forth above, the defendant has demonstrated that he does not have to be a leader to cause death or serious bodily injury.

V.    The SAMs Do Not Violate the Defendant's First Amendment Rights

The SAM restrictions also do not violate the defendant's First Amendment

rights.   See United States v. Felipe, 148 F.3d 101, 110-11 (2d Cir. 1998) (rejecting inmate's

First Amendment argument on the ground that the SAM restrictions permitted him to exercise

his First Amendment right in a more limited manner) (citing Thornburgh, 490 U.S. at 417-418

("The Court in Turner did not require that prisoners be afforded other means of communicating

with inmates at other institutions . . . . Rather it held . . . it was sufficient if other means of

expression . . . remained available.")).   In Felipe, the defendant, the former leader of the Latin

Kings gang, was sentenced to life imprisonment but he continued to engage in criminal

conduct, including ordering the murders of gang rivals, while behind bars.   148 F.3d at 106.

As a result, the court imposed special conditions of confinement, which included a total ban on

correspondence and visits with others except for his attorney and close family members

approved by the court, and the monitoring of all correspondence and visits with anyone except

his attorney.   Id. at 107. Applying the Turner test, the Second Circuit concluded that the severe

restrictions were warranted in such a case, and did not violate the defendant's First Amendment

rights.   Id. at 110-11.

Two years later, in El Hage, where the al Qaeda-affiliated defendant was subject

to pre-trial SAM restrictions similar to those here, the Second Circuit again rejected the claim

that the conditions of confinement violated the defendant's First Amendment rights.   See El

Hage, 213 F.3d at 81-82.   The Court reasoned that, even though the security concerns were

more significant in Felipe because the defendant had ordered murders and beatings from prison,

the restrictions were correspondingly more severe.   Id.   Thus, the Court found the less severe

22

SAM restrictions were "reasonably related to the government's asserted security concerns." Id.   Thus, Felipe and El Hage make clear that the SAM restrictions at issue in this case do not violate the defendant's First Amendment rights.

VI.   The Government Has Sought To Accommodate The Defendant's Concerns

Throughout the brief filed in support of his motion, the defendant accuses the government of ignoring his concerns and his proposed remedies.   He writes that the government failed to get him appropriate clothing, that it failed to set up a system for facilitating his communication with prison personnel, that the defendant is unable to get medical attention.   Def. Br. at 10-13.   The defendant's claims on this point are unsupported by the actual record of communication and cooperation between the parties.   As noted above, the government has addressed many of the concerns raised by defense counsel.   Among other steps, the government has:

- Modified the SAMs to permit the defendant's attorneys to take dictation of letters to the defendant's family members.

- Confirmed that the defendant has received thermal underwear and four blankets, two of them wool.

- Confirmed that a Unit Team responsible for SAM inmates makes daily rounds and has generally been able to understand basic communication from the defendant in English, without the aid of an interpreter, but also employs the services of Arabic or French speaking staff members as needed.

- Confirmed that the defendant has received regular medical attention.   Medical staff members visit the SHU daily, with limited exception.   The primary care physician assigned to the defendant speaks fluent French, and has thoroughly evaluated the defendant on several occasions, most recently earlier this month. The primary care physician has reported no difficulty communicating with or understanding the defendant.

- Confirmed that members of MCC's psychology staff visit the defendant weekly

23

and make use of Arabic or French speaking staff members to speak with the defendant.   The psychology staff has not reported any difficulty communicating with the defendant.

- Confirmed that the defendant has permission to receive books sent directly to the MCC by his attorneys via Amazon or similar booksellers.   To date, the defendant has received every book that has been sent to the institution by his attorneys.

- Confirmed that the MCC purchased a CD player for the defendant to enable him to listen to books, classes, and other programs on CD in French or Arabic. Defense counsel may purchase additional CDs for the defendant in the same manner in which they purchase books.

See Eldridge Decl., Ex. D.   In addition, the government arranged for the defendant to send letters to his family through the Red Cross, and even offered to have an agent from the Federal Bureau of Investigation contact Red Cross to facilitate the arrangement.   Accordingly, given the government's and the prison's efforts to accommodate the defendant's concerns, the defendant's specific complaints are moot.   All that is left is the general constitutional claims raised by the defendant, which have been repeatedly rejected in every case in which they have been raised.   Because the SAMs was implemented to address the significant security concerns posed by the defendant, and is reasonable related to those serious concerns, it should be upheld.

<u>CONCLUSION</u>

For the forgoing reasons, the defendant's motion to vacate the SAMS should be denied, and given the steps that have already been taken to alleviate some of the defendant's concerns, no additional modifications are necessary.

Dated:   Brooklyn, New York
      March 20, 2015

         LORETTA E. LYNCH
         United States Attorney
         Eastern District of New York

By:  _/s/_____
         Zainab Ahmad
         Celia A. Cohen
         Samuel P. Nitze

25

# EXHIBIT A



# Office of the Attorney General
## Washington, D. C. 20530

July 15, 2014

<u>LIMITED OFFICIAL USE</u>

MEMORANDUM FOR CHARLES E. SAMUELS, JR.
                                 DIRECTOR
                                 FEDERAL BUREAU OF PRISONS

                                 STACIA HYLTON
                                 DIRECTOR
                                 UNITED STATES MARSHALS SERVICE

FROM:                       THE ATTORNEY GENERAL

SUBJECT:              Origination of Special Administrative Measures Pursuant to
                          28 C.F.R. § 501.3 for Federal BOP Pretrial Inmate
                          <u>Alhassane Ould Mohamed</u>

        Federal Bureau of Prisons (BOP) pretrial inmate Alhassane Ould Mohamed is charged with one count of murdering an internationally protected person and one count of attempting to murder an internationally protected person, in violation of 18 U.S.C. § 1116(a). These charges stem from Mohamed's participation in a violent carjacking of an American diplomat in Niamey, Niger, in December 2000, during which Mohamed and his fellow assailant shot a United States Marine and shot and killed a civilian Department of Defense employee. Mohamed was extradited to the Eastern District of New York, following his extradition from Mali, and arraigned on March 12, 2014. He is presently confined in the Special Housing Unit (SHU) at the Metropolitan Correctional Center (MCC), in Manhattan, New York.

        The United States Attorney for the Eastern District of New York (USA/EDNY) requests that Special Administrative Measures (SAM) be imposed on Mohamed because there is a substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. The Federal Bureau of Investigation (FBI) concurs with the USA/EDNY that SAM should be imposed on Mohamed.

<u>LIMITED OFFICIAL USE</u>

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                               Page 2
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

## Background Information

On September 13, 2013, Mohamed, a Malian national, was indicted by a grand jury in the Eastern District of New York for the murder and attempted murder of internationally protected persons. He was arrested by French forces in Mali in late November 2013, and arrived in the Eastern District of New York on March 12, 2014, following his extradition from Mali.

On December 23, 2000, a group of employees of the United States Embassy in Niamey, Niger, including Defense Attaché System Operations Coordinator William Bultemeier and U.S. Marine Corps Staff Sergeant Christopher McNeely, drove separately to a restaurant in Niamey in U.S. diplomatic vehicles registered to the United States Embassy and bearing diplomatic license plates. The vehicles were parked across the street from the restaurant.

After dinner, the American Embassy group exited the restaurant, and Bultemeier approached his diplomatic vehicle. Mohamed, brandishing a pistol, and his accomplice, who was armed with an AK-47 assault rifle, accosted Bultemeier as he approached his car. Mohamed demanded that Bultemeier hand over the keys to his diplomatic vehicle, and when Bultemeier did not immediately comply, Mohamed shot him. McNeely ran to Bultemeier's aid and attempted to provide medical help to him. Mohamed and his accomplice continued to demand the keys, and the accomplice fired his assault rifle, wounding both Bultemeier and McNeely. Mohamed then removed the keys from Bultemeier's pockets as he lay bleeding on the ground, and he and his accomplice fled in Bultemeier's vehicle. Bultemeier died of the gunshot wounds that he sustained in the attack. McNeely was medically evacuated from Niger and survived.

Following the shooting, Mohamed and his accomplice drove the stolen vehicle to Mohamed's hometown of Gao, in northern Mali. Three days after the vehicle was stolen, on December 26, 2000, Malian police officials arrested individuals in possession of the stolen vehicle in Timbuktu. Subsequent forensic testing revealed the presence of Mohamed's DNA inside the vehicle. The police in Gao arrested Mohamed and searched his home, where they discovered items taken from the stolen diplomatic vehicle, including a luggage rack, front bumper, and antenna, all hidden outside. In addition, they recovered a pistol hidden in Mohamed's bedroom.

Mohamed was detained during the pendency of the Malian investigation, but in May 2002, he escaped from custody during a medical visit and remained at large for several years. In December 2009, Mohamed was involved in a brutal attack on a convoy of Saudi Arabian officials in Niger. Mohamed and two other armed assailants detained and fired upon the group, killing four Saudi nationals and seriously injuring the others. On February 2, 2010, Mohamed was arrested in Mali for his involvement in these murders, and in May 2010, he was extradited to Niger, where he was convicted of the murder of four Saudi nationals and sentenced to twenty years' imprisonment.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 3
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

In June 2013, Mohamed again escaped custody, this time from a Nigerien prison. Several inmates, including Mohamed, launched an assault that was coordinated with armed militants outside of the prison and spearheaded by the terrorist group Boko Haram, a Nigeria-based militant group with links to al-Qaeda in the Islamic Maghreb (AQIM) that is responsible for thousands of deaths in northeast and central Nigeria over the last several years, including targeted killings of civilians. The Nigerien government believes that several weapons had been smuggled into the prison prior to the assault. After killing three Nigerien guards, Mohamed and approximately 21 other inmates escaped. Mohamed remained at large until he was apprehended by French forces in Northern Mali in late November 2013.

**Mohamed's Terrorist Connections**

In addition to his association with Boko Haram mentioned above, Mohamed has admitted his membership in the National Movement for the Liberation of Azawad (the Azawad Movement), a violent rebel group that has waged multiple attacks on the governments of Mali and Niger, and his close connections with the West Africa-based designated foreign terrorist groups Movement for Unity and Jihad in West Africa (MUJAO) and AQIM.

At the time of his 2013 arrest in Mali, Mohamed was traveling with three armed members of the Azawad Movement. During his post-arrest interview by FBI agents, Mohamed stated that he was very close with leaders of the designated terrorist group MUJAO in Mali and Niger, many of whom he had known since childhood (although he claimed not to have had recent contact with them). According to the State Department, MUJAO, created in September 2011 as a splinter group of AQIM, has conducted several violent terrorist attacks and kidnappings in the Sahel region, including the October 2011 abduction of three aid workers from a refugee camp in western Algeria; a March 2012 suicide attack on a police base in Algeria; a June 2012 attack in Algeria; and the April 2012 kidnapping of several Algerian diplomats in Gao, Mali.

Mohamed has also previously admitted that he knows Mokhtar Belmokhtar, a former senior leader in AQIM who currently leads the al-Qaeda controlled designated terrorist group, al-Mulathamun Battalion. When Belmokhtar announced the formation of the al-Mulathamun Battalion, he stated that it was composed of AQIM's best fighters and would fight against Western interests. Soon thereafter, Belmokhtar claimed responsibility on behalf of al-Mulathamun Battalion for the January 2013 attack on a gas facility near In-Amenas, Algeria. The group's four-day siege of the facility resulted in the deaths of 38 people, including three U.S. citizens.

According to the State Department, the al-Mulathamun Battalion and MUJAO jointly conducted twin suicide bombings in Niger in May 2013, which killed approximately 20 people. In August 2013, MUJAO and the al-Mulathamun Battalion announced their merger and

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 4
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

formation of a new joint group, al-Murabitoun, which has also been designated as a foreign
terrorist organization.  The U.S. State Department has stated that the "al-Murabitoun extremist
group constitutes the greatest near-term threat to U.S. and Western interests in the Sahel."

**Basis for Special Administrative Measures**

The USA/EDNY reports that Mohamed is an extremely violent individual with strong
connections to multiple active terrorist organizations in West Africa, including Boko Haram, the
Azawad Movement, MUJAO, and the al-Mulathamun Battalion.  Given Mohamed's deep and
current ties to these terrorist groups, his demonstrated violent tendencies, the at-large status of
his co-conspirators, and the likelihood that Mohamed may attempt to use his terrorist
connections to retaliate against government witnesses, the USA/EDNY believes that SAM are
appropriate in this case.

Based upon information provided to me of Mohamed's proclivity for violence, I find that
there is substantial risk that his communications or contacts with persons could result in death or
serious bodily injury to persons, or substantial damage to property that would entail the risk of
serious bodily injury to persons.  Therefore, I am requesting that you, pursuant to 28 C.F.R.
§ 501.3, implement SAM to restrict Mohamed's access to the mail, the media, the telephone, and
visitors.  Implementation of the SAM will commence immediately upon notice to the inmate, and
the SAM will be in effect for one year from the date of my approval, subject to my further
direction.

1.    **General Provisions**

a.    **Adherence to Usual USMS, Bureau of Prisons (BOP), and Detention Facility
(DF) Policy Requirements -** In addition to the below-listed SAM, the inmate
must comply with all usual USMS, BOP, and non-BOP DF policies regarding
restrictions, activities, privileges, communications, etc.  If there is a conflict
between USMS/BOP/DF policies and the SAM, as set forth herein, where the
SAM are more restrictive than usual USMS/BOP/DF policies, then the SAM shall
control.  If usual USMS/BOP/DF policies are more restrictive than the SAM, then
USMS/BOP/DF policies shall control.

b.    **Interim SAM Modification Authority -** During the term of this directive, the
Director, Office of Enforcement Operations (OEO), Criminal Division, may
modify the inmate's SAM as long as any SAM modification authorized by OEO:

i.    Does not create a more restrictive SAM;

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 5
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

      ii.    Is not in conflict with the request of the USA/EDNY, FBI, or USMS/BOP/DF, or applicable regulations; and

      iii.   Is not objected to by the USA/EDNY, FBI, or USMS/BOP/DF.

c.    **Inmate Communications Prohibitions -** The inmate is limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) information with intent to harm others.

d.    **Use of Interpreters/Translators by the USMS/BOP/DF -** Interpreter/Translator approval requirement:

      i.    The USMS/BOP/DF may use Department of Justice (DOJ) approved interpreters/translators as necessary for the purpose of facilitating communication with the inmate.

      ii.    No person shall act as an interpreter/translator without prior written clearance/approval from the USMS/BOP/DF, which shall only be granted after consultation with the FBI and USA/EDNY.

      iii.   Interpreters/translators utilized by the USMS/BOP/DF shall not be allowed to engage in, or overhear, unmonitored conversations with the inmate. Interpreters/translators shall not be alone with the inmate, either in a room or on a telephone or other communications medium.

2.    <u>**Attorney-Client Provisions**</u>

a.    **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document -** The inmate's attorney (or counsel) – individually by each if more than one – must sign

---

   [1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/EDNY, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his or her individual capacity.

<u>LIMITED OFFICIAL USE</u>

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 6
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

an affirmation acknowledging receipt of the SAM restrictions document. By
signing the affirmation, the attorney acknowledges his or her awareness and
understanding of the SAM provisions and his or her agreement to abide by these
provisions, particularly those that relate to contact between the inmate and his
attorney and the attorney's staff. The signing of the affirmation does not serve as
an endorsement of the SAM or the conditions of confinement, and does not serve
to attest to any of the factors set forth in the conclusions supporting the SAM.
However, in signing the affirmation, the inmate's attorney and precleared staff[2]
acknowledge the restriction that they will not forward third-party messages to or
from the inmate.

    i.    The USA/EDNY shall present, or forward, the attorney affirmation of
receipt of the SAM restrictions document to the inmate's attorney.

    ii.    After initiation of the SAM and prior to the inmate's attorney being
permitted to have attorney-client privileged contact with the inmate, the
inmate's attorney shall execute a document affirming receipt of the SAM
restrictions document and return the original to the USA/EDNY.

    iii.    The USA/EDNY shall maintain the original of the SAM acknowledgment
document and forward a copy of the signed document to OEO in
Washington, D.C., and the USMS/BOP/DF.

b.    **Attorney Use of Interpreters/Translators -**

    i.    **Necessity Requirement** - No interpreter/translator shall be utilized unless
absolutely necessary where the inmate does not speak a common language
with the attorney. Any interpreter/translator shall be precleared.[3]

---

[2] "Precleared," when used with regard to an attorney's staff, or "precleared staff
member," refers to a co-counsel, paralegal, or investigator who is actively assisting the inmate's
attorney with the inmate's defense, who has submitted to a background check by the FBI and
USA/EDNY, who has successfully been cleared by the FBI and USA/EDNY, and who has
received a copy of the inmate's SAM and has agreed - as evidenced by his or her signature – to
adhere to the SAM restrictions and requirements. As used in this document, "staff member" also
refers to more than one staff member, and the provisions of this document shall be fully
applicable to each such staff member in his or her individual capacity. A "paralegal" will also be
governed by any additional DF rules and regulations concerning paralegals.

[3] "Precleared," when used with regard to an interpreter/translator, refers to an
interpreter/translator who is actively assisting the inmate's attorney with the inmate's defense,

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                          Page 7
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

      ii.    **Attorney Immediate Presence Requirement -** Any use of an interpreter/translator by the attorney shall be in the physical and immediate presence of the attorney – *i.e.*, in the same room. The attorney shall not patch through telephone calls, or any other communications, to or from the inmate.

      iii.    **Translation of Inmate's Correspondence -** An attorney of record may only allow a federally approved interpreter/translator to translate the inmate's correspondence as necessary for attorney-client privileged communication.

c.    **Attorney-Client Privileged Visits -** Attorney-client privileged visits may be contact or non-contact, at the discretion of the USMS/BOP/DF.

d.    **Attorney May Disseminate Inmate Conversations -** The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.

e.    **Unaccompanied Attorney's Precleared Paralegal(s) May Meet With Client -** The inmate's attorney's precleared paralegal(s) may meet with the inmate without the need for the inmate's attorney to be present. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.    **Simultaneous Multiple Legal Visitors -** The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors is the inmate's attorney or precleared paralegal. These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF. An investigator or interpreter/translator may not meet alone with the inmate.

g.    **Legally Privileged Telephone Calls -** The following rules refer to all legally privileged telephone calls or communications:

---

who has submitted to a background check by the FBI and USA/EDNY, who has successfully been cleared by the FBI and USA/EDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his or her signature – to adhere to the SAM restrictions and requirements.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 8
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

    i.      **Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls** - The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

    ii.     **Inmate's Initiation of Legally Privileged Telephone Calls** – Inmate-initiated telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

        (1)    The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

        (2)    The inmate's attorney must instruct his or her staff that:

            (a)    The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

            (b)    The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's calls, or any other communications, to third parties.

        (3)    No telephone call/communication, or portion thereof, except as specifically authorized by this document:

            (a)    Is to be overheard by a third party.[4]

            (b)    Will be patched through, or in any manner forwarded or transmitted, to a third party.

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney-client privileged communications.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 9
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

    (c)    Shall be divulged in any manner to a third party, except as otherwise provided in Section 2.d. above.

    (d)    Shall be in any manner recorded or preserved.[5] The inmate's attorney may make written notes of attorney-client privileged communications.

  (4)  If the USMS/BOP/DF, FBI, or USA/EDNY determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

 h.  **Documents Provided by Attorney to Inmate** - During a visit, the inmate's attorney may provide the inmate with, or review with the inmate, documents related to his defense, including discovery materials, court papers (including indictments, court orders, motions, etc.), and/or material prepared by the inmate's attorney, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator. Any documents not related to the inmate's defense must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2.h. and 3.g. Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

  i.  None of the materials provided may include inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/EDNY and FBI.

  ii.  The USA/EDNY may authorize additional documents to be presented to the inmate. If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document may be obtained from the USA/EDNY without the need to formally seek approval for an amendment to the SAM.

---

[5] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities. This section does not allow monitoring of attorney-client privileged communications.

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 10
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

    i.     **Legal Mail**[6] - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise), to third parties.

          In signing the SAM acknowledgment document, the inmate's attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that neither the attorney nor his or her staff will forward third-party mail to or from the inmate.

3.    **Inmate's Non-legal Contacts**

    a.     **Non-legally Privileged Telephone Contacts -**

        i.     The inmate is limited to non-legally privileged telephone calls with his immediate family members.[7]

        ii.    The quantity and duration of the inmate's non-legally privileged telephone calls with his immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

    b.     **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.     Is to be overheard by a third party.

        ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

        iii.   Shall be divulged in any manner to a third party.

        iv.   Shall be in any manner recorded or preserved.[8]

---

[6] "Legal mail" is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF- or FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis.

[8] Except by the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities.

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 11
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

All telephone calls shall be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is available to contemporaneously monitor the telephone call.  Arranging for an interpreter/translator may require at least fourteen (14) days' advance notice.

c.   **Telephone SAM Restriction Notifications -** For all non-legally privileged telephone calls to the inmate's immediate family member(s):

   i.   The USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

   ii.   The USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communication of the SAM restrictions.  The USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

   iii.   The USMS/BOP/DF shall document each such telephone notification.

d.   **Family Call Monitoring -** All calls with the inmate's immediate family member(s) shall be:

   i.   Contemporaneously monitored by the FBI.

   ii.   Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

   iii.   A copy of each inmate/immediate family member telephone call recording shall be provided by the USMS/BOP/DF on a single, individual cassette tape or compact disk (per call) for forwarding to the FBI.  These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.   **Improper Communications -** If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 12
Pursuant to 28 C.F.R. § 501.3
Inmate -- Mohamed

time to be determined by the USMS/BOP/DF.  If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.     **Non-legal Visits -**

   i.     **Limited Visitors -** The inmate shall be permitted to visit only with his immediate family members. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI in advance.

   ii.    **English Requirement -** All communications during non-legal inmate visits will be in English unless a fluent USMS/BOP/DF- or FBI-approved interpreter/translator is readily available to contemporaneously monitor the communication/visit.  Arranging for an interpreter/translator may require at least fourteen (14) days' advance notice

   iii.   **Visit Criteria -** All non-legal visits shall be:

      (1)    Contemporaneously monitored by the USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

      (2)    Permitted only with a minimum of fourteen (14) calendar days' advance written notice to the USMS/BOP/DF facility where the inmate is housed.

      (3)    Without any physical contact.  All such meetings shall be non-contact to protect against harm to visitors or staff.

      (4)    Limited to one adult visitor at a time.  However, the FBI-verified children of the inmate may visit with a pre-approved adult visitor.

g.     **Non-legal Mail -** Non-legal mail is any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). Non-legal mail is limited to only the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 13
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

    i.     **General correspondence with limitations** - Correspondence is restricted to immediate family members. The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI.

    ii.    **General correspondence without limitations** -There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order, or discipline of the institution, the public, or national security may be jeopardized.

    iii.    All non-legal mail shall be -

        (1)   **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his or her designee, of the facility in which the inmate is housed.

        (2)   **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI.

        (3)   **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail shall be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming), or directly to the addressee (outgoing).

    iv.    The federal government shall forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

        (1)   A reasonable time not to exceed fourteen (14) business days for mail that is written entirely in the English language.

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 14
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

      (2)    A reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation.

      (3)    A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

    v.    **Mail Seizure -** If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. The inmate shall be notified in writing of the seizure of any mail.

4.    **Communication With News Media**

The inmate shall not be permitted to speak, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, his attorney, or a third party; or otherwise.

5.    **Religious Visitation**

    a.    The inmate shall not be allowed to engage in group prayer with other inmates.

    b.    If a USMS/BOP/DF- and/or FBI-approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.    **No Communal Cells and No Communication Between Cells**

    a.    The inmate shall not be allowed to share a cell with another inmate.

    b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                          Page 15
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

7.    **Cellblock Procedures**

    a.    The inmate shall be kept separated from other inmates as much as possible while
in the cellblock area.

    b.    The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and
existing confinement conditions, from communicating with any other inmate
while in the cellblock area.

8.    **Commissary Privileges**

The USMS/BOP/DF shall restrict access to commissary items or any other objects
determined by the USMS/BOP/DF to be capable of being converted into dangerous
instruments.

9.    **Access to Mass Communications**

To prevent the inmate from receiving and acting upon critically timed information or
information coded in a potentially undetectable manner, the inmate's access to materials
of mass communication is restricted as follows:

    a.    **Publications/Newspapers -**

        i.    The inmate may have access to publications determined not to facilitate
criminal activity or be detrimental to national security; the security, good
order, or discipline of the institution; or the protection of the public. This
determination is is to be made by the USMS/BOP/DF, in consultation with
the USA/EDNY.

        ii.    Sections of any publication/newspaper that offer a forum for information
to be passed by unknown and/or unverified individuals, including but not
limited to classified advertisements and letters to the editor, should be
removed from the publications/newspapers prior to distribution to the
inmate.

        iii.    If restricted by the USMS/BOP/DF rules, access to a publication will be
denied. If acceptable, upon delivery, the USMS/BOP/DF will review the
publication and make the initial determination. If the FBI's expertise is
required, the publication will be forwarded to the FBI for review. The
USMS/BOP/DF will also forward the publication to the FBI if translations
are needed to make that determination. (In these cases, the FBI shall

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 16
Pursuant to 28 C.F.R. § 501.3
Inmate — Mohamed

respond to the USMS/BOP/DF within fourteen (14) business days.) The inmate shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

iv.    In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share the publication(s) with any other inmates.

b.    **Television and Radio -** The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

c.    **Termination or Limitation -** If the USMS/BOP/DF determines that mass communications are being used as a vehicle to send messages to the inmate relating to the furtherance of violent or criminal activities, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

10.    <u>**Access to Books**</u>

The inmate may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of terrorism or violence and/or whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share books with any other inmates.

11.    <u>**Transfer of Custody**</u>

In the event that the inmate is transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for this inmate shall continue in effect, without need for any additional DOJ authorization.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 17
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

12.    **Inmate's Consular Contacts**

The inmate, who is a citizen of a foreign country, shall be allowed Consular
communications and visits, consistent with USMS/BOP/DF policy. The Consular contacts shall
comply with the U.S. Department of State (DOS) Consular notification and access
requirements.[9] Prior to permitting any Consular contact, the FBI will verify the Consular
representative's credentials with the DOS.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney-client privileged
communications and family contact, are reasonably necessary to prevent the inmate from
committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these
measures are the least restrictive that can be tolerated in light of the ability of this inmate to aid,
knowingly or inadvertently, in plans that create a substantial risk that the inmate's
communications or contacts with persons could result in death or serious bodily injury to
persons.

With respect to telephone privileges, the SAM are reasonably necessary because of the
high probability of calls to co-conspirators to arrange terrorist or criminal activities.

With respect to mail privileges, the SAM are reasonably necessary to prevent the inmate
from receiving or passing along critically timed messages. Although I recognize that eliminating
the inmate's mail privileges entirely may be an excessive measure except in the most egregious
of circumstances, I believe that delaying mail delivery and allowing authorized personnel to
examine a copy of the mail is sufficient at this time to adequately ensure that the mail is not used
to deliver requests for, or to assist in, violent and/or terrorist activities. Under these procedures,
the inmate can relate personal news to family members, even if delayed, but he may find it
difficult or unwise to pass along restricted information.

To the extent that the use of an interpreter/translator is necessary, the government has the
right to ensure that the interpreter/translator given access to the inmate is worthy of trust.

---

[9] *See* Consular Notification and Access, Instructions for Federal, State, and Local Law
Enforcement and Other Officials Regarding Foreign Nationals in the United States and the
Rights of Consular Officials to Assist Them, DOS. The DOS contact is the Consular
Notification and Outreach Division, Office of Policy Coordination and Public Affairs, DOS,
telephone (202) 485-7703 or http://www.travel.state.gov/law/consular/consular_753.html.

LIMITED OFFICIAL USE

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 18
Pursuant to 28 C.F.R. § 501.3
Inmate – Mohamed

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if the inmate advocates terrorist, criminal, and/or violent offenses, or if he makes statements designed to incite such acts. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate solicits or attempts to arrange a violent or terrorist act to justify such media restrictions.

The SAM's limitations on access to mass communications are reasonably necessary to prevent the inmate from receiving and acting upon critically timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. Although I recognize that eliminating the inmate's access to such media may be an excessive measure except in the most egregious of circumstances, I believe that limiting and/or delaying such access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information that furthers terrorist, violent, and/or criminal activities.

**SAM CONTACT INFORMATION**

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 1301 New York Avenue, N.W., JCK Building, Room 1200, Washington, D.C. 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.

# EXHIBIT B

# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

October 8, 2014

Ms. Zainab Ahmad and Ms. Celia Cohen
Assistants United States Attorney
United States Attorney's Office
271 Cadman Plaza East, 4th Floor
Brooklyn, N.Y. 11201

Mr. Adam Johnson
Supervisory Staff Attorney
CLC New York
Metropolitan Correctional Center
150 Park Row
New York, N.Y. 10007

<u>U.S.A. v. Alhassane Ould Mohamed, 13 CR 0527 (WFK)</u>

Dear Ms. Ahmad, Ms. Cohen, and Mr. Johnson:

## **Preliminary Statement**

We set forth in this letter objections to the Special Administrative Measures ("SAMs") of July 15, 2014, imposed upon our client, Mr. Alhassane Ould Mohamed, and make recommendations about modifications. We do so now in light of our experience with the SAMs as actually put into practice by and interpreted by the government, including the Bureau of Prisons ("BOP"). We direct this letter to whoever has authority to modify the SAMs, whether the Assistants U.S. Attorney ("AUSAs"), the Metropolitan Correctional Center ("MCC"), or the Office of Enforcement Operations ("OEO"), Criminal Division. If modifications require the decision, input or approval of the OEO, Criminal Division, we ask that you forward them this letter.

Regardless of the overall legitimacy of the SAMs (and we reserve the defendant's rights to make any and all further objections), we assume in this letter that the purported purpose is

1

what the SAMs says it is: to avoid a "substantial risk that [Mr. Mohamed's] communications or contacts with persons . . . result in death or serious bodily injury to persons, or substantial damage to property . . . ." SAMs, at 1; see also id. at 4 (the SAMs "are appropriate" because of "the likelihood that Mohamed may attempt to use his terrorist connections to retaliate against government witnesses . . . ."); 5 (referring to "the SAM's intent of significantly limiting the inmate's ability to communicate . . . information with intent to harm others."); 11 (indicating that the SAMs should keep the inmate from discussing "illegal activity" or "the soliciting of or encouraging of acts of violence . . . ."); 14 (similar to p. 11); 17 ("The SAM . . . are reasonably necessary to prevent the inmate from committing, soliciting, or conspiring to commit additional criminal activity.")  The objections we make and the modifications we propose do not interfere with the government accomplishing its stated goal.

Although the government describes its measures as the least restrictive alternatives, see SAMs, at 17 ("[T]hese measures are the least restrictive that can be tolerated . . . ."), the SAMs here block, hamper and create an obstacle path to counsel's ability to represent Mr. Mohamed; jeopardize his mental health, well-being and stability; and risk creating his incompetence. They also violate due process and the attorney-client and work-product privileges. Finally, they are also often obscure, failing the test of clarity and precision necessary for a document of this sort.

Since so many of the provisions are illogical, unnecessary and not tailored to Mr. Mohamed's specific circumstances (rather appearing often to be boilerplate lifted from other SAMs relating to totally different defendants), we set forth not only objections. We also set forth solutions. We hope that these solutions can help create conditions of confinement that meet the government's concerns while not violating Mr. Mohamed's rights.

### Objections to Specific SAMs

**§2.a., p. 6, and §2.h.iii., p. 9 (mislabeled as i rather than iii):** Section 2.a., p. 6 requires "the inmate's attorney and precleared staff to acknowledge the restriction that they will not forward third-party messages to or from the inmate." Section 2.h.iii, p. 9 bars counsel and his staff from "forward[ing] third-party mail to or from the inmate."

Section 2.a., p. 6 is both vague and overbroad, and section 2.h.iii, p. 9 is overbroad. First, the first provision leaves obscure what "messages" are. Second, both provisions presumptively target political communications but may also bar counsel from using information obtained from the defendant in representing him and from conveying personal, non-political information to family members.

The biggest problem is that §2.a., p. 9 interferes with counsel's ability to represent their client effectively. To develop a defense, counsel must use information that clients provide, and pass that information on to investigators, researchers, and experts. Counsel should not have to fear that if they use information, which otherwise they would use in the normal course, they face

2

sanctions or prosecution for violating the SAMs. Nor, in representing clients, should counsel have to forego the use of valuable information that their clients provide.

Another problem is that both provisions interfere with Mr. Mohamed's ability to communicate with his family. For a man now in solitary confinement, such contact, whatever form it may take, is crucial for his mental well-being. Family contact is critical for normal human relations. Furthermore, for a man who is illiterate, or semi-literate at best, counsel plays an indispensable role in maintaining Mr. Mohamed's contact with his family. Finally, counsel's role in maintaining that contact is all the more critical where, as here, the client's family lives abroad and phone connections between here and his family in Mali are bad.

Since Mr. Mohamed's transport from Mali to the United States, he has had no contact with his family. While we have finally managed to reach immediate family members on a regular basis, the SAMs seem to forbid us from telling them anything beyond the fact that we have met with him. Ordinarily, when a client cannot contact his immediate family we let the immediate family members know the basics about his well-being, i.e., that he says that he is in good health and spirits, that he wants them to deposit money in his commissary account, and that he sends his love and does not want them to worry. The SAMs seem to prevent us from sending even simple messages, human messages, like these, which could alleviate unnecessary worry on the part of our client and his family alike.

The concern that messages to family members may be a disguised political messages is no answer. The government has provided no evidence that Mr. Mohamed has ever used codes or that he intends to do so now. The possibility is particularly remote for an illiterate, or semi-literate, man. Defense counsel understand the obligation not to pass on political messages, are sophisticated enough to be alert to the risk, and doubt that Mr. Mohamed is in a position to manipulate them. Furthermore, defense counsel would never pass on information that they themselves do not understand. Finally, defense counsel would not simply pass on untranslated messages. There is no reason why the SAMs cannot accommodate defense counsel facilitating the communication of personal messages, unrelated to politics, with immediate family members as part of defense counsel's general attempts to establish and maintain trust with their client and to watch out for his mental health.

**§2.d., p. 7:** This provision states: "The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff."

Section 2d., p. 7 prohibits anyone, except the inmate's attorney, from disseminating the contents of the inmate's communications. The prohibition is again both vague and overbroad. The meaning of the critical verb "disseminate" is unclear and the restriction on dissemination to Mr. Mohamed's counsel personally is impractical, if not impossible, so long, that is, that counsel strive to provide their client with effective assistance. Investigators, experts and researchers may

need to rely on information obtained from Mr. Mohamed and incorporate that information into their further inquiries. Are they barred from doing so? Do defense counsel risk accusations of violating the SAMs, for example, if they instruct investigators to interview prospective witnesses and pursue lines of inquiry based on information obtained from Mr. Mohamed? Is the alternative that counsel must act as their own investigators, experts and researchers, or risk violating the SAMs?

The last alternative, i.e., that counsel act as their own investigators, experts and researchers, is impossible in the present circumstances. The offense took place in Niger, which is poor and unstable. The arrest took place in Mali, which is war torn. Travel to much of both countries is unsafe. Research and investigation will require knowledge of French and Arabic, as well as Tamasheq, Songhai, Hausa, and Zarma – languages beyond the ken of defense counsel. If barred from providing investigators, experts and researchers with any information from Mr. Mohamed, defense counsel cannot provide the effective assistance of counsel required by the Sixth Amendment.

There is another problem. In undertaking investigations and developing a legal defense, with the complex evolution of such processes, especially in a complicated case such as this one, how is counsel supposed to segregate the sources of information, both information obtained from Mr. Mohamed as opposed to from other sources, and information obtained before the imposition of the SAMs as opposed to thereafter?

**§2.a. fn.2, p. 6:** This provision defines "precleared staff" as "a co-counsel, paralegal, or investigator who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/EDNY, who has successfully been cleared by the FBI and USA/EDNY, and who has received a copy of the inmate's SAM and has agreed . . . to adhere to the SAM restrictions and requirements."

The definition of "precleared staff" is overly restrictive by excluding staff at Federal Defenders of New York, Inc. ("FDNY"), who are not co-counsel, paralegals or investigators, and by excluding outside experts, or the like, who FDNY might retain. There is no rational basis for this restriction since any staff who is actively assisting counsel must still submit to the background check and be cleared. Furthermore, the restriction denies equal protection of the law, discriminating against the defense and in favor of the prosecution by creating bureaucratic obstacles that only the defense, not the prosecution, must face, and thus providing the prosecution with an unfair advantage. Finally, the imposition of such bureaucratic obstacles burden the defendant's Sixth Amendment right to effective assistance of counsel. The irrationality of the provision, its denial of equal protection, and its burden on the Sixth Amendment are all even more egregious because a case as complicated and unusual as this one calls for a series of atypical experts and consultants, of the kind that no law office would have in house.

The problem is hardly theoretical. This irrational and overly restrictive provision has already created a substantial delay in undertaking a psychological evaluation of Mr. Mohamed, which still has not occurred.

**§§2.e. and f., p. 7:** Section 2.e. allows precleared paralegals to meet with the inmate without the presence of the inmate's attorney but §2.f. does not allow an investigator to do so. There is no reasoned basis for barring an investigator from meeting alone with the defendant. Both paralegals and investigators need preclearance, which provides the necessary assurance of trustworthiness. See §2.a., fn, 2, p. 6. There is no reason to believe that the title of investigator or an investigator's function is qualitatively different from a paralegal's for purposes of abiding by SAMs or creates any reason why an investigator cannot meet alone with the defendant. For similar reasons, these provisions are unreasonable to the extent that they bar outside experts, such as mental health professionals, from meeting alone with the defendant.

**§§2.g.ii., p. 8, and 2.b.ii., p. 7:** Section 2.g.ii. allows the inmate to initiate legally privileged telephone calls. But that right is rendered null and void because §2.b.ii limits the attorney to using an interpreter who "shall be in the physical and immediate presence of the attorney – *i.e.*, in the same room. The attorney shall not patch through phone calls, or any other communication, to or from the inmate."

As matters now stand, Mr. Mohamed could rarely call counsel since FDNY does not have a French or Arabic interpreter on staff or regularly in the office.

A simple modification could solve the problem. Section 2.b.ii should be modified to eliminate the words "physical and," and the words "*i.e.*, in the same room," and should add at the end that "the attorney may talk with the inmate with an interpreter who participates by conference call after the interpreter has represented to the attorney that nobody else is listening in on the conversation or is in earshot of the interpreter." Accord. §2.g.ii.(1)("The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate."). This proposed modification provides the protection that the government seeks since any interpreter who the government has precleared to work on the case is trustworthy.

**§2.g.ii.(3)(a), fn. 4, p. 8, and §2.g.ii.(3)(d), fn. 5, p. 9:** We object to these provisions to the extent that they permit federal authorities to hear, record or otherwise have access to attorney-client privileged communications.

Footnote 4 excludes "officials of the USMS/BOP/DF, FBI, DOJ, or other duly authorized federal authorities" from the definition of a "third party," and thus from the prohibition on third parties "overhear[ing]" attorney-client privileged phone calls. See §2.g.ii.(3)(a). Footnote 4 adds that "[t]his section does not allow monitoring of attorney-client privileged communications." Similarly, footnote 5 allows federal authorities to record or preserve but not to monitor attorney-client privileged communications.

5

The drafting is either sloppy or foxy. If §2.g.ii.(3)(a) uses the verbs "overhear" and "monitor" as synonyms, then the prohibition against federal authorities listening in on privileged communications is clear. But if the section implicitly distinguishes overhearing from monitoring, the distinction is obscure. Similarly, §2.g.ii.(3)(d) in combination with footnote 5 allows federal authorities to record or preserve attorney-client privileged communications but leaves obscure if, and if so, under what circumstances and with what notice to the defendant and counsel, any government authority may listen to such communications.

We object to the violation of the attorney-client privilege and the Sixth Amendment. We ask for clarification of the meanings of these provisions. And we ask for notification of any time, in the past or future, that the government has overheard or monitored in any way attorney-client communications.

**§2.g.ii.(3)(a), fn. 4, p. 8; and §2.g.ii.(3)(d), fn. 5, p. 9; §3.c.iii., 3.d.ii., and 3.d.iii., all on p. 11:** To the extent that the government construes these, or any other provisions, to allow it to monitor, overhear or in any way listen to Mr. Mohamed's phone calls, whether privileged or non-privileged, we make three requests. The underlying principle for these three requests is that the SAMs may serve their function of assuring security without the government misusing, manipulating or exploiting the SAMs to gain an unfair litigation advantage.

First, we ask for a regular accounting of every one who has heard the phone conversation, whether live or on tape, including each person's name and position. Second, we ask that those people who hear such phone conversations exclude any and all agents or other government employees engaged in, consulted with, or otherwise involved in prosecuting the federal case. Third, we ask that the contents of such phone conversations not be passed on to the prosecution.

**§2.h., p. 9:** This provision allows counsel to "provide the inmate with, or review with the inmate, documents related to his defense . . . so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator."

We object to this provision because the subordinate clause "if translation is necessary" is ambiguous, possibly mandating the translation of all documents reviewed with Mr. Mohamed because he does not speak English. The clause may imply that counsel cannot provide Mr. Mohamed with anything in English and must arrange for translations into French or Arabic of all documents reviewed with him. We suspect that the problem results from poor drafting, in which case we ask simply for clarification. In the alternative, we can arrange for the translations and send the government the bill.

**§2.h.i., p. 9:** This provision states: "None of the materials provided [by counsel to Mr. Mohamed] may include inflammatory materials, materials inciting violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/EDNY and FBI."

We object to this provision as vague.  The problem is that much material relating to the government's allegations involve groups that the government claims use violence.  Under the heading "Mohamed's Terrorist Connections," the government's Memorandum setting forth the SAMs names six such groups. See SAMs, at 3-4.  Does §2.h.i. bar counsel from reviewing that portion of the SAMs with their client?  Does this provision bar such review even though the SAMs implies that the government must have reviewed those pages with him as part of their notice to him? See id. at 4.  Does this provision bar counsel from sharing with their client the results of any investigation that they might undertake to respond to the government allegations?  The interpretation that the government may refer to inflammatory material but defense counsel cannot review with their client material that describes such groups would deny Mr. Mohamed equal protection of the law, due process, and the Sixth Amendment right to effective assistance of counsel.

The possible answer that counsel need only preclear any such materials with the USA/EDNY and FBI worsens the problem by also trenching on the work-product privilege.  That solution gives the government an unfair advantage by granting it clues to defense strategy.

Another problem is whether the government takes the position that this provision bars counsel from reviewing with their client certain material that the government itself has produced in discovery.  We ask that the government state whether it has precleared all discovery material for review by the defendant.

The bottom line is that defense counsel would obviously not provide their client with material for the purpose of inciting him to commit further crimes.  Doing so would violate the SAMs and, even without the SAMs, would violate professional ethics.  But defense counsel should be able to provide their client and review with him material related to the offenses that the government has charged and the allegations that the government has made.

**§3.a.i., p. 10:** This provision includes within its definition of "immediate family members" the defendant's "spouse."  The singular should be changed to the plural.

**§3.a.ii, p. 10:** This provision sets "a minimum of one call per month" between Mr. Mohamed and his immediate family members.  For a man in solitary confinement, phone calls with family are important.  The minimum of one per month is too few.

**§3.b.iv, p. 11:** This provision requires that Mr. Mohamed's phone calls with immediate family members "be in English unless a fluent . . . approved interpreter/translator is available to contemporaneously monitor the telephone call," in which case "[a]rranging for an interpreter/translator may require at least fourteen (14) days advance notice."

The problem is that this provision unduly burdens someone, like Mr. Mohamed, who does not speak English.  Since the BOP is already on notice that Mr. Mohamed will always need an interpreter for phone calls with immediate family members, and since coordinating phone

7

calls with family members abroad in a poor country like Mali is already hard enough, the arrangements for an interpreter/translator should require no more than seven (7) days advance notice.

**§3.c.ii., p. 11:** This provision requires the USMS/BOP/DF to "verbally inform the inmate's immediate family member(s) on the opposite end of the inmate's telephone communications of the SAM restrictions. The USMS/BOP/DF is only required to notify the inmate's communication recipient in English."

We object to the last sentence of this provision to the extent the government construes it as barring Mr. Mohamed's phone calls with family members because they cannot understand SAMs restrictions explained to them in English. We assume that Mr. Mohamed's family members speak the same languages as he does, i.e., French and Arabic, not English.

We add that we cannot fathom the purpose of the last sentence. The government will have an interpreter present "to contemporaneously monitor the telephone call." See §3.b.iv., p. 11. Why can't such an interpreter "notify the inmate's communication recipient" in the language of the imminent phone call, whether in French or Arabic or both? Perhaps, the government's position is that it need only inform the family members of the SAMs restrictions in English, regardless of whether they understand. If so, the approach seems silly, but that is the government's business. If not, the government should eliminate the provision's last sentence. The bottom line is that the SAMs cannot prevent a defendant from speaking with immediate family members because they do not speak English.

**§3.g.i., p. 13:** In our letter of September 3, 2014, we objected to the government's interpretation that counsel could not assist Mr. Mohamed, who is illiterate or semi-literate, in taking dictation of a letter to his family, thereby simply reducing to writing the letter he composed in his head (the only place he can compose a letter), and then providing the hard copy to him for sending to his family. We renew our objections and requests – to which nobody has responded – whether the government has reconsidered its interpretation, as it should, or made a modification to the SAMs, to facilitate the reasonable procedure we have proposed.

**§3.c.iii., 3.d.ii., and 3.d.iii., all on p. 11:** These provisions provide for documentation of each of Mr. Mohamed's phone calls with his family, the contemporaneous recording of those phone calls, and a copy of each recording "on a single, individual cassette tape or compact disk (per call) . . . ."

We request for all past and future phone calls copies of the documentation, including transcripts and translations, and the respective cassette tapes or compact disks.

**§3.g.iii., p. 13:** This provision requires the Warden or his or her designee to copy all non-legal mail, forward it "to the location designated by the FBI," and await a government analysis and approval before delivering it to Mr. Mohamed.

8

We request that defense counsel be provided copies of the non-legal mail and be informed if, and when, the mail is delivered to Mr. Mohamed.

**§3.g.iv.(2), p. 14:** This provision requires the government to forward non-legal mail to Mr. Mohamed "after a review and analysis period of" a "reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation."

This provision is contradictory in requiring a "reasonable time" and allowing that time to last up to sixty days, which is not reasonable, especially if the mail is in French or Arabic, both languages for which translators and interpreters are readily available. There is no reason why the time period should not be the same "fourteen (14) business days for mail that is written entirely in the English language." See §3.g.iv.(1), p. 13.

**§3.g.v., p. 14:** According to this provision, the government will notify the inmate "in writing of the seizure of any mail" based on the government's determination that the mail contains "overt or covert discussions of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM . . . ."

We request that the government copy defense counsel on any such notification. There are two reasons for this request. First, copying defense counsel will help assure that Mr. Mohamed actually receives notice, which is otherwise doubtful since he is illiterate or semi-literate. Second, seizure of mail under such circumstances implicates the prosecution of the case and is necessary for counsel to know in order to provide effective representation.

**§3.f., p. 12:** This provision limits Mr. Mohamed's non-legal visits to his immediate family members. Since all of Mr. Mohamed's immediate family members live in Africa, and since there is no realistic expectation that any of them can travel to the United States, this provision, as a practical matter, prevents Mr. Mohamed from any non-legal visits, further limiting the human interactions that are so necessary for mental health.

There is an alternative. Defense counsel can work with the government to find a mutually agreeable charitable organization that can send precleared volunteers on a regular schedule to visit Mr. Mohamed for the purpose of conversations and activities unrelated to the case or politics.

**§3.g., p. 12:** This provision limits non-legal mail "to only the inmate's immediate family, U.S. courts, federal judges, U.S. Attorneys' Offices, members of U.S. Congress, the BOP, or other federal law enforcement entities."

This provision is both over-inclusive and under-inclusive. It is over-inclusive to the extent that it includes the U.S. Attorneys' Offices and other federal law enforcement entities, which could encourage U.S. Attorneys' Offices or other federal law enforcement entities to

9

engage in ex parte communications with Mr. Mohamed and violate, interfere with, or otherwise erode his Sixth Amendment rights. The provision is under-exclusive in excluding entities that Mr. Mohamed may have legitimate reasons to contact, such as the Red Cross or Red Crescent, or the Embassy or Consulate of Mali.

In regard to non-legal mail to and from the Embassy or Consulate of Mali, this provision contradicts §12, p. 17, which "allow[s] Consular communications . . . consistent with USSMS/BOP/DF policy" and in compliance "with the U.S. Department of State (DOS) Consular notification and access requirements." The DOS's "Consular Notification and Access, Instructions for Federal, State, and Local Law Enforcement and other Officials Regarding Foreign Nationals in the United States and the Rights of Consular Officials to Assist Them" states: "Foreign consular officers must be given access to their nationals and permitted to communicate with them. Such officers have the right to visit their nationals, to converse and *correspond* with them, and to arrange for their legal representation." (P. 10; emphasis added.)

**§6.b., p. 14:** This provision limits Mr. Mohamed "from communicating with any other inmate by making statements audible to other inmates . . . ."

There are three points to make about this provision – which enforces solitary confinement with a vengeance.

First, this provision is inhumane. Human interaction is normal, healthy and necessary. Its deprivation is cruel and damaging to Mr. Mohamed's mental health.

Second, there is no reason to believe that Mr. Mohamed would, or could, pass on messages to other inmates, especially since there is no reason to believe that he knows any other inmates or that he would have contact with any inmate who spoke either French or Arabic.

Third, this provision may be construed to put the onus on Mr. Mohamed to avoid contact with other inmates whereas the BOP should be in control of the location of inmates, especially if it chooses, as here, to isolate one.

The government should eliminate this cruel provision altogether. In the alternative, the government should clarify that this provision imposes no obligation on Mr. Mohamed. There is a reasonable alternative. The government should assure that Mr. Mohamed regularly has contact with other inmates, even if under a highly controlled setting that addresses security threat concerns, to assure that he has the human contact necessary for human existence.

**§§7.a., and 7.b., p. 15:** Section 7.a states.: "The inmate shall be kept separated from other inmates as much as possible while in the cellblock area." Section 7.b. states: "The inmate shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area."

In addition to the objections stated above for §6.b., p. 14, we object to these two provisions to the extent that they are construed to impose an obligation on Mr. Mohamed rather than to set forth directives to the MCC.

<u>**Conclusion**</u>

For the reasons set forth above, we ask that the government respond to our objections and modify the SAMs along the lines requested above. We would also welcome discussions with the goal of coming up with conditions of confinement that both address the government's security concerns underlying the SAMs and protect Mr. Mohamed's mental and physical health and overall well-being while he awaits trial.

Sincerely,

Douglas G. Morris, Esq.
Assistant Federal Defender
718-330-1209 (W)
718-855-0760 (FAX)
douglas_morris@fd.org

cc:   Ms. Mildred Whalen, Esq.

Clerk of the Court

Mr. Mohamed Ould Alhassane

# EXHIBIT C



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| ZA:SPN | *271 Cadman Plaza East* |
| F. #2012R00596 | *Brooklyn, New York 11201* |

November 14, 2014

<u>By Email and ECF</u>

Douglas Morris, Esq.
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

   Re: United States v. Alhassane Ould Mohamed
     <u>Criminal Docket Number 13-527 (WFK)</u>

Dear Mr. Morris:

   We write in response to your letter dated October 8, 2014, in which you variously object to, seek clarification of, and propose modifications to the Special Administrative Measures (SAMs) imposed on the above-referenced defendant on July 15, 2014 at the direction of the Attorney General.

   As you know, the SAMs are meant to address the substantial risk that the defendant, an extremely violent individual with strong ties to active terrorist organizations in West Africa, might attempt to communicate with co-conspirators, encourage violent retaliation against government witnesses, or otherwise solicit or assist in violent or terrorist activities. The defendant has a long history of violent conduct, including the charged murder of a civilian Department of Defense employee in 2000, the murder of four Saudi nationals in 2009, and the murder of three Nigerien prison guards during the defendant's escape (his second) from prison. Strict limitations on the defendant's ability to communicate freely with fellow inmates and with outside parties were imposed—and are interpreted and enforced—in view of this background.

   The government is mindful, of course, of the need to protect the defendant's mental and physical well-being as he awaits and prepares for trial. As discussed with you in person on October 24, 2014, and as detailed and demonstrated below, the government shares your goal of establishing conditions of confinement that address for your needs as defense counsel, the need to protect the defendant's health, and the government's security concerns.

I.      Interpretive Questions

Throughout your October 8 letter, you raise questions concerning the scope of several of the SAMs provisions and object to the use of language you view as overbroad or vague.  The drafting of the SAMs is, of necessity, an exercise in line drawing that does not permit of perfect precision.  To the extent you perceive ambiguity in the terms of the SAMs, such terms should be interpreted using common sense, an understanding of the underlying purpose of the restrictions and, as you put it, your experience with the SAMs "as actually put into practice by and interpreted by the government, including the Bureau of Prisons."

A.      SAMs Sections 2.a, 2.d, and 2.h.iii – Third Party Messages

The SAMs provisions barring the forwarding of third-party messages from the defendant do not prevent defense counsel from using information provided by the defendant to develop a defense, including by sharing such information with investigators, researchers, and experts.  To share information is not necessarily to forward a message.  The former is permitted; the latter is not.  Similarly, the SAMs permit investigators, researchers, and experts to rely on information provided by the defendant, through defense counsel, in conducting interviews or otherwise carrying out their roles in building a defense, so long as that reliance does not become active dissemination of the defendant's communications.

The government does not interpret the provisions concerning third-party messages to preclude defense counsel from sharing observations about the defendant's health, spirits, or general well-being with the defendant's parents.  In the government's view, such observations by defense counsel do not constitute the forwarding of third-party messages within the meaning of the relevant SAMs provisions.  However, defense counsel may not forward personal messages from the defendant to third parties.

B.      SAMs Section 2.h – Translation of Documents

SAMs Section 2.h simply requires that if the defense deems it necessary to translate a document related to the defense in order to review the document with the defendant, such translation must be conducted by a pre-cleared translator/interpreter.

C.      SAMs Section 2.h.i – Inflammatory Materials

SAMs Section 2.h.i bars defense counsel from providing the defendant with inflammatory materials, materials that incite violence, military training materials, and materials that may be used to pass messages from inmate to inmate, unless such materials have been pre-cleared.  This provision should not be interpreted to prevent defense counsel from sharing materials related to building a defense, such as discovery materials or the results of defense investigations.

D.     SAMs Section 3.c.ii – Informing Family Members of SAMs Restrictions

The government does not construe SAMs Section 3.c.ii to bar the defendant from calling family members who cannot speak or understand English.  The government agrees that, if feasible, and subject to Bureau of Prisons ("BOP") approval, it may make sense to have the interpreter assigned to monitor family calls translate the notice of SAMs provisions required to be provided to the defendant's family members.

E.     SAMs Section 3.a.9 – Defendant's Spouses

It is the government's understanding that the BOP interprets "family members" to include the defendant's spouses.

II.     SAMs Sections 2a, fn. 2; 2.e; and 2.f – Pre-Cleared Staff/Investigators

Regarding your objection to SAM Section 2a., fn.2, it is the government's understanding that the BOP cleared a doctor to visit your client and perform a psychological evaluation several weeks ago, and that a system is in place for clearing additional defense personnel as warranted.  Should you run into difficulty securing clearance for personnel other than the pre-cleared staff already covered by the SAMs, please do not hesitate to contact us.

Sections 2.e and 2.f are designed to limit the people who may meet alone with the defendant to core members of the defense team, including attorneys and paralegals. Should you have a need to send a staff investigator to meet with the defendant alone, without sending a paralegal, please let us know and we will explore the possibility of a one-time or temporary SAM modification, as with the recently cleared psychologist.

III.     SAMs Sections 2.g.ii(3)(a), fn. 4; 2.g.ii(3)(d), fn. 5; 3.c.iii; 3.d.ii; and 3.d.iii – Call Monitoring

The government does not interpret the SAMs to permit the monitoring of privileged attorney-client communications.  The government is not aware of any instance in which a government official has been privy to this defendant's attorney-client communications.

The BOP commonly records telephonic communications by inmates, and the defendant's communications are no exception.  The government will provide the defendant with any discoverable documentation or recordings of the defendant's phone calls.

IV.     SAMs Sections 2.b.ii; 3.a.ii; 3.b.iv; 3.g; 3.g.iii; 3.g.iv; and 3.g.v – Call and Mail Limitations

As discussed during our meeting last month, Section 3.b.ii sets a minimum number of calls per month, not a maximum.  The determination as to how many calls the defendant will be permitted is left to the discretion of the BOP.  It is the government's understanding that the BOP is willing to accommodate and/or facilitate a call to a group of

3

approved, immediate family members to the extent defense counsel is able to arrange such a call.

Similarly, Section 3.b.iv sets the maximum notice that may be required for the BOP to arrange for an interpreter to monitor calls with family, and Section 3.g.iv provides a maximum period of time that may be required for the government to review non-legal mail. These provisions set reasonable deadlines meant to reflect the outer limits of time permitted to carry out the relevant requirements.  Please do not hesitate to contact us if, in actual practice, the implementing agencies exceed or regularly use all of the allotted time.

To the extent you find that, in practice, you are unable to arrange for the defendant to call you at times when a cleared interpreter can be present with you, please let us know and we will consider supporting an amendment to Section 2.b.ii along the lines you suggest.

The defendant may provide defense counsel with copies of non-legal mail once it has been cleared and forwarded to the defendant, and/or copies of any mail seizure notifications provided pursuant to Section 3.g.v, to the extent he chooses to do so.  The government will provide the defense with copies of any discoverable, non-legal mail that is held back owing to security or related concerns.

Notwithstanding your suggestion to the contrary, the government obviously does not view Section 3.g as an encouragement to engage in ex parte or other improper communications with the defendant.  Nor does the government interpret the provision to bar the Consular communications referenced in Section 12.

V.      SAMs Section 3.g.i – Dictation of Letters

A proposed amendment the SAMs to permit defense counsel to take dictation of letters to the defendant's family members, to be mailed by the defendant in accordance with the relevant SAMs provisions, is under review.  We will inform you of the government's decision as soon as possible.

VI.     SAMS Sections 3.f; 6.b; 7.a; and 7.b – Communication And Contact Within The MCC

Provisions barring the defendant from communicating and associating with other inmates are directed in part at BOP officials tasked with keeping the defendant physically separated from other inmates and limiting the defendant's ability to communicate with other inmates.  These provisions also require the defendant to avoid communication and contact with other inmates.  Restricting the defendant's ability to communicate with his fellow inmates is among the basic security precautions typical of SAMs, particularly when, as here, the inmate has demonstrated that he is both extremely violent and able to inspire violence in others.  Your suggestion that there is no reason to believe that the defendant would or could pass messages to other inmates is belied by his recent efforts to do just that, prompting disciplinary action by the BOP.

4

The government understands that the BOP has already taken steps to address your concern that the defendant is unduly isolated, and that such isolation may affect his mental well-being.  First, the BOP reports that mental health and other staff visit the defendant regularly and make it a point to enlist the aid of an Arabic- or French-speaking staff member.  Second, BOP staff has provided the defendant with picture language books.  Third, if you purchase additional reading materials for the defendant (soft-cover books, for example) and arrange to have them shipped directly from the bookseller to the Metropolitan Correctional Center ("MCC"), MCC staff will arrange to have the materials reviewed and provide cleared materials to the defendant.  Finally, the education staff at the MCC are exploring whether any additional activities can be made available to the defendant, although it is our understanding that he will not be permitted to receive privileges or programs beyond those offered to other inmates in administrative detention at the MCC.

VII.    Conclusion

We hope that this response aids your interpretation of the SAMs and provides some assurance that we take seriously the concerns you have raised concerning the isolating effects of the SAMs.  We trust that you also take seriously the difficult security concerns posed by the defendant in light of his violent past and affiliation with active terrorist groups.  Please contact us if you require further clarification of the SAMs or wish to seek formal modification of the SAMs.  The defendant may also seek review of any of the restrictions imposed by the SAMs through the Administrative Remedy Program set forth at 28 C.F.R. pt. 542.

Very truly yours,

LORETTA E. LYNCH
United States Attorney

By:    /s/  Samuel P. Nitze
Zainab Ahmad
Celia A. Cohen
Samuel P. Nitze
Assistant U.S. Attorneys
(718) 254-6522/6147/6465

cc:    Ms. Mildren Whalen, Esq.
Clerk of the Court (WFK) (by ECF)

# EXHIBIT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

                                                  DECLARATION OF REGINA
                                                  ELDRIDGE

- against -

                                                  13-CR-527 (WFK)

ALHASSANE OULD MOHAMED,
      also known as "Cheibani,"

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      I, Regina Eldridge, declare pursuant to 28 U.S.C. §1746, under penalty of
perjury, that to the best of my knowledge, based in part on my review of relevant records and
discussions with relevant BOP personnel, the following is correct:

      1.     I am employed by the United States Department of Justice, Federal Bureau of
Prisons ("BOP"), as an Associate Warden of the Metropolitan Correctional Center in New
York, New York (the "MCC"). I have been employed by the BOP since February 11, 1990,
and I have been employed at the MCC since June 1995.

      2.     I was appointed Associate Warden of the MCC on March 9, 2015. Before my
appointment to that position, I served as a Unit Manager. Since May 2012, one of my
responsibilities has been oversight of inmates subject to Special Administrative Measures
("SAMs") and the MCC's program for implementing such measures. I will continue to
oversee the MCC's SAMs program in my current role, pending the appointment of a new
Unit Manager.

3.      In connection with my role as coordinator of the MCC's SAMs program, I have access to records maintained in the ordinary course of business at the MCC and to BOP personnel involved in implementing the MCC's SAMs program.

4.      Inmate Alhassane Ould Mohamed, also known as "Cheibani," (the "defendant") has been in BOP custody, housed at the MCC, since March 12, 2014.  Starting on his first day of incarceration at the MCC, the defendant was placed in the MCC's Special Housing Unit ("SHU") in administrative detention status, a non-punitive form of separation from the MCC's general population that is used when the presence of the inmate within the general population would pose a serious threat to life, property, self, staff, or other inmates, or to the security or orderly running of the institution.  The decision to place the defendant in SHU was initially due to the nature of the charges against him pending further information from outside law enforcement.

5.      On July 14, 2014, the Attorney General of the United States directed the Bureau of Prisons to implement specified SAMs to restrict the defendant's access to the mail, the media, the telephone, and visitors.  The BOP implemented the SAMs that day.

6.      Under an amendment to the SAMs, approved on December 12, 2014, the defendant's lawyers are authorized to take dictation of letters from the defendant to his family members.  To date, the defendant and his attorneys have not provided any dictated letters to be mailed pursuant to this amendment.  We have a record of one letter being sent by the defendant to his family this past October.

7.      During his incarceration at the MCC, the defendant has received regular medical attention.  Medical staff members visit the SHU daily, with limited exception.  The primary care physician assigned to the defendant speaks fluent French, and has thoroughly

evaluated the defendant on several occasions, most recently earlier this month. The primary care physician has reported no difficulty communicating with or understanding the defendant.

8.     Members of MCC's psychology staff visit the SHU weekly and generally perform thorough assessments of each SHU inmate once every 30 days. The psychology staff makes use of Arabic or French speaking staff members to speak with the defendant and have reported no difficulty communicating with the defendant.

9.     A Unit Team responsible for SAM inmates makes daily rounds and has generally been able to understand basic communication from the defendant in English, without the aid of an interpreter, but also employs the services of Arabic or French speaking staff members as needed. I am unaware of any need or request expressed by the defendant that has not been conveyed to and understood by the Unit Team.

10.    The defendant has been provided with thermal long underwear and four blankets, two of them wool.

11.    The defendant has permission to receive books sent directly to the MCC by his attorneys via Amazon or similar booksellers. To date, the defendant has received every book that has been sent to the institution by his attorneys.

12.    In light of the defendant's illiteracy, the MCC purchased a CD player for the defendant to enable him to listen to books, classes, and other programs on CDs in French or Arabic. The CDs may be purchased by defense counsel in the same manner in which they purchase books and will be provided to the defendant once the materials have been reviewed and cleared by the Federal Bureau of Investigation in accordance with the SAMs.

13.    The BOP has established an Administrative Remedy Program through which inmates can seek formal review of any complaint regarding any aspect of their imprisonment. Petitioner had available to him the four-step procedures set forth in the Administrative Remedy Program. See 28 C.F.R. § 542.10-.19.  BOP regulations provide "a process through which inmates may seek formal review of an issue which relates to any aspect of their confinement . . . if less formal procedures have not resolved the matter." 28 C.F.R. § 542.10. In accordance with the BOP's Administrative Remedy Program, an inmate shall first attempt informal resolution of his complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. See 28 C.F.R. § 542.13(a).  Informal requests should be submitted in writing using a BP-8 form.  If the complaint cannot be resolved informally, the inmate may submit a formal written Administrative Remedy Request to the Warden, on a designated BP-9 form, within twenty days of the event that triggered the inmate's complaint. 28 C.F.R. § 542.14(a).  If the inmate is dissatisfied with the Warden's response, the inmate may submit an appeal to the appropriate Regional Director of the BOP. 28 C.F.R. § 542.15(a).  If the inmate is dissatisfied with the Regional Director's response to the appeal, the inmate may appeal to the General Counsel's office within thirty days of the date of the Regional Director's decision.  Id.  No administrative remedy appeal is considered to have been finally exhausted until considered by the BOP's Central Office. 28 C.F.R. §§ 542.14, 542.15.

14.    The defendant has not sought formal review, through the Administrative Remedy Program, of the constitutionality of the SAMs or their implementation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:      New York, New York
            March 20, 2015

_____
Regina Eldridge, Associate Warden