UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------X

UNITED STATES OF AMERICA          :

     -against-                              :          13 CR 0527 (WFK)

ALHASSANE OULD MOHAMED        :

     Defendant.                            :

----------------------------------------------X


**REPLY MEMORANDUM OF LAW AND FACT IN SUPPORT
OF RULE 11 AND RELATED MOTIONS**

                      DOUGLAS G. MORRIS, ESQ.
                      MILDRED WHALEN, ESQ.
                      FEDERAL DEFENDERS OF NEW YORK, INC.
                      ONE PIERREPONT PLAZA, 16TH FLOOR
                      BROOKLYN, N.Y. 11201

                      ATTORNEYS FOR DEFENDANT
                      ALHASSANE OULD MOHAMED


DATED:      BROOKLYN, N.Y.
             AUGUST 27, 2015


CC:   ASSISTANT U.S. ATTORNEY ZAINAB AHMAD

      ASSISTANT U.S. ATTORNEY CELIA COHEN

      ASSISTANT U.S. ATTORNEY SAMUEL NITZE

      CLERK OF THE COURT

      MR. ALHASSANE OULD MOHAMED

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------X

UNITED STATES OF AMERICA          :

    -against-          :          **Reply Memorandum of Law and Fact**

ALHASSANE OULD MOHAMED          :          13 CR 0527 (WFK)

      Defendant.          :

----------------------------------------------X

### REPLY MEMORANDUM OF LAW AND FACT IN SUPPORT OF RULE 11 AND RELATED MOTIONS

#### Preliminary Statement

      This case is complicated.  It involves events from the turn of the century in foreign countries with different cultures.  It includes official investigations about a variety of subjects that have spanned fifteen years.  The defense needs to investigate, too.  Much of its investigation cannot even get started without critical information, such as the names of witnesses, including eye-witnesses. The government has that information.  But its answering brief states that it will not disclose that information until some unspecified future time.

      In the American adversarial system, the truth emerges when both parties have the opportunity to develop the evidence.  The government itself writes that this "case warrants investigation . . . , no matter how long it takes to conclude nor how far-flung the evidence and witnesses."  But apparently the government applies that timing only to itself, not the defense.  In connection with disclosing information to the defense, the government wishes to put off a hearing on eye-witness identification until the eve of trial, refuses to disclose (at least for the time being) either impeachment information

2

or a witness list, and declines to discuss what other-act evidence (besides the car-jacking on the Tillabery Road in May 2004) that it might seek to introduce or when it might do so.  Yet if the government refuses to disclose such information, the defense will lack any realistic chance to investigate, explore, and work toward the truth at a fair trial.

The government justifies its efforts to delay disclosures on the grounds of potential witness tampering.  The government has imposed, and the Court has upheld, Special Administrative Measures ("SAMs").  The SAMs – which subject Mr. Mohamed to extreme solitary confinement, minimize his contacts with the outside world, and tightly supervise his limited contacts with his family – prevent him from communicating with virtually anyone and from influencing witnesses. The government has never pointed to any evidence that Mr. Mohamed, or anyone else for that matter, has tried to threaten any witness or tamper with any evidence related to the present case. With the SAMs in place and no evidence of witness tampering, the government has no justification for holding back information.

In its answer, the government discloses that it seeks to introduce nine of Mr. Mohamed's twenty prior purported statements.  With this information in hand, the defense now submits a Declaration of Mr. Mohamed.  He sets forth the horrendous conditions surrounding the interrogations that yielded eight of the nine purported statements, the ones procured while in Malian or Nigerien custody.  With foreign authorities procuring all eight of these statements with coercion, compulsion and intimidation, they were involuntary.  For the final statement, taken aboard a flight from Bamako to New York, the effects of prior coercion continued and U.S. authorities did not give proper *Miranda* warnings.  Thus, the Court should suppress all the statements as involuntary and the

final one as in violation of *Miranda*.  In the alternative, the Court should grant an evidentiary hearing.

In the present reply brief, the defense tries to avoid repeating its original brief and rather to simply focus on these and other flaws in the government's answer.  We add one caveat.  The government's answering brief often misstates the defense positions.  We can only ask that the Court consider the points we actually make rather than the government's misstatements of them.

For all the reasons in our main brief and the further reasons set forth below, the defense asks that the Court grant its motions in full.[1]

## ARGUMENT

## I.

## THE COURT SHOULD DISMISS COUNT TWO OF THE INDICTMENT WITH PREJUDICE

The government agrees that Count Two of the indictment charges aiding and abetting attempted murder, pursuant to 18 U.S.C. §1113, but then argues that the charged offense carries no statute of limitations, pursuant to 18 U.S.C. §§3286(b) and 2332(g)(5)(B) (Gvt. Ans. at 7).  In fact,

---

[1] This submission uses the same references and abbreviations as set forth in footnote 1 on page 4 of our original brief.  In addition, we abbreviate that brief as "Def. Br."; abbreviate the government's answering "Memorandum of Law in Opposition to Defendant's Rule 11 and Related Motion" as "Gvt. Ans."; and abbreviate the exhibits to the government answer as "Gvt. Ex. _."  In addition, we attach Mr. Mohamed's Declaration of August 24, 2015, as Defense Exhibit G (lettered consecutively to our original brief's exhibits).

The citations for this "Preliminary Statement" are as follows: the quotation in the second sentence in the second paragraph (Gvt. Ans., at 2); the information in the fourth sentence in the second paragraph (*id*. at 3, 31, 56-59); the third paragraph's first sentence (*id*., at 3, 58-60); and the fourth paragraph's first sentence (*id*. at 9-10).

the statute of limitations applicable to the attempted murder charge is eight years – the limitation period in effect at the time of the alleged offense.[2]

In 2000, when the alleged offense took place, an eight-year statute of limitations applied to attempted murder of an internationally protected person. 18 U.S.C. §3286(a). Section 3286 was amended in 2001 to add subsection (b), which provides for no statute of limitations for any offense listed in §2332b(g)(5)(B), a list that includes murder or attempted murder of a protected person in violation of 18 U.S.C. §1116. *See* 18 U.S.C.A. §3286, Historical and Statutory Notes. The statute of limitations in effect at the time of the offense should apply because retroactive application of the amended statute of limitations would run afoul of the *ex post facto* clause.

The Supreme has clearly stated that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than the Republic." *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994). This doctrine is expressed in the constitutional prohibition of *ex post facto* laws. *Lynce v. Mathis*, 519 U.S. 433, 439-40 (1997)("The presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords the individual citizen."). It is well-settled that *ex post facto* principles apply to statutes of limitations. *See Stogner v. California*, 539 U.S. 607 (2003).

In *Stogner*, the Supreme Court held that the *ex post facto* clause bars the application of an extension in the statute of limitations after the original period has expired. *Stogner v. California*, 539 U.S. 607, 610 (2003). *Stogner* explicitly did not address the question whether the *ex post facto* clause barred application of an extension in the statute of limitations made before the period of limitations had expired but after the offense was committed. *Id*. at 618. The Supreme Court noted

---

[2] The defense originally thought the statute of limitations was five years (*see* Def. Br., at 6).

in *Stogner* that several cases, including *Falter v. U.S.*, 23 F.2d 420, 425 (2d Cir. 1928), had permitted prosecution under amended statutes of limitations that had been extended after the crime was committed but before the original period had expired. *Stogner*, 539 U.S. at 628-29.  Other courts have held that the statute of limitations in effect at the time the offense was committed must apply, regardless of whether it had expired at the time the period was extended. *See, e.g. State v. Hansen*, 605 N.W.2d 461, 463-64 (Neb. 2000); *Overton v. State*, 874 S.W.2d 6, 10-11 (Tenn. 1994); *Rubin v. State*, 390 So.2d 322, 323 (Fla. 1980).  *Stogner* did not reach this issue of the extension of an unexpired statute of limitations.  It held only that the application of a statute of limitations that was extended after the limitations period for the offense had expired falls into one of the four categories of *ex post facto* violations: it made the crime greater than it was when it was committed. *Stogner*, 539 U.S. at 613.

The rationale of *Stogner* supports the conclusion that the statute of limitations in effect at the time the offense was committed should apply.  The *Stogner* majority quoted the four categories of *ex post facto* clause violations established in *Calder v. Bull*, 3 Dall. 386, 391, 1 L.Ed. 648 (1789) and relied on the two emphasized:

> "1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  *2d. Every law that aggravates a crime, or makes it greater than it was, when committed.* 3d.  Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  *4th. Every law that alters the legal rules of evidence, and receives less or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.*  All these, and similar laws, are manifestly unjust and oppressive." *Calder*, *supra*, at 390-391, 1 L.Ed. 648 (emphasis altered from original).

*Stogner*, 539 U.S. at 612.

The Court in *Stogner* held that the extension of the statute of limitations after the original limitations period had expired fell literally into two of those categories, the second and the fourth. Under the second category, the extension made the crime greater than it was when committed in the sense that it inflicted punishment for past criminal conduct that did not trigger any such liability when the extension was enacted. *Id*. at 613. It also fit the fourth category by permitting prosecution on evidence that would have been insufficient (because no evidence would have been sufficient) at the time the statute of limitations was amended.

The *Stogner* majority was dealing only with a statute of limitations that had expired before the limitations period was extended, and referred in its analysis to the point in time when the statute was amended. But the four categories of violation set forth in *Calder* refer to the point in time when the crime was committed. And the rationale of the *ex post facto* clause is to prevent the use of laws that expand criminal liability beyond what it was at the time the offense was committed. *See Lynce v. Mathis*, 519 U.S. 433, 441 (1997), *citing Weaver v. Graham*, 450 U.S. 24, 30 (1981). The application of an extended statute of limitations (actually no limitation) to prosecute fifteen years later an offense that carried an eight-year statute of limitations when it was committed offends that principle, just as it would if the extension had been enacted after the eight years had expired.

For the reasons set forth here and in our original brief, the Court should dismiss Count Two.

## II.

## THE COURT SHOULD SUPPRESS ALL PRIOR STATEMENTS OF MR. MOHAMED

**A.**     **The Government Wants the Admission of Nine Prior Statements.**

In its answer, the government states that it intends to introduce nine statements in its case-in-chief (Gvt. Ans., at 9).   We include immediately below our earlier chart of the twenty alleged statements (*see* Def. Br., at 14), revised by bolding the statements that the government wants, adding the nations that confined and interrogated Mr. Mohamed in eliciting those statements, and noting the one and only of those statements for which the government claims *Miranda* warnings.

8

**Early:**

| | | | | |
|---|---|---|---|---|
| **Statement #1a:** | **12/26/2000** | **Summary in Discovery letter of 4/17/2015**: | | *Mali* |
| **Statement #1b:** | **12/27/2000** | **Summary in Discovery letter of 4/17/2015**: | | *Mali* |
| **Statement #1c:** | **12/29/2000** | **B## 262-74** | **French: B## 262-65:** | *Mali* |
| | | | **Translated on 3/22/13** | |
| Statement #2: | 01/01/2001 | B## 191-200 | | |
| Statement #3: | 01/09/2001 | B## 275-77 | French: B## 266-67 | |
| | | B## 201-04 | | |
| Statement #4: | 02/08/2002 | B## 205-09 | | |
| Statement #5: | 2/10/2002 | B## 210-13 | Report dated 2/21/02 | |

**Middle:**

| | | | | |
|---|---|---|---|---|
| Statement #6: | 02/14 & 15/2010 | | | |
| | | B## 219-33, 325-339 | | |
| Statement #7: | 02-03/2010 | B## 235-43 | Translated on 3/26/10 | |
| **Statement #8:** | **04/19/2010** | **B## 250-56** | **French: B## 244-49** | |
| | | | **Translated 6/28/10**: | *Mali* |
| **Statement #9:** | **11/11/2010** | **B## 257-58** | **French: B## 259-60:** | *Niger* |

**Late:**

| | | | | |
|---|---|---|---|---|
| Statement #10: | 12/7/2013 | B## 490-95 | | |
| Statement #11: | 12/8/2013 | B## 496-98 | | |
| Statement #12: | 12/11/2013 | B## 499-502 | | |
| Statement #13: | 12/12/2013 | B## 503-09 | | |
| Statement #14: | 12/19/2013 | B## 282-83 | French: B## 292-93 | |
| **Statement #15:** | **12/23/2013** | **B## 279-81** | **French: B## 289-91** | *Mali* |
| **Statement #16:** | **12/30/2013** | **B## 473-80** | | *Niger* |
| **Statement #17:** | **1/1/2014** | **B## 481-89** | | *Niger* |
| **Statement #18:** | **03/12/2014** | **B## 308-19** | | *U.S. –* |
| | | | | *Mir.* |

The government does not oppose the defense motions to suppress Statements ##2, 3, 4, 5, 6, 7, 10, 11, 12, 13 and 14.  It is not asking for their admission (Gvt. Ans., at 9), and thus raises no objections to their exclusion.  While asking the Court to deny this part of the defendant's motion as moot (*id.*, at 9 fn. 2), the government leaves unclear whether it would seek to use any of these statements for possible impeachment.  If the government does not intend to use these statements for any purpose, including impeachment and rebuttal, then the matter is resolved. *See Mincey v. Arizona*, 437 U.S. 385, 398 (1978)("But *any* criminal trial use against a defendant of his involuntary statement is a denial of due process of law . . . . ")(emphasis in original).  If not, the defense would ordinarily address the issue of involuntariness as a later *in limine* motion, pursuant to Federal Rules of Evidence 613 and 801.  But the issues of the involuntariness of these statements and the ones that the government seeks to admit are closely related.  Thus the Court should resolve all the involuntariness issues at one time.  If the Court takes that course, the defense can submit a supplementary Declaration.

As to the nine statements, the government opposes an evidentiary hearing because the defense "has offered no specific factual allegations based on personal knowledge in support of the motion." (Gvt. Ans., at 10; *see also id*. at 25.)  Now that the government has specified what statements it intends to use, the defense is able to submit a Declaration from Mr. Mohamed (Ex. G).  Thus, this government objection is moot.

10

**B.**     **The Court Should Suppress Eight Prior Statements Because Foreign Authorities Procured Them under Compulsion in Violation of Due Process and the Fifth Amendment Right against Self-Incrimination.**

    **1.**     **The Court Should Suppress Eight Involuntary Statements that Foreign Authorities Used Compulsion to Procure or, in the Alternative, Hold an Evidentiary Hearing.**

In discussing the legal standards for voluntariness, the government essentially repeats what the defense has already explained (*compare* Def. Br., at 15-20 *with* Gvt. Ans., at 12-16). It simply changes the emphasis, to the extent it can, away from voluntariness altogether. The government accuses the defense of "attempt[ing] to graft onto the governing law – namely, that interrogations conducted abroad by foreign officials must comply with the substance, if not the form, of *Miranda* . . . . " (Gvt. Ans., at 14.) But the government seems more interested in its horticultural metaphor of "grafting" than Supreme Court precedent. The Supreme Court long ago made clear that *Miranda*, even when not directly applicable, is "relevant on the issue of voluntariness . . . . " *Clewis v. State of Texas*, 386 U.S. 707, 709 (1967); *see also Davis v. State of N.C.*, 384 U.S. 737, 740 (1966)("[T]hat a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda*, is a significant factor in considering the voluntariness of statements later made.").

The form of the *Miranda* warnings might only bind American rather than foreign police, but the substance of due process bars the admission into evidence at an American trial of involuntary statements procured by compulsion. *E.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)(the government has the burden of proving that a defendant's confession was "the product of an essentially free and unconstrained choice," since if his "will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.")(internal

quotation marks omitted); *U.S. v. Covington*, 783 F.3d 1052, 1056 (9th Cir. 1985)(this case, which the government repeatedly cites, states that evidence is excludable "on due process grounds, if the statements were involuntary or the evidence was otherwise untrustworthy.").

While "*Miranda* changed the focus of much of the inquiry in determining the admissibility of suspects' incriminating statements," the Supreme Court has "never abandoned [its] due process jurisprudence . . . exclud[ing] confessions that were obtained involuntarily." *Dickerson v. U.S.*, 530 U.S. 428, 432 (2000). The present case is more akin to the thirty-odd voluntariness cases that the Supreme Court tackled in the thirty-odd years before *Miranda* – cases that largely involved police obtaining purported confessions by beating, abusing and threatening to lynch young, male black defendants. *See generally Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973); *see also Dickerson v. U.S.*, 530 U.S. 428, 432 (2000); Steven Penney, *Theories of Confession Admissibility: A Historical View*, 25 Am. J. Crim. L. 309, 322-361 (1998).

In the mid-1930s, an era when elsewhere dictatorship was spreading, the U.S. Supreme Court set forth the universal principles underlying due process:

> Coercing the supposed state's criminals into confessions and using such confessions so coerced from them against them in trials has been the curse of all countries. It was the chief iniquity, the crowning infamy of the Star Chamber, and the Inquisition, and other similar institutions. The Constitution recognized the evils that lay behind these practices and prohibited them in this country.

*Brown v. State of Mississippi*, 297 U.S. 278, 287 (1936)(quotation marks and citation omitted).

There is no foreign police exception to due process. Foreign police do not get a pass. They do not get to use the third degree. Or even to threaten it. If they do, American courts will not admit the tainted statement. *E.g.*, *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177,

203 (2d Cir. 2008)("[W]henever a court is asked to rule upon the admissibility of a statement made to a foreign police officer, the court must consider the totality of the circumstances to determine whether the statement was voluntary. If the court finds the statement involuntary, it must exclude this because of its inherent unreliability." )(citation omitted); *U.S. v. Karake*, 443 F. Supp. 2d 8, 85-86 (D.D.C. 2006)("Indeed, based on the totality of circumstances, the Court finds that the conditions under which defendants were held at Kami [in Rwanda] and the abuse and mistreatment they endured while being interrogated shock the conscience and therefore render the statements involuntary and inadmissible.").

The unconstitutional evil that offends due process includes both violence and its threatened use. *See Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)("[A] finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient.")(footnote omitted); *Hutto v. Ross*, 429 U.S. 28, 30 (1976)(the test of voluntariness "is whether the confession was extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence.")(internal punctuation omitted); *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)("[C]oercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition."). Oppressive conditions of confinement are an important factor in determining involuntariness. *E.g.*, *Brooks v. Florida*, 389 U.S. 413, 413-15 (1967)(a confession was involuntary where the defendant was held in solitary confinement for 14 days, was fed a restricted diet, had contact only with the prison's investigating officer, and was "completely under the control and domination of his jailers."); *Arnett v. Lewis*, 870 F.Supp. 1514, 1523-25, 1540-42 (D. Ariz. 1994) (a confession was involuntary where the defendant

was incarcerated in "oppressive conditions," including inadequate sanitation, plumbing, heating, clean water, blankets, and nutrition).

The government's answer, by insisting on what everyone knows, *i.e.*, that the U.S. cannot and does not require foreign police to give *Miranda* warnings, cannot deflect attention from the critical point: due process requires the exclusion of involuntary statements that any authority procured through coercion. In that regard, even the government must mention what the defense already explained more fully: courts use a "totality-of-the-circumstances" test to determine whether authorities used compulsion to procure an involuntary statement (*compare* Def. Br., at 17-20, *with* Gvt. Ans., at 15-16). Under the totality of the circumstances, authorities used compulsion to procure from Mr. Mohamed the statements that the government seeks to admit into evidence.

**2.      The Conditions of Interrogation and the Conduct of Law Enforcement Officials for Each of these Eight Statements Show Compulsion.**

        *a)      Mr. Mohamed Has Described State Compulsion Surrounding his Interrogations.*

Mr. Mohamed's Declaration (Ex. G) shows that the conditions of his interrogations and the conduct of the foreign police bore the hallmarks of state compulsion and due process violations that the Supreme Court has condemned.

Mr. Mohamed was subjected to coercion, intimidation, and deception. His jailers fed him no food or little food – often only a slice of bread in the morning and small portions of rice for lunch and supper – leaving him hungry and at times probably malnourished (Statements ##1a, 1b, 1c, 8, 15-17). They deprived him of medical treatment (Statement #8). At times they isolated him and incapacitated him for months on end, including always keeping his wrists in hand-cuffs and his ankles in shackles (Statements ##8, 15-17). They housed him in squalor and filth, often with a

14

bucket for a toilet, which was rarely emptied (Statements ##1a, 1b, 1c, 8, 15-17).  At times these circumstances clouded his mental state and may have resulted in hallucinations (Statements ##1a, 1b, 8, 15-17).  His jailers threatened him with torture and death, including telling him that they would whip him and electrocute him and that they would hand him over to the Americans, who would cut off his head and toss him from a plane into the sea (Statements ##1a, 1b, 1c, 8, 9, 15-17). They interrogated him while blind-folded (Statements ##8, 15).  They ordered him to lie in giving answers, on pain of torture and death (Statements ##8, 9, 15-18).

In short, the statements that authorities elicited through these interrogations were involuntary and compelled.

> b)    *Independent Sources Confirm the Type of State Compulsion that Mr. Mohamed Has Described.*

Mr. Mohamed's descriptions of his interrogations are what one might expect in light of the U.S. State Department's country reports on Mali and Niger, which the defense has described (*see* Def. Br., at 24-25), but the government ignores (*see* Gvt. Ans., at 19-20).  The State Department reports do not stand alone.

A variety of independent sources show that in practice the governments of Mali and Niger not only fall short of criminal justice ideals but subvert them.  The Malian judiciary lacks independence; it is subject to the influence of the executive. Freedom House, Freedom in the World Reports, for the years 2001-2010, https://freedomhouse.org/report/freedom-world; U.S. Department of State, Country Report for Mali on Human Rights Practices, for the years 2001-2010.  A recent study describes "extensive reports of corruption regarding both the Mali law enforcement and judiciary system." OPCAT ["Optional Protocol to the Convention against Torture"] Mali Research

15

Project, Center for Law and Global Affairs, Sandra Day O'Connor College of Law, Arizona State University, "Memo to the [United Nations] Sub-Committee on the Prevention of Torture (SPT)" (July 11, 2011)("ASU, Memo – Mali"), at 2; *see also* "Country Brief – Mali," of the OPCAT Mali Research Project ("ASU, Country Brief – Mali"). With no political will to reform, "the amount of judiciary corruption is currently increasing." ASU, Memo – Mali, at 2; *see also* ASU, Country Brief – Mali, at 16. According to Transparency International's "Corruption Perceptions Index" – reflecting the views of domestic and foreign business people, academics, and risk analysts – both Mali and Niger have consistently scored low. *See* Transparency International, Corruption Perceptions Indices, available at: http://www.transparency.org/cpi.

A recent American Bar Association Report details the nature of Mali's judicial corruption:

> [T]he justice dispensed by courts and tribunals is undermined by corruption and undue influence. The meager salaries paid to justice sector actors may well be an important cause of corruption. However, justice sector actors also point out that corruption is problem [sic] of culture and, "there will never be a definitive solution without changing culture." This culture persists in a context in which few acts of corruption are criminally prosecuted or result in professional sanction.

American Bar Association Rule of Law Institute, "Evaluation of Access to Justice in Mali, 2012," at 3, available at http://www.americanbar.org/content/dam/aba/directories/roli/mali/mali_access_to_justice_assessment_2012.authcheckdam.pdf; *see also id.* at 38 (Malian interviewees "described corruption as 'the greatest scourge,' 'the weak link', and 'the cancer in the body' of the justice system"; interviewees said that "[a]ttempts to use political or other influence to affect the decisions of magistrates are . . . common"; and the government itself has "acknowledged during a roundtable on corruption and

16

financial impropriety in 2008: 'in spite of the reforms implemented, the phenomenon of corruption and financial impropriety has withstood our assaults.'"); U.S. Department of State, Country Report for Mali on Human Rights Practices, for the years 2001-2009 ("The Ministry of Justice appoints and has the power to suspend judges; it supervises both law enforcement and judicial functions"; and "[d]omestic human rights groups alleged that there were instances of bribery and influence peddling in the courts.").

Similarly, "[a]llegations and reports of corruption within [Mali's] police force are extensive." ASU, Country Brief – Mali, at 15.  The State Department has consistently found that the police and gendarmes extort bribes, U.S. Department of State, Country Report for Mali on Human Rights Practices, for the years 2001-2009, and, despite constitutional and legal prohibitions against torture, that police have reportedly abused, beat or tortured civilians. *Id*., for the years 2010-2012; *see also* Freedom House, Freedom in the World Reports, for the years 2001-2010, https://freedomhouse.org/report/freedom-world.

Documentation is extensive not only of judicial and police corruption but also of the type of horrendous prison conditions that Mr. Mohamed has reported, including lack of food, poor health care, disgusting sanitation, and severe overcrowding. ASU, Country Report – Mali, at 19 ("[E]xtremely poor detention conditions and serious overcrowding," including inadequate medical facilities and sanitation and insufficient food, "often amount to cruel, inhuman, or degrading treatment or punishment."), 22-23; ASU, Memo – Mali, at 2.  Reports of such conditions have been persistent for all of the last fifteen years. *E.g.*, Freedom House, Freedom in the World Reports, for the years 2001-2010, https://freedomhouse.org/report/freedom-world; U.S., Department of State, Country Report for Mali on Human Rights Practices, for the years 2001-2012.  Amnesty

17

International has reported that two detainees died in custody in Bamako during 2014 due to lack of medical care, https://www.amnesty.org/en/countries/africa/mali/report-mali/, and that two Mauritanian men accused of Al Qaida connections detained from late 2007 until February 2008 reported that "they were tortured" by way of "kicking, beating, electronic shocks, suspension by the arms and sleep deprivation." http://www.refworld.org/topic,50ffbce582,50ffbce5b5,4a1fadd8c,0,AMNESTY,,MLI.html.    A prisoner, such as Mr. Mohamed, fearing death is no surprise when "[a]rbitrary and unlawful killings are . . . a significant concern." ASU, Country Report – Mali, at 16.

Reports on Niger raise similar concerns. Based on visits to a number of prisons and detention centers in December 2008, the Niger Association for the Defense of Human Rights (Association Nigérienne pour la Défense des Droits de l'Homme, or "ANDDH") learned that detainees and prison personnel alike complained about the lack of food, toilets, and health care, as well as cramped cells, insufficient personnel, and dilapidated facilities. Death Penalty Worldwide, "Niger," "Description of Prison Conditions," last updated March 27, 2012, available at http://www.deathpenaltyworldwide.org/country-search-post.cfm?country=Niger. The ANDDH also reported that, despite some recent improvements, prison conditions remained far from satisfactory and that some members of the security forces extorted confessions through violence. *Id*. A United Nations General Assembly Human Rights Council Report from 2010 found few improvements, which were hindered by the dilapidated and unsanitary infrastructure, overcrowding, police stations with little equipment, and courts lacking human and material resources. *Id*. The U.S. State Department reported that Niger's prisons were underfunded, understaffed and overcrowded, yielding

18

conditions that were harsh and life threatening. U.S. Department of State, 2012 Country Report for Niger on Human Rights Practices.

In short, a variety of independent sources document the very kind of state compulsion that Mr. Mohamed has described and tend to confirm that the statements that authorities elicited from him were involuntary.

c)   *The Government Ignores the Type of State Compulsion that Mr. Mohamed Faced.*

The government earlier lacked the details now provided in Mr. Mohamed's Declaration.  But it never seriously addresses the details, which the defense had already set forth, about the lawless conduct of Malian and Nigerien officials.  Instead, the government persistently misrepresents the defense points and loses the forests for the trees.

Based on the defense's well-documented description of legal factors in Mali and Niger that "*contribute* to an atmosphere conducive to involuntary statements," (Def. Br., at 22, emphasis added), the government declares that the defense "alleges . . . that *all* statements obtained by interrogators in countries that utilize the French civil law system *are necessarily obtained* in 'an atmosphere conducive to involuntary statements.'" (Gvt. Ans., at 19, emphasis added; *see also id*. [the defense suggests that such a legal system "is *incapable* of obtaining voluntary statements," which is "insulting".][emphasis added]; *id*. at 20 ["{T}here is no basis in law to conclude that statements obtained in compliance with French civil law standards are *necessarily involuntary*."][emphasis added].)  Having caricatured the defense point, the government burlesques the nature of legal systems.  The French civil law system, in the government's eyes, "is used in numerous countries with longstanding democratic traditions and human rights adherence, such as

19

France itself, Italy, Germany, the Netherlands and Spain." (*Id*.) Does the government include among these "*longstanding* democratic traditions and human rights adherence" Vichy France, fascist Italy, Franco's Spain, and Hitler's Nazi Germany?  Democratic civil law systems indeed!

The serious inquiry, which the government ignores, is whether state actors used compulsion to elicit involuntary statements.  Legal systems, whether common law or civil law, are neither invariably democratic nor invariably dictatorial.  Nor can they – or at least have they ever – immunized legal systems against state abuses. *See generally Miranda v. Arizona*, 384 U.S. 436, 469 (1966)(discussing state compulsion and involuntary statements in a common law legal system).  But each legal system has its vulnerabilities.  The defense has shown vulnerabilities of the civil law system as used in Mali and Niger (*see* Def. Br., at 22-24).  The government bemoans the fact that the defense cited to "law review articles and analytical reports to the exclusion of even a single federal case or statute . . . . " (Gvt. Ans., at 19.)  The second half of the remark, on "the exclusion of even a single federal case or statute," is just silly.  The lack of case law in the United States on Malian and Nigerien police misconduct simply reflects the reality that an analogous American case with events in these two poverty-stricken, underpopulated countries is rare – if ever there was one. In that regard, the present case is probably unprecedented.  The first half of the government's remark, on the defense citing to "law review articles and analytical reports," hurts the government's position. The defense has referred – both in the original and present submission – to available independent sources for the relevant factual inquiry (Def. Br., at 21-26).  The government does not.

While the government claims that the defense does not base its motions on facts but on counsel's arguments (*see* Gvt. Ans., at 12), in actuality the defense continuously relies on facts as set forth in the very documents that the government has produced in discovery or published.  The

government's only response to any of the independent sources comes in a rather odd footnote. The government downplays its own State Department reports on official misconduct in Mali and Niger because Mr. Mohamed could not have feared mistreatment based on reading those reports since he is functionally illiterate (*see* Gvt. Ans., at 23 fn. 4). Once again, the government is being silly. Who would suggest that a Malian arrestee could learn of Malian government misconduct only through a U.S. State Department report? The defense never made that suggestion. The defense point was as straight-forward as obvious: independent evidence (including from the U.S. government) shows that prison conditions in Mali and Niger have been horrendous, police have acted arbitrarily, and the independence of the courts has been compromised (*see* Def. Br., at 24-25). A fair inference is that Malians have reason to fear these circumstances if detained because they know what the State Department has also learned. In light of Mr. Mohamed's present Declaration, these circumstances tend to confirm his account of what he personally suffered when in his jailers' clutches.

In contrast to the defense's references to independent sources, the government relies on its own redacted, self-serving documents manufactured for this litigation. Apparently based on these, the government presents a pollyannaish description of legal proceedings in Mali and Niger (*see* Gvt. Ans., at 20-21; *see also id*. at 21 [the government cites as the source for its block and indent quotation its own Exhibit A, which, however, does not include the passage]). The government never distinguishes legal ideals from practice. Why it assumes that authorities in poor and unstable countries like Mali and Niger carry out the ideals is anyone's guess. Even as to the ideals, the government's own carefully culled documents contradict its assertions. The government writes that "[b]oth countries further guarantee criminal defendants the right to counsel." (Gvt. Ans., at 21.) But the FBI reports that a Malian judge stated that "[t]here is no legal requirement for suspects to have

an attorney present during interrogations until the case has been sent to the court for prosecution," (Gvt. Ex. D), and also reports that two officials at the Malian Ministry of Justice stated that "[t]he Investigating Magistrate has up to two years to complete their investigation." (Gvt. Ex. C; *see also* Gvt. Ex. D ["If the suspect does not have or can not [sic] afford an attorney, the interrogation will continue."].)  For evaluating the voluntariness of statements, the lack of any real and effective right to counsel during interrogations is troubling.

Ultimately, the government wants to rely on the uncross-examined foreign interrogators who "have assured the government that . . . basic rights were in fact afforded to the defendant." (Gvt. Ans., at 23.)  The defense asks that the Court at least hold a hearing so that the government can try to prove its assertions in an adversarial proceeding.

### 3.    The Characteristics of Mr. Mohamed Showed his Vulnerability to Compulsion by the Authorities Who Procured the Involuntary Statements.

In regard to characteristics of Mr. Mohamed that made him vulnerable to giving involuntary statements because of state coercion, the government continuously misses the mark by moving the mark to its own liking.  Instead of answering the defense, the government knocks down the straw men that it has constructed.  When the defense writes, as summarized in a sub-heading, that "Mr. Mohamed's Limited Education and Functional Illiteracy *Increases the Chances* That His Statements Were Involuntary" (Def. Br., at 20; emphasis added), the government answers that the defense "relies repeatedly on his alleged illiteracy and limited education *as being dispositive* . . . . " (Gvt. Ans., at 16; emphasis added.)  Where, may we ask, did we ever state that this factor in a multi-factor test was dispositive?  Important, yes; dispositive, no.  The government immediately implies – again, wrongly

22

– that the defense had argued that "illiterate defendants *are incapable* of voluntarily participating in oral interrogations." (*Id*., emphasis added.)  The government can think only in absolutes.

Absolutes aside, Mr. Mohamed's lack of education and functional illiteracy is far more significant than the government cares to admit.  Thus the government fails to grapple with the issue of whether authorities interrogated him in conditions that elicited involuntary statements.  Instead, the government indulges three fundamental misunderstandings.

First, the government insists that Mr. Mohamed is "street-smart" (Gvt. Ans., at 17), "sophisticated" (*id*. at 18), and self-confident (*see id*. at 29).  But the Supreme Court has warned against assuming that someone knew his rights by speculating about his level of knowledge based on information such as age, intelligence, education, or prior contact with authorities. *See Miranda v. Arizona*, 384 U.S. 436, 469 (1966); *Arnett v. Lewis*, 870 F. Supp. 1514, 1541 (D. Ariz. 1994)(the defendant's statement was involuntary even if he was "street-wise").

Second, there is a difference between someone being smart, on the one hand, and being uneducated and functionally illiterate, on the other.  Whatever Mr. Mohamed's intelligence, the record is clear that he had little formal education and has been functionally illiterate (*see* Def. Br., at 21).

Third, limited education and functional illiteracy render someone vulnerable to the manipulations of authority that an educated elite can wield.  That danger is particularly acute in light of the long-lasting conflict in Mali between the governing South, centered in the capital of Bamako, and the restless north, such as Gao, whence Mr. Mohamed hails. *See generally* ASU, Country Brief – Mali ("The high illiteracy rates among Malians leave them unaware of their rights and duties."); ASU, Memo – Mali, at 3 ("In Mali's rural areas, there is a high illiteracy rate among Malians making

them unaware of their rights and they also have little access to attorneys and legal assistance making them vulnerable to abuse."); American Bar Association Rule of Law Institute, "Evaluation of Access to Justice in Mali, 2012," at 2, available at http://www.americanbar.org/content/dam/aba/directories/roli/mali/mali_access_to_justice_assess ment_2012.authcheckdam.pdf ("Efforts to build legal knowledge amongst women are hindered by low literacy and education rates (in 2009, Mali's literacy rate was 27.7%, and 19.8% for women)."); *id*. ("In any case, to obtain legal assistance, a litigant has to produce a long list of official documents, a difficult task for much of the country's largely illiterate population."); *id*. at 19 (". . . Mali's low literacy and education rates pose a particular challenge to efforts to raise legal awareness.").

Rather than grapple with these issues, the government wanders astray in its lively but tendentious characterizations of Mr. Mohamed.  For one thing, the government ignores the wisdom underlying Federal Rule of Evidence 404, namely, that broad descriptions of character rarely illuminate conduct on particular occasions.  For another thing, the government's characterizations arise largely from its suspicions, or from its big inferences from little scraps.  The number of assertions pass by at an almost breathless pace, for example, in the government's following sentence: "Indeed, the defendant's successful and enterprising international criminal career, which has run the gamut from cigarette smuggling to carjacking, robbery, kidnapping, murder and terrorism, as well as his success in evading prosecution and law enforcement during that career, suggest that he is both highly intelligent and street-smart." (Gvt. Ans., at 16-17.)  Assertions aside, the government has provided precious little *evidence* of success, enterprise, evasion of prosecution and law enforcement, robbery or kidnapping.  It has failed to seriously address what it means by an "international criminal career," including smuggling, in a region of the world where trade spans vast regions without state

24

control.  As to murder, there is no evidence on whether Mr. Mohamed's conviction of the Saudi homicides at a trial in Niger reflected actual guilt proven during fair proceedings, and the evidence on whether or not he is guilty of the indicted murder here, of course, will not be tested until the forthcoming trial.

The government also makes statements, such as the following one, that are both unsupported and irrelevant.  It states that Mr. Mohamed "is not even below-average in terms of literacy and education level when evaluated in the context of his fellow countrymen and women." (Gvt. Ans. at 17.)  But the government presents no evidence of where Mr. Mohamed's limited education falls on a scale of the education of Malians.  Furthermore, the relevant factor is not where Mr. Mohamed's limited education falls in connection with some statistical average but rather what his educational level actually is.  (The defense noted the low literacy rate in Mali to show that functional illiteracy is not as unexpected for someone from rural Mali, like Mr. Mohamed, as it would be for someone from the United States.)  Similarly, the government is impressed that Mr. Mohamed is multilingual and learned four languages by age six (*id*. at 18; 18 fn. 3) – which means little in Mali, a country of fifty languages, whose residents must learn several languages simply to get by.

The government gets matters backwards, upside down, and inside out when it suggests that functional illiteracy is less of a problem in determining voluntariness when many people in the country lack education.  That suggestion, anyway, is the best we can make out from its rather convoluted sentence: "The differences in literacy rates and educational standards between the United States and Mali lay bare the limited value of commentary in U.S. court decisions about the relevance of a poor American education during an American interview in attempting to discern how a Malian defendant with a little formal education would fare when confronted with Malian authorities in Mali

(or Nigerien interrogators in the neighboring, and poorer, country of Niger)." (Gvt. Ans., at 17-18.) In fact, the problem is that educated elites can use law as their weapon against uneducated arrestees, especially against uneducated members of ethnic groups out of power. An obvious comparison is with the relationship between the courts and education in the American slave south. Did African American slaves fare better in that justice system because most of them were illiterate? Or did the whites in power wield the justice system to their own benefit in part by making sure that slaves could rarely gain an education and that they lacked the learning necessary for self-protection when caught up in that justice system? The answers should be obvious. *See generally* A. Leon Higginbotham, Jr., and Anne F. Jacobs, "'Law Only as an Enemy': The Legitimization of Racial Powerlessness Through the Colonial and Antebellum Criminal Laws of Virginia," 70 *N.C.L. Rev.* 969, 1020 (1992). The lack of literacy renders people more, not less, vulnerable to state authority.

Whatever Mr. Mohamed's intelligence, his lack of education and his functional illiteracy rendered him particularly vulnerable to state coercion when interrogated by officials of the distant, centralized state. As a result, his statements were compelled and involuntary.

**C.** **The Court Should Suppress a Ninth Prior Statement Because American Officials Took It under Compulsion and in Violation of Miranda.**

In regard to Mr. Mohamed's most recent alleged statement, the one to the FBI (Statement #18), the government has not proven that it gave *Miranda* warnings; if so, that it gave those warnings in an understandable way; or, if so, that Mr. Mohamed knowingly and voluntarily waived his rights.

There is at the very least a disputed issue of fact in light of Mr. Mohamed's Declaration that he does not remember ever having seen an "Advice of Rights" form, does not remember anyone translating such a form to him, remembers an American asking him whether he wanted to chat but

not whether he wanted to answer questions, and remembers his continued fear from the repeated threats from Malian authorities for months preceding their handing him over to the Americans (Statement #18).

The government produced a purported "Advice of Rights" form only in answer to the defense brief (Gvt. Ex. E).  But even that form shows that the government failed to give *Miranda* warnings. The middle third of the form, entitled "Acknowledgment of Rights and Waiver of Rights to an Attorney and to Remain Silent," has neither initials nor check marks.  It fails to document a waiver – a prime purpose of the form – and instead has blanks.  It has blanks after each of its four assertions, namely, that Mr. Mohamed (i) was "willing to make a statement and answer questions," (ii) did "not want a lawyer at this time," (iii) understood his rights and made a "decision [that] is a knowing and voluntary one," and (iv) faced "[n]o promises or threats . . . and no pressure or coercion of any kind . . . . " (*Id*.)  The form does not even include the name of the interviewee.  While it does include the scrawled name of a translator, the form itself is not in Arabic and is not accompanied by a video or audio of any communication of the rights and the actual words used for translation.[3]

The government subverts its own argument in relying on a case of a defendant who "was confident in his own ability to deal with law enforcement officers . . . . " *U.S. v. Scarpa*, 897 F.2d 63, 69 (2d Cir. 1990), *quoted in* Gvt. Ans., at 29.  In *Scarpa*, the defendant was keeping track of the trial of his co-defendants – "his minions in the marijuana operation" – and, when arrested, "expressed an understanding of his rights, indeed interrupted the agent who advised him of his rights, to indicate both his familiarity with them and his determination to make his own decisions." *Id*. at

---

[3] While our original brief mentioned that the discovery gives no clue whether the interpreter spoke a different dialect of Arabic from Mr. Mohamed (Def. Br., at 44), we now doubt that dialect played a significant role.

27

68-69.  In contrast, there is no evidence that Mr. Mohamed had any knowledge of legal rights or had ever before heard *Miranda* warnings.  In fact, U.S. agents failed to read Mr. Mohamed *Miranda* rights in at least eight prior encounters over the course of a dozen years (*see* Def. Br., at 32, 37-42) – doubtless an important reason why the government is not seeking the admission of any of the resulting alleged statements (*see* Gvt. Ans., at 9 fn. 2).

The government also fails to grasp that before someone like Mr. Mohamed could understand *Miranda* rights, there is a need to bridge a vast cultural gap – between a functionally illiterate man from an undeveloped area in a poor country with little formal law and the typical American from a media saturated culture in which *Miranda* rights are a public good and second nature.  A person can voluntarily waive those rights, after all, only "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also id*. ("Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.").

In addition to the lack of or inadequacy of *Miranda* warnings, and the lack of any waiver, any responses that Mr. Mohamed gave were involuntary because they resulted from compulsion.  Mr. Mohamed had just suffered from months in Malian custody under horrendous conditions.  During that time, Malian authorities threatened him.  Rather than dissipate those threats, the transfer from Malian to American custody exacerbated them.  The worst threat that Malian authorities had made to Mr. Mohamed was that they would transfer him to American custody and all that would entail, including being decapitated and tossed from an airplane into the sea. The Supreme Court has made clear that, after an earlier statement obtained by coercion, "[t]he effect of . . . earlier abuse may be

28

so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary." *Lyons v. Oklahoma*, 322 U.S. 596, 603 (1944); *see also Oregon v. Elstad*, 470 U.S. 298, 317 (1985)("[N]or do we condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him."); *U.S. v. Karake*, 443 F. Supp. 2d 8, 87 (D.D.C. 2006)("[T]he court may take into consideration the continuing effect of the prior coercive techniques on the voluntariness of any subsequent confession.").  Here there was no "break in the stream of events . . . sufficient to insulate the statement from the effect of all that went before." *Clewis v. State of Texas*, 386 U.S. 707, 710 (1967).[4]

   Taken as a whole, the record lacks any indication that American agents made an effort to communicate *Miranda* warnings to Mr. Mohamed in way that he would have understood.  Words have meaning in a context, and the context here is strong countervailing head winds that would have swept away *Miranda* warnings that were not articulated clearly and explained in detail so that a foreigner who had repeatedly suffered official compulsion, coercion, mistreatment, threats, and deceit could understand what those warnings meant in the American legal system.  Mr. Mohamed was, after all, a functionally illiterate man from an undeveloped area in a poor country with little formal law; he had just suffered months in the custody of Malian police, who had terrified him about the life-threatening dangers of American custody; and in prior encounters with American agents, they had never before mentioned rights.

---

   [4] While Mr. Mohamed may also have feared flying, we now believe that that fear arose not from having never flown before – which was a fair inference from the government's discovery (*see* Def. Br., at 45-46) – but rather from having flown rarely.

In short, since officials procured Statement #18 during custodial interrogation without providing *Miranda* warnings or adequate *Miranda* warnings, or procuring a waiver, or an adequate one, and since officials procured that statement under the continuing effects of compulsion, the Court should suppress that statement or, in the alternative, grant an evidentiary hearing.

### III.

### THE COURT SHOULD SUPPRESS ALL EYE-WITNESS IDENTIFICATIONS

**A.      The Court Should Suppress All Eye-Witness Identifications.**

The government does not object to a pretrial hearing on undue suggestiveness and independent reliability to determine admissibility of eye-witness identifications (Gvt. Ans., at 31). But in previewing its positions, the government fails to seriously address what the defense has already explained: the eye-witness identifications were unduly suggestive and gave rise to a substantial likelihood of misidentification.

**B.      The Court Should Suppress the Eye-Witness Identification by its One Witness to the Indicted Crime.**

The government seeks to introduce at trial a single unnamed eye-witness's identification of Mr. Mohamed at two separate times, one in the summer of 2001 and a portion of another in February 2002 (Gvt. Ans., at 36).  But both procedures were unduly suggestive and gave rise to a substantial likelihood of misidentification.

**1.      The 2001 Identification Was Unduly Suggestive.**

The first identification procedure may have taken place in the summer of 2001, although the government is at a loss about dating it any more closely than some time in July or August (*see* Gvt. Ans., at 33).  Whatever the date, the government argues that there was nothing inherently or unduly

suggestive about the procedure because the witness chose Mr. Mohamed from one of three photos (although we are hard put to characterize a presentation of three photos as a "photo array")(*id*. at 36). According to the government, "the photos had no writing on them, and were placed together on a single sheet.  Thus, there was nothing more suggestive about one versus the other." (*Id*.).

The government conveniently ignores a troubling fact: authorities failed to preserve the photos presented to the witness.  Nor did they memorialize the manner of presentation.  Without that critical information, nobody can know whether the photo of Mr. Mohamed was more suggestive than the other two photos.  The government claims that the photos had no writing on them (Gvt. Ans., at 35).  Who knows?  Without a copy of the photos, nobody can rely on that assertion.  Even were the government to present someone's sworn testimony, the memory of such a detail would be questionable.

Even if no writing, number, mark, stamp, or other sign appeared on any part of the photos, the presentation of these three photos was unduly suggestive for two other reasons.  First, it was unduly suggestive because it included only three, rather than the recommended six, photos. *See* Nat'l Inst. of Justice, U.S. Dep't of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* 29 (1999).  Second, the presentation was unduly suggestive because it included only the photos of suspects, an approach that increases the chance that an identification was simply a lucky guess. *State v. Henderson*, 208 N.J. 208, 251 (2011).

The problems caused by the failure of authorities to preserve the photos that they used in this presentation taints the ability to retrospectively evaluate not only this procedure's undue suggestiveness but all that came after.  For example, the possibility looms that so-called "mug-shot contamination" took place (*see* Def. Br., at 71).  That is to say, the later identification in February

31

2002 may well have resulted not from the purported witness's memory of the indicted crime but rather from his exposure to Mr. Mohamed's photo during this first procedure. And, as we now show, that second identification proceeding suffered from other defects of its own.

### 2. The 2002 Identification Was Unduly Suggestive.

In the identification proceeding in February 2002, officials showed the purported eye-witness 48 photos in eight photo arrays with six photos each, one of them of Mr. Mohamed, and then showed the witness a single sheet with two photos of Mr. Mohamed (Gvt. Ans., at 35-36; Gvt. Ex. F, at 3). The government claims that there was nothing unduly suggestive either in displaying single photos of Mr. Mohamed or in showing his photo more than once (Gvt. Ans., at 36-37). We cannot fathom the government's logic.

The government concedes that "[t]ypically, single-photo or 'show up' identifications are disfavored" as "inherently suggestive" (Gvt. Ans., at 36), but then argues that some courts have found no unnecessary suggestibility in showing a single person in a show-up or a single photo in a show-up like proceeding (*see id*. at 37). But these cases are utterly different from here since they involved show-ups and ones that took place within hours or even only minutes of the event. *See Briscoe v. Ercole*, 565 F.3d 80, 90 (2d Cir. 2009)(the show-up "took place at the scene of the crime, within an hour of the commission of the crime . . . . "); *see also id*. at 96 (Judge Korman concurring)(while agreeing in denying the writ on other grounds, finding that the identification proceeding was unnecessarily suggestive); *U.S. v. Bautista*, 23 F. 3d 726, 729-730 (2d Cir. 1994)(the identification took place immediately after a raid on an apartment); *U.S. v. Butler*, 970 F.2d 1017, 1021 (2d Cir. 1992)(the show-up occurred within thirty minutes of a robbery); *U.S. v. Ofaril*, 779 F.2d 791 (2d Cir. 1985)(the identification of the suspect by an undercover officer occurred shortly

after the drug sale).  In contrast to those cases, this identification was a photo array, not a show-up, and it took place seven to eight months later, not with hours or minutes.

In regard to showing two color photos of Mr. Mohamed on a single sheet after having already shown 48 black-and-white photos in eight arrays, the government struggles to distinguish what "make[s] the identification procedure suggestive" from what renders it "automatically . . . suggestive." (*See* Gvt. Ans., at 37.)  While there might be circumstances in which the repetition of an individual's photo in similar arrays in an identification proceeding is not automatically unduly suggestive, the present case is not one of them.  For one thing, as our original submission explained (Def. Br., at 71), serious concerns arise about "mug-shot contamination" when someone's photo is included more than once in the same proceeding or over the course of a number of proceedings. *See State v. Henderson*, 208 N.J. 208, 255 (2011).  For another thing, the problem here was not simply that Mr. Mohamed's photo appeared in similar arrays.  The problem was something else.  After showing the purported eye-witness eight black-and-white photo arrays with six photos each, officials then displayed a single page with two color photos of Mr. Mohamed (Gvt. Ans., at 35-36; Gvt. Ex. F, at 3).  They showed no similar photo array either beforehand or afterwards.  The purported eye-witness identified Mr. Mohamed as the shooter not from the black-and-white photo array, only from the later photos in conspicuous color.  The purported eye-witness identified Mr. Mohamed not from an array of choices, but from a display of two photos of only one person.

The government aptly quotes the Second Circuit: "[T]he principal question is whether the picture of the accused . . . so stood out from all of the other photos as to suggest to an identifying witness that that person was more likely to be the culprit." (Gvt. Ans., at 39, *quoting Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)(internal punctuation omitted)).  With this procedure, Mr.

33

Mohamed's photo stood out to suggest him as the culprit.  Any witness would have gotten the message: officials wanted him to choose Mr. Mohamed's photo.  How much more suggestive could the officials have been?  Did they need to actually circle Mr. Mohamed's photo itself?  Here the purported eye-witness did not choose Mr. Mohamed's photo when it simply appeared in the six-person photo arrays.  The witness only chose Mr. Mohamed's photo when it stood out from all the others because it was shown in duplicate.  On a single piece of paper.  In color.

In one rather novel tangent, the government tries to shift attention from the identification procedure to the witness's nationality.  The procedure would not sway this man, the government argues, because he is Nigerien (Gvt. Ans., at 38).  A Nigerien, so this argument goes, would have withstood official influence because he would not know about U.S. law enforcement procedures (*see id*.).  The argument is a non-sequitur.  Undue suggestiveness results from unconscious influence and official pressure, not a subject's on-the-spot analysis of police techniques.  People everywhere respond to official pressure and understand the difference between sameness and difference.  People in almost all cultures play games like the one in Sesame Street: "One of These Things Is Not like the Other."  A witness participating in this procedure would have known that authorities wanted him to choose the photo that was substantially different from the others.

In short, this photo array in February 2002 – with its sudden switch from eight similar six-subject black-and-white photo arrays to a one-page, two-color-photos-of-a-single person display – was unduly and unnecessarily suggestive.

### 3.     The Purported Eye-Witness's Statements Do Not Demonstrate That the Identifications Are Independently Reliable.

The government relies on the purported eye-witness's statements about the indicted crime to argue that his identifications are independently reliable (Gvt. Ans., at 39-43).  The problem is that all his statements about the crime and identification took place after the purported identification in the summer of 2001.  Furthermore, the only account of this witness's statements is no better than the double-hearsay of another unidentified individual from a decade later in 2012 (*see* Def. Ex. C1).

The government claims that the witness will testify that he saw a Tuareg man – in his thirties, six feet tall, and with a distinctive scar on his face – shouting, holding a pistol, and then shooting the American, William Bultemeier (Gvt. Ans., at 34-35).  The government claims further that the witness will estimate that the distance between them was less than seven feet, and that just before the man shot Bultemeier, a Toyota truck with red-and-white striping turned on its headlights and lit up the entire area (*id*. at 35).  The government also claims that the witness will testify that he recognized the shooter because of the scar on his face and because of an encounter fifteen minutes before the shooting, when he exchanged greetings with the shooter and then saw the Toyota truck pull up and the shooter speak with its driver (*id*.).

The witness's statements fail to provide independent reliability for an in-court identification because, while the government seems to merge them into one master narrative, they have, in fact, changed dramatically over time.  In his earliest statement, at the time of the purported identification in February 2002 – just over a year after the shooting – the witness said the following (*see* Gvt. Ex. F; Gvt. Ans., at 33 fn. 5).  When the American (Bultemeier) left the restaurant, the witness followed him to his car, making sure to keep his distance because the American did not like to be crowded

35

(Gvt. Ex. F, at 1.).   The witness expected some money for having watched the car while the American had been inside the restaurant (*id*.).   As he approached, the witness heard the phrase "quittez-la," and stopped and stepped back (*id*. at 2).   The witness saw the American shot in the back (*id*.).   The witness was scared and ran from the scene back to his work station (*id*.).   The witness said that he did not see anything else (*id*.).   He described the shooter as an approximately six-foot tall male in his thirties, as light skinned like a Tuareg or maybe lighter, with short hair and a short sleeved shirt, and with a pistol (*id*.).   The witness also said that shortly before the shooting he saw a Toyota pick-up truck, a beige one with red stripes, drive four or five times through the area, but that he did not see who was in the truck and he never saw the truck stop (*id*.).

The witness made a second recorded statement in the summer of 2003, more than two-and-a-half years after the shooting, and a year-and-a-half after his first statement in February 2002 (*see* Gvt. Ex. G).   This second account diverges significantly from the earlier one.

First, in his later August 2003 statement the witness said that he walked with the American (Bultemeier) to his car when the American left La Cloche (Gvt. Ex. G, at 3).   In contrast, the witness said in his earlier February 2002 statement that he had kept his distance from the American because the American did not like to be crowded (Gvt. Ex. F, at 1).

Second, in his later August 2003 statement, the witness claimed that he had seen the Toyota pick-up truck parked at a gas station down the street, and that the pick-up shined its headlights, allowing him an exceptionally good look at the shooter (Gvt. Ex. G, at 3).   In contrast, the witness made no mention in his earlier February 2002 statement of shining headlights (Gvt. Ex. F, at 2).

Third, in his later August 2003 statement, the witness said that he ran to the Air Afrique building to hide, looked out the window, and saw an unknown man in the driver's seat of the

American's car and another man with a Kalishnikov rifle entering through the car's rear doors, as the car sped away (Gvt. Ex. G, at 3-4). In contrast, in his earlier February 2002 statement the witness provided none of these details but rather said specifically that he saw nothing else after he ran from the scene (Gvt. Ex. F, at 2).

Fourth, in his later August 2003 statement, the witness said that, after the shooting, the police took him to the police station, and he made a statement about what he had seen (Gvt. Ex. G, at 4). The witness said that at the police station he recounted having seen the Toyota pick-up earlier in the evening, and its having circled the block three times (*id.*). But in his earlier February 2002 statement the witness failed to mention having made an immediate statement to the police (*see* Gvt. Ex. F), and the government has failed to produce any such statement in support of the identifications.

Fifth, in his later August 2003 statement the witness said that, although he had not been able to identify the Toyota's driver from the photo spreads, he had been able to immediately identify the shooter (Gvt. Ex. G, at 4). The F.B.I. report containing this statement adds that the witness had previously identified Mr. Mohamed as the shooter (*id.*). But, in fact, in February 2002 the witness was not immediately able to identify Mr. Mohamed in the photo spreads and made an identification only after officials showed him two individual color photos of Mr. Mohamed (*see* Gvt. Ex. F, at 3). Furthermore, officials showed the witness photo arrays only once: during the February 2002 identification proceeding (*see id.*). During the proceedings in 2001, police did not use a photo array but rather one sheet with three photos on it (*see* Gvt. Ans., at 33). The witness failed to mention that earliest identification proceeding in his statements of both February 2002 and August 2003 (*see* Gvt. Exs. F, G).

37

The witness gave another statement in May 2012 (Gvt. Ex. H) – more than eleven years after the shooting in December 2000, almost eleven years after the first purported identification in the summer of 2001, more than ten years after the first statement in February 2002, and nine years after the second statement in August 2003.  This late statement turns out to be the most elaborate of all. It piles on new contradictions.  In 2012, the witness said, for the first time, that he had exchanged greetings with the later shooter, that the Toyota pick-up truck pulled up and parked in the alley between La Cloche and the Air Afrique building, and that the shooter spoke with its driver (Gvt. Ex. H, at 1).  The witness also said for the first time that a bystander pulled him back into the crowd and out of the way (*id*. at 2).  He did not mention fleeing to the Air Afrique building.  The witness said that he later heard about one of the perpetrators having had a rifle but did not see that person himself because he was too fixated on the handgun (*id*.).  He then claimed, again for the first time, that the shooter was a man with a distinctive scar on his face (*id*.).

In short, the witness's three statements do not bolster the identifications.  With each retelling, his story has grown, new details have appeared while others have fallen away, and contradictions abound.  These successive statements show memory subject to change, influence and invention. What they do not show, under the totality of the circumstances test, *see Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), is that this witness's identifications were reliable.

**C.**   **The Court Should Suppress the Eye-Witness Identification to the Purported Other Act of a Much Later Car-Jacking by its One Witness a Decade after the Event.**

In regard to the identification that one witness purportedly made ten years later of a car-jacker on the Tillabery Road hours north of Niamey (*see generally* Def. Br., at 83-86), the government advances a number of flawed arguments.

38

First, the key to suggestiveness in identifications is difference. *See generally Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986)(when the number of photos shown is not unfairly small and the manner of presentation not unduly suggestive, then "the principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to suggest . . . that that person was more likely to be the culprit.")(internal punctuation omitted).  Someone is much more likely to choose a photo that is different from the others than similar to them.  A recent leading case on eye-witness identifications gave the following explanation:

> [M]istaken identifications are more likely to occur when the suspect stands out from other members of a live or photo lineup. . . . As a result, a suspect should be included in a lineup comprised of look-alikes.  The reason is simple: an array of look-alikes forces witnesses to examine their memory.  In addition, a biased lineup may inflate a witness' confidence in the identification because the selection process seemed easy. . . .

*State v. Henderson*, 208 N.J. 208, 251 (2011)(internal punctuation and citations omitted).

We have pointed out that Mr. Mohamed's photo is the only one in the array that is a three-quarter profile (Def. Br., at 76).  The government, which cannot retroactively rotate the image, instead adjusts its own description.  Mr. Mohamed's head, the government writes, "is merely turned at a slight angle." (Gvt. Ans., at 45.)  The government then adds that, through its eyes, "photographs 2 and 20 are not head-on photographs either." (*Id.*)  We disagree, but the Court, of course, can look for itself.  Even if those two photos, however, were not "head-on," or face-front, the photo array taken as a whole would still contain 21 face-front photos, compared with three that were not. Furthermore, the victim making the identification described the driver as stocky and Arab and the

39

shooters as slim and Tuareg (Def. Ex. C5; 404(b) B## 451).  Although photo #2 appears to be of a stocky Arab, photo #20 matches none of the descriptions, appearing to be neither Arab nor Tuareg.

Second, the government argues that the description of Tuareg covers a range of skin color (Gvt. Ans., at 45).  The victim in the car-jacking noted the skin color as light-skinned (Def. Ex. C, 404(b) B## 453-54) and the witness to the shooting in Niamey also described the shooter's skin as "light, similar to a Tuareg or maybe slightly lighter." (Gvt. Ex. F, at 2.)  Although lightness in skin tone is relative, the government provides no support for its claim that a Tuareg from Libya would be much lighter than a Tuareg from Niger (*see* Gvt. Ans., at 45).  Furthermore, since the car-jacking took place in Niger, a mixture of various skin tones in the photo array was inappropriate.  The individuals in the photo array, light skinned or dark skinned, should have been similar in tone to represent the local Tuareg population.

Third, the government claims that using several other suspects in the photo array was no problem, and claims that the defense "advances nothing either in law or in fact to support his claim that it is improper to use multiple suspects in a photo array." (Gvt. Ans., at 46.)  The assertion is incorrect.  As we noted in our original motion, the use of multiple suspects in a photographic line-up magnifies the chances of a lucky guess. *State v. Henderson*, 208 N.J. 208, 251-53 (2011), *cited in* Def. Br., at 65.

Finally, with respect to independent reliability, the government relies on a witness description from ten years after the event but then argues that such a lapse between the car-jacking and identification is not dispositive (Gvt. Ans., at 47-48).  A decade-long lapse, however, can do nothing but hurt an identification's reliability.  In fact, research shows that the passage of time both degrades correct memories and heightens confidence in incorrect ones. *See* Kenneth A. Deffenbacher et al.,

"Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation," 14 *J. Experimental Psychol.: Applied* 139, 147-48 (2008).  As exemplified by the statements of the eye-witness to the events in Niamey in December 2000, memories change over time, often radically.  According to the Second Circuit:

> [R]esearch indicates that the passage of time both degrades correct memories and heightens confidence in incorrect ones. *See* Kenneth A. Deffenbacher et al., *Forgetting the Once – Seen Face: Estimating the Strength of an Eyewitness's Memory Representation*, 14 J. Experimental Psychol.: Applied 139, 147–48 (2008). The Supreme Court has stated that a delay of seven months between a crime and a pre-trial identification is "a seriously negative factor" weighing against independent reliability "in most cases." *Neil [v. Biggers]*, 409 U.S. [186] at 201, 93 S.Ct. 375 [(1972)]. According to studies, even a one-week delay can cause the "typical eyewitness viewing a perpetrator's face that [is] not highly distinctive . . . to have no more than a 50% chance of being correct in his or her lineup identification." Deffenbacher et al., *Forgetting*, at 147.

*Young v. Conway*, 698 F. 3d 69, 84 (2d Cir. 2012).  Without testimony from the witness and consideration of the science behind eyewitness identification and memory, the government cannot credibly argue that a witness's statement of events more than ten years earlier, as recorded by others, is reliable.

For all these reasons, as well as those set forth in our opening submission, The Court should hold the evidentiary hearing – to which the government does not object – on the unduly suggestive nature of the pretrial identifications and the lack of indicia of independent reliability for any in-court identification, and should then suppress both the pretrial identification evidence and any eyewitness identification testimony at trial.

## IV.

### THE COURT SHOULD DETERMINE NOW TO PRECLUDE MR. MOHAMED'S PURPORTED OTHER ACTS

**A.      Evidence of the Tillabery Road Car-Jacking in 2004 is Inadmissible Because It Does Not Show *Modus Operandi*.**

The government wishes to divert the real focus of this trial with the unrelated episode of a car-jacking at dusk on the rural Tillabery Road hours north of Niamey years after the indicted crime (*see* Gvt. Ans., at 48-56).  The defense has already shown that this car-jacking resembled car-jackings in the region in general and bore no peculiar similarity to the middle-of-the-night middle-of-the-city attack outside La Cloche years earlier (*see* Def. Br., at 86-88).  The government cannot pull together these two widely disparate events by labeling the routine "idiosyncratic" and major differences as "minor" or "trivial." (*E.g.*, Gvt. Ans., at 52-53.)  The government cannot meet its burden of proving a common *modus operandi*.

In a far cry from seeking the admission of this purported other act evidence "for the limited . . . purpose of establishing the identity of the defendant as the perpetrator of the charged offenses," (Gvt. Ans., at 50), the government wants to do precisely what Federal Rule of Evidence 404 prohibits: to show propensity.  The government wants the jury to infer that Mr. Mohamed must have committed the indicted crime because he is a bad guy who later committed another crime.  Since "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait," Fed.R.Evid. 404(a), the Court should preclude this episode from trial.

42

**B.   Evidence of the Tillabery Road Car-Jacking in 2004 is Inadmissible Because the Government Cannot Show that Mr. Mohamed Was Involved.**

The government also cannot meet its burden of proving that Mr. Mohamed had anything to do with the Tillabery Road car-jacking.  Trying to justify its position, the government makes two points that are wrong.

First, the government does not deny that the only evidence linking Mr. Mohamed to the event is a purported eyewitness identification from a decade later (*compare* Def. Br., at 84, *with* Gvt. Ans., at 6, 51).  Rather, the government asserts that an eye-witness identification made by a traumatized victim of a total stranger is "unsurprising." (Gvt. Ans., at 51.)  Here even the government does not – and cannot – invoke its old stand-by: common sense.  Nor can it refer to empirical evidence.  As we have just discussed, research shows that time lapses erode memories, the Supreme Court has referred to seven-month delays as "a seriously negative factor," and the Second Circuit has noted that even after only one week "the typical eyewitness" has no better than a fifty-fifty chance of correctly identifying a perpetrator's face (*see* §III.C. *supra*).  The delay here was more than seventeen times longer than seven months and 520 times longer than one week.

Second, the government needs to address evidence that tends to exclude Mr. Mohamed as an attacker since an eyewitness said that the attackers spoke Hausa (*see* Def. Br., at 85).  The defense has pointed out that "there is no reason to believe that Mr. Mohamed knows, understands or can speak Hausa . . . . " (*See id*.)  Using a dull knife for trying to split hairs, the government thinks it significant that the defense does *not* write that Mr. Mohamed "does *not* in fact speak [Hausa]." (Gvt. Ans., at 51)(emphasis added).  So let the defense clarify.  The defense relies, as it must, on the record.  The record contains nothing about Mr. Mohamed speaking Hausa.  According to documents

43

produced by the government, Mr. Mohamed speaks Arabic, French, Tamasheq, Songhai (Sonraii), and "Ghangaria"[5] (B## 220, 326, 491).  No document from any country states, shows, indicates, or in any way suggests that he speaks Hausa.  The defense knows of nothing outside the record that Mr. Mohamed speaks Hausa.

Lacking evidence that Mr. Mohamed speaks Hausa, the government asserts that "[i]n fact it is likely the defendant does speak and understand at least some Hausa . . . . " (Gvt. Br., at 51.)  In support, the government claims that Hausa "is spoken in Niger and is a common trade language across North Africa," and that Mr. Mohamed "traveled frequently across North Africa, and was a prolific trafficker of cigarettes in the region, particularly between Mali, Niger and Algeria, areas where Hausa is commonly spoken." (*Id.*)  But the government gives no authority for its assertions about who speaks Hausa and where.  Unsurprisingly.  Its assertions are wrong.  They are make-believe.

The languages for trade in northern Mali, northern Niger and southern Algeria, where Mr. Mohamed traveled, are Arabic and Tamasheq.  Historically Tuaregs (a Berber people) and related groups have dominated the trade networks throughout southern Algeria and northern Mali and spoken Arabic and Tamasheq. *See* Judith Scheele, *Smugglers and Saints of the Sahara: Regional Connectivity in the Twentieth Century*, Chapter 2 (Cambridge University Press, 2012); Bachir Bouhania, "Le Touat pluriglossique ou plurilingue: Approche sociolinguistique," available at http://www.researchgate.net/publication/249961434.  Members of the Kunta tribe, such as Mr.

---

[5] "Ghangaria" is probably a transliteration for "Gangari" or "Gangara," which are alternative names for Soninke, which is a major language spoken in western and central Mali, includes a dialect heavily influenced by Hassaniya Arabic, and is also used for trade in the Sahel. *See* https://www.ethnologue.com/language/snk.

Mohamed (*see* B## 219, 326), have historically taken part in the trans-Saharan trade between southern Algeria and northern Mali and spoken their own native language, Hassaniya Arabic, and the other language for trade in that region, Tamasheq. *See* Scheele, *Smugglers and Saints*, at 159-60. The Kunta have also spoken Tamasheq because of their strong cultural ties with the Tuareg. *See* Susan Rasmussen, "An Ambiguous Spirit Dream and Tuareg-Kunta Relationships in Rural Northern Mali," 88 *Anthropological Quarterly* 635-64 (Summer 2015). Traders in northern Mali, northern Niger and southern Algeria also need some French (which Mr. Mohamed speaks) since French is the official administrative language in Mali and since Mali, Niger, and Algeria, as well as Mauritania and Burkina Faso, are former French colonies. *See* Ana Pakarinen, "Le statut du français en Afrique: La politique linguistique au Mali et au Sénégal," 46 (Spring 2009): http://uta32-kk.lib.helsinki.fi/bitstream/handle/10024/80917/gradu03793.pdf?sequence=1). Mr. Mohamed speaks Songhai since Gao, where he was born and lived, is a Songhai-speaking region. *See* http://africa.isp.msu.edu/afrlang/Songhai_root.html

In contrast to Arabic and Tamasheq – and contrary to the government's assertions – the Hausa language is not "a common trade language across North Africa" and is not "commonly spoken" in Mali and Algeria (*contra* Gvt. Ans., at 51). Hausa is not a trade language in northern Mali, northern Niger, and southern Algeria. Hausa speakers live well to the south, populating most importantly northern Nigeria and to some extent southern Niger and some cities in Ghana, Togo, and Burkina Faso. While once Hausa traders ventured north to sell slaves to buyers in the Sahara, the sphere of influence of Hausa as a trade language has always been, and continues to be, in the southern part of Central West Africa. *See* Yahaya Hashim and Kate Meager, "Cross-Border Trade and the Parallel Currency Market – Trade and Finance in the Context of Structural Adjustment: A

Case Study from Kano, Algeria," Research Report no. 113, Chapter 3 (Nordiska Afrikainstitutet, Uppsala 1999); *see also* Paul Lovejoy, *Caravans of Kola: The Hausa Kola Trade 1700–1900* (Oxford University Press, 1980).

Thus, as a native of Gao in Mali engaged in trade in and near the Sahara desert in northern Mali, northern Niger and southern Algeria, Mr. Mohamed needed Arabic, Tamasheq and maybe some French for purposes of trade, but not the Hausa language of regions far to the south.

In short, the eyewitness identification, which is too weak to credibly connect Mr. Mohamed to the Tillabery Road car-jacking, and one language of the perpetrators, which tends to exclude him, show that this car-jacking had nothing to do with Mr. Mohamed or the indicted crimes. The Court should preclude admission of evidence about it.

**C.   Evidence of the Tillabery Road Car-Jacking in 2004 is Inadmissible Because It Would Be Unduly Prejudicial.**

The defense has explained that the admission of any alleged bad act after 2002, including the Tillabery Road car-jacking, would be unduly prejudicial because it would invariably raise issues of terrorism (Def. Br., at 82-83). The government counters that it intends to introduce evidence about "a particular act, a violent carjacking, not of broader trends concerning kidnappings or terrorism." (Gvt. Ans., at 55.) The problem is that this later car-jacking may have exemplified wider trends, that any evidence about it might draw in related evidence about terrorism, and that its admission may put Mr. Mohamed in a bind. How can he defend against a crime that possibly arose from terrorism without opening the door to evidence about terrorism? Furthermore, the very coupling of the La Cloche and Tillabery Road attacks, which took place in faraway central Africa, may imply terrorism

46

in the minds of some American jurors.  Inserting terrorism into this trial would be inflammatory, generating the very type of sensationalism that Federal Rule of Evidence 403 is designed to prevent.

While the government reverts to the prosecutor's old stand-by that limiting jury instructions can cure any potential prejudice (*see* Gvt. Ans., at 55), the Supreme Court has made clear that some error is too prejudicial for any instruction to cure. *See Bruton v. U.S.*, 391 U.S. 123, 135 (1968)("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."); *see also U.S. v. Bates*, 590 F. App'x 882, 889 (11th Cir. 2014)("The few limiting instructions given here, so general in nature, cannot cure the constitutional deficiencies in this voir dire process."); *Jones v. Basinger*, 635 F.3d 1030, 1055 (7th Cir. 2011)("To think that any amount of instruction would enable a jury to disregard the damning substance of an out-of-court statement like the one at issue here – a lengthy statement setting forth a detailed account of an accomplice's confession implicating Jones in a particularly heinous crime – and to consider that statement only for some marginally-relevant collateral purpose simply defies human nature, particularly if the jury had any doubts about the sufficiency of the other evidence against Jones.").  The suggestion of terrorism is beyond the healing powers of a curative instruction.

The terrorism taint aside, evidence of the Tillabery Road car-jacking would create a side-show.  It would create another trial within a trial about a different event at a different time and at a different place.  The difficulties of a defense investigation, hard enough as it is in connection with the indicted crime, would increase dramatically.

Introduction of the Tillabery Road car-jacking would cause this undue prejudice for no purpose. The evidence is totally unnecessary. Nothing about this other purported bad act sheds any light at all on what happened outside La Cloche on December 23, 2000.

For all these reasons and other reasons stated in our main brief, the Court should preclude, pursuant to Fed. R. Evid. 401, 402, 404(b), 403, admission of the Tillabery Road car-jacking as other act evidence.

## V.

## THE COURT SHOULD ORDER EARLY AND FULL DISCLOSURES THAT THE CONSTITUTION AND RULES REQUIRE

**A.** **The Defense Moves for Early Disclosure of *Brady* and *Giglio* Information and of the Government's Witness List, and Asks the Court to Encourage Early Disclosure of Jencks Act Material.**

**1.** **The Defense Moves for Early Disclosure of *Brady* and *Giglio* Information.**

Mr. Mohamed moves the Court for an order compelling the government to immediately disclose all exculpatory information in its possession that falls within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963), and all impeachment information that falls within the scope of *Giglio v. U.S.*, 405 U.S. 150 (1972)(*see* Def. Br., at 99-100).

Not unexpectedly, the government intones the mantra that it "is aware of its obligation to disclose exculpatory e]vidence pursuant to *Brady* . . . . " (Gvt. Ans., at 58.) But the Second Circuit has noted that in the past the government in this very district has failed to meet its *Brady* obligations. *U.S. v. Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012)("None [of the "host of excuses" advanced by the government as to why testimony was not *Brady* material] excuses the government's misconduct."); *id*. at 133 ("The government's failures to comply with *Brady* were entirely preventable. On multiple

48

occasions, the prosecution team either actively decided not to disclose the SEC deposition transcripts or consciously avoided its responsibilities to comply with *Brady*."). The signs are not encouraging where, as here, the defense has received no response to two specific *Brady* requests (Defense *Brady* request Letters to the government of July 8, 2015 [docket entry #59], and July 16, 2015 [docket entry #63]) – which the government has simply ignored.

      The signs are also not encouraging when the government justifies holding back *Giglio* material by relying on a case predating *Giglio* by more than a dozen years and discussing 3500 material instead (*see* Gvt. Ans., at 58, *citing Palermo v. U.S.*, 360 U.S. 343, 350-52 (1959)). In treating *Giglio* information as if it were 3500 material, the governments fails to grasp that evidence that may impeach a government witness is one kind of exculpatory evidence. The Supreme Court has rejected any distinction between impeachment evidence and exculpatory evidence. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999)(the government's duty to disclose evidence favorable to the accused "encompasses impeachment evidence as well as exculpatory evidence . . . . "); *U.S. v. Bagley*, 473 U.S. 667, 676 (1985)("Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule."). The Supreme Court stated in *Giglio* itself that "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule [of *Brady*]." *Giglio v. U.S.*, 405 U.S. 150, 154 (1972). Indeed, impeachment evidence may be the most important type of exculpatory evidence. *See Napue v. Illinois*, 360 U.S. 264, 269 (1972)("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

While the government claims that it will disclose *Giglio* material "in time for the defendant to be able to make use of it at trial" (Gvt. Ans., at 58), the government leaves utterly obscure what timing it has in mind and what kind of use its timing might accommodate.  But the government should resolve any doubts on the side of disclosure.  The Supreme Court expects that "a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." *Kyles v. Whitley*, 514 U.S. 419, 439 (1995); *accord U.S. v. Agurs*, 427 U.S. 97, 108 (1976)("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure.").  With that straight-forward approach, the government need not engage in a guessing game that has no reasoned rules, namely, how long it can put off making disclosures while still allowing the defense time to put information to effective use at trial.  The adage is apt here: If not now, when?  The difficulties are especially pronounced for an indicted crime like this one, which took place a long time ago, overseas, in a difficult locale.  While in more bread-and-butter circumstances the development of impeachment information may be plain on its face, here it is not because the circumstances are so complex and so unusual.  The ways that the defense may develop impeachment information may not be immediately obvious and may require unusual amounts of time.  Here the constitutional and practical approach are one and the same.  As with all *Brady* information, the government must disclose *Giglio* information immediately, as soon as it comes into the government's possession.

The immediate disclosure of *Brady* and *Giglio* material is also important because there is a structural asymmetry between the prosecution and the defense. *U.S. v. Turkish*, 623 F.2d 769, 774 (2d Cir. 1980).  In addition to "greater financial and staff resources," the prosecution has "inherent information-gathering advantages," such as the ability to begin the investigation shortly after the crime while the facts are still fresh and, in the process, to "remove[] much of the evidence from the

50

field"; the power to "compel people . . . to cooperate"; the right to "search private areas and seize evidence"; the means to tap networks of informants and access to "vast amounts of information in government files"; and the benefit of "respect for government authority[, which] will cause many people to cooperate with the police or prosecutor voluntarily when the[y] might not cooperate with the defendant." *Wardius v. Oregon*, 412 U.S. 470, 476, 477 fn. 9 (1973). The defense, by contrast, typically must rely on the protections of due process, including the *Brady* and *Giglio* rule, to offset these advantages. See *id*. at 480 (Douglas, J., concurring in the result)("Much of the Bill of Rights is designed to redress the advantage that inheres in a government prosecution.").

We therefore ask the Court to order the government to again review its files for information that is favorable to the defense, pursuant to *Brady*, *Giglio*, and *Mahaffy*, and disclose any such information forthwith. *See also U.S. v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002)(disclosure of critical information on the eve of trial is unsafe for the prosecution). We further ask that the Court impose a standing order that the government continue to disclose such material as it finds it.

**2.    The Defense Moves the Court to Exercise its Authority to Compel Early Disclosure of the Government's Witness List.**

The government objects to early disclosure on "a specific showing of need for concealment by the government," and then claims that "the record has amply established that the defendant is a violent person with connections to individuals who have the ability to locate and intimidate witnesses in Niger and Mali." (Gvt. Ans., at 59.)  But the record has established no such thing. Rather the government has alleged that Mr. Mohamed has engaged in violence and has connections with terrorist groups; has used its own allegations as a basis for imposing SAMs, *i.e.*, the executive branch of the government has accepted the allegations of the executive branch of the government;

and then tries to bootstrap its executive decisions into what "the record has [purportedly] amply established . . . . " The allegations may be troubling, but they have never been tested in a hearing or adversarial proceeding.

Whatever federal investigators may suspect about Mr. Mohamed's prior activities, the government is glib in asserting that he has "connections to individuals who have the ability to locate and intimidate witnesses in Niger and Mali," and that he "would attempt to use his terrorist connections to retaliate against government witnesses located in West Africa . . . . " (Gvt. Ans., at 59.)  A witness is someone who testifies, or will testify, "to what he has seen, heard or otherwise observed." *Wigginton v. Order of United Commercial Travelers of America*, 126 F.2d 659, 666 (7th Cir. 1942).  It is someone who will play a role in a legal proceeding.  The government has not alleged, or produced any information, that either Mr. Mohamed, or anyone he is connected with, have acted against potential witnesses in any circumstances.  Nor has the government shown that any of the terrorist groups that it has named have the American legal system on their radar screen.

More important, the government has not cited a single act, event or piece of evidence that shows that Mr. Mohamed has ever tried to retaliate against, intimidate, or even locate a witness.  The failure of the government to produce any such information is all the more remarkable since he would have had plenty of time to have done so during the last fifteen years, *i.e.*, since the indicted crimes outside La Cloche in December 2000 or even the alleged other act on the Tillabery Road in May 2004.  It is also remarkable since Mr. Mohamed was in custody in Mali and Niger from February 2010 until June 2013 and from November 2013 until March 2014, and then in the United States since then.  Yet the government has not pointed to a single incident, report, claim, clue, or even rumor of his having engaged in, encouraged, or been connected with witness tampering.

52

With the SAMs in place, the government has rendered any witness tampering attempt virtually impossible. Nobody living under such rigid restrictions could do so. Mr. Mohamed is in solitary confinement; he has no contact with fellow inmates; he is permitted one phone call per month to his family, which officials monitor in real time; and officials read before mailing his rare outgoing letter. Under the SAMs, there is no risk of Mr. Mohamed intimidating a witness.

The government also worries that witnesses living abroad, beyond the government's subpoena power, may "decide not to testify at trial" if they learn that the government has disclosed their names (*see* Gvt. Ans., at 58-59). Of course, the government need not inform foreign witnesses about the disclosure of a witness list. More important, the government's worries have no legal basis, or consequence. The government may not withhold witness information for fear that the defense counsel might try to meet their obligations to effectuate their client's Sixth Amendment rights by trying to speak with witnesses. Nor may the government withhold such information for fear that a witness speaking with someone other than a government agent may infer that part of the American adversarial system includes questioning by parties with different interests. And the government has never suggested, nor would they have a basis for suggesting, that defense counsel would engage in witness tampering. *See generally* Government's "Memorandum of Law in Opposition to Defendant's Motion to Vacate or Modify Special Administrative Measures," of March 20, 2015, at 15 ("In fact, compliance with SAM restrictions is highly dependent upon the honesty and integrity of counsel and their staff, and in this instance in particular, the government has the highest regard for defense counsel."). After all, the defense has as much an interest in a fair trial as the government.

Without evidence that Mr. Mohamed has ever retaliated against, intimidated, threatened or otherwise tried to tamper with a witness, the Court should order early disclosure of the witness list.

As the Second Circuit has held, the court's main objective is to balance the defendant's specific showing of need for disclosure with the government's specific showing of need for concealment. *See U.S. v. Cannone*, 528 F. 2d 296, 300-301 (2d Cir.1975); *U.S. v. Turkish*, 458 F. Supp. 874, 881 (S.D.N.Y. 1978).  In this case, that balance tilts heavily in favor of early disclosure.

> **3.    The Defense Asks the Court to Urge the Government to Make Early Disclosure of Jencks Act Material.**

Our original brief showed why the Court, while unable to compel early disclosure of §3500 material, can, and should, encourage the government to disclose this material as early as possible (*see* Def. Br., at 103).  Revolving around events that took place far away long ago, the defense simply does not have rapid response capabilities.  It cannot address issues on the turn of a dime, certainly not with the care, research, and study that a case of this gravity demands.  Information found in §3500 material often generates the need for more investigation, which will be impossible if the defense receives the material only shortly before trial – or during trial.

We therefore ask the Court to use its good offices to encourage the government to make early disclosure of §3500 material.  For the same reasons, we ask the Court to grant any adjournments requested by the defense to investigate information provided in §3500 disclosures that are material to the defense case and is not timely disclosed.

**B.    The Defense Requests the Immediate Production of Materials Pursuant to Federal Rule of Criminal Procedure 16(a)(1).**

While the government produced some additional discovery on June 26, 2015, the defense is entitled to more, pursuant to Federal Rule of Criminal Procedure 16, which the government either actually possesses or can obtain if in the possession of French, Nigerien, or Malian law enforcement, prosecution, or government authorities. *See generally U.S. v. Yousef*, 327 F.3d 56, 129-30 (2d Cir.

2003)(in a joint investigation with foreign law enforcement officials the Jencks Act requires U.S. officials to make "a good-faith effort to obtain the statements of prosecution witnesses in the possession of the foreign government.").

### 1.    The Defense Requests Mr. Mohamed's Written or Recorded Statements.

1.    The defense has sought writings or recordings memorializing statements that Mr. Mohamed allegedly made to Mohamed Lamine Maiga, the Chief Detective of the Malian Police force in Gao (Def. Br., at 95).  The government claims that it has complied with Rule 16 by providing the substance of Mr. Mohamed's statements to Maiga, on December 26, 2000, and December 27, 2000 (Gvt. Ans., at 57 fn. 12).  But the government's position does not constitute compliance with Rule 16(a)(1)(B)(ii).

Rule 16(a)(1)(B)(ii) states that the government "*must* disclose . . . the portion of *any written record containing the substance* of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent." (Emphasis added.)  Thus the Rule requires the government to disclose any reports describing Mr. Mohamed's statements ("any written record containing the substance" of his statements), not just the government's summary of the substance.  If the reports contain other information besides the statement's substance, the government may wield its well-honed redaction skills.  But the government may not redact – or withhold, condense, abridge, summarize, or otherwise boil down – "the substance of any relevant oral statement" already contained within "any written record . . . . " Those items, such as and including a transcript of Maiga's grand jury testimony, are written records that the government is duty-bound to produce.

55

2.      We renew our request that the government provide the defense with any statements that Mr. Mohamed has made to or in the presence of any U.S. law enforcement or other governmental agencies, any law enforcement or other governmental agencies in Mali, and any law enforcement or other governmental agencies in Niger.  We also request copies of reports or other writings or recordings that memorialize those statements.

3.      While the government's discovery of June 26, 2015, included the charts from the polygraph performed on February 10, 2002, the government must still provide (or confirm the non-existence of)

(a) any audio or video recording of the polygraph examination,

(b) a list of all questions asked of Mr. Mohamed (whether control, neutral, or relevant),

(c) any written or recorded French interpretation of those questions, and

(d) Mr. Mohamed's responses, if separately noted from the polygraph paper charts or digital recording.

**2.      The Defense Requests Documents and Objects.**

Since the following items are discoverable, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E), the defense requests that the government either (a) permit the defense the right to inspect, review, and copy them or (b) confirm that it has contacted and requested access from the appropriate foreign governments, law enforcement agencies, or like entities and report on the status of such contacts (*see* Def. Br., at 96).  The items are the following:

1.      Any items taken from Mr. Mohamed or his home upon his arrest on December 26, 2000.  We also request any inventories made of any items seized from Mr. Mohamed or his home on December 26, 2000 or a later date.

2.      Any items taken from Mr. Mohamed upon his arrest by French forces in November 2013, including but not limited to cell phones; SIM cards; ledgers, notebooks or the like; personal papers or official documents; and anything else in his possession.

3.      Copies of any photographs used in any identification proceedings by foreign governments or law enforcement agencies of Mr. Mohamed, as well as copies of any memorializations of photo arrays or photo spreads used in these identification proceedings, including those resulting in negative identifications.

4.      Any vehicles or other property alleged to have been involved in the instant offense or 404(b) offenses.

5.      The names, current addresses, and current contact information of any eyewitnesses to the 2000 shooting of Mr. Bultemeier and the 2004 car-jacking on the Tillabery Road.

Mr. Mohamed's present circumstances largely resemble those in a case revolving around events in another part of Africa. *See U.S. v. Karake*, 281 F. Supp. 2d, 302, 309 (D.D.C. 2003).  In that case, an attack took place in 1999 in a Ugandan National Park and two U.S. tourists, along with several others, were killed.  The defendants were later arrested and extradited to stand trial in the U.S.  The defense in *Karake* faced obstacles like those facing the defense here: a far-away locale, foreign witnesses, and an attack that had taken place years earlier.  The defense in *Karake* requested the names and addresses of any eyewitnesses to the attack, and the court ordered the government to turn over the information, pursuant to Rule 16(a)(1)(E)(i).  The court found that the information was material to the defense, writing that "[w]hen someone has witnessed the offense, disclosure of his or her identity will almost always be material to the defense . . . . " *Id*. at 309 (internal quotation

marks omitted).  Given the far-away locale, the foreign witnesses, and the age of the case, the

defense was unable to obtain the information through ordinary due diligence in investigation.

The *Karake* court wrote cogently as follows:

> Compelling disclosure of the identities and contact information of eyewitnesses to this event is especially appropriate.  The attacks occurred several years ago in a remote Ugandan rainforest, more than one hundred people were present, and the eyewitnesses are located throughout the world.  This type of case presents a discovery dilemma quite unlike more typical criminal proceedings in which the defense can learn the identity of [eye]witnesses through available investigative techniques.

*Id*. at 310 (internal quotation marks and citations omitted).

One of the exhibits to the government's answer includes a reference to the fact that the

Nigerien police interviewed at least one unnamed eyewitness to the events of the 2000 shooting (*see*

Gvt. Ex. G, at 4).  A fair inference is that the Nigerien police also interviewed other eyewitnesses

or witnesses.  Similarly, the government has provided the statements of unnamed witnesses to the

car-jacking on the Tillabery Road.  As to both events, the defense has no obvious way of identifying

or locating the foreign witnesses.  The only way to even approach a level playing field and to assure

that the defendant gets due process of law and may benefit from effective assistance of counsel is

for the government to turn over the names, addresses and other contact information of these

eyewitnesses and witnesses.  The Court should order the government to do so.  If the government

were to claim that the information is not in its possession, then the Court should order the

government to make good faith efforts to obtain it from the appropriate government authorities in

Niger and Mali.

3.     **The Defense Requests Reports of Examinations and Tests.**

While the government has produced discovery on June 26, 2015, relating to examinations and tests (*see generally* Def. Br., at 96-97), we ask leave to request further discovery, pursuant to Federal Rule of Procedure 16(a)(1)(F), after our experts have reviewed the discovery if they have grounds for believing that there are additional reports, records, or data that exist regarding the government's collection, possession and analysis of DNA, finger and palm prints, ballistics, and other forensic evidence.

While the government has provided charts from the polygraph examination of Mr. Mohamed (*see* §V.A.1. *supra*), the government may also possess the following items or documents that it has not yet disclosed.  If these items exist, the government should produce them and, if they do not exist, the government should so inform the defense.  We request:

(a)     any audio or video recording of the polygraph examination;
(b)     all questions asked of Mr. Mohamed (control, neutral, and relevant);
(c)     any written or recorded French interpretation of those questions;
(d)     Mr. Mohamed's responses, if separately noted from the polygraph paper charts or digital recording;
(e)     a photo or description of the location within the Bamako jail where the polygraph was performed;
(f)     the length of the interview prior to the actual polygraph examination (the entire polygraph proceeding apparently lasted six hours, *see* B# 213);
(g)     whether Mr. Mohamed was provided with food, water, or bathroom breaks during the polygraph proceeding; and
(h)     who, if anyone, aside from the examiner, the interpreter, and Mr. Mohamed were present for the examination.

4.     **The Defense Requests Notice of Expert Witnesses.**

While the government has disclosed certain expert witnesses and discovery on June 26, 2015, the defense still asks, for the reasons detailed in our original motion (*see* Def. Br., at 97-98), the Court to order the government to disclose the remaining experts and evidence in finger print, palm

print, ballistics and any other forensic examinations and evidence as quickly as possible.  Only with such expeditious disclosure will the defense have sufficient time to view or examine evidence and request an opportunity to perform its own tests upon that evidence.

## VI.

## THE COURT SHOULD ORDER THE GOVERNMENT TO RETURN TO MR. MOHAMED THE PROPERTY HE WAS CARRYING WHEN ARRESTED

The defense has moved for the return to Mr. Mohamed of the property he was carrying when arrested, including a Red Cross document, a notebook, and just under the equivalent of approximately $16,500 (*see* Def. Br., at 104).  The government claims that "[t]he property . . . is not within the government's possession." (Gvt. Ans., at 61).

In support of its claim, the government submits no affidavit and points to no documentary evidence.  In fact, the one relevant document that the government has produced indicates that the government does have possession of the property.  An F.B.I. report of March 25, 2014, states explicitly that during an interview with agents "onboard a United States government aircraft in route from Bamako, Mali, to New York, New York," Mr. Mohamed "was shown and positively identified the following items already recovered during [his] capture," and enumerates nine items, including the ones specified in the defense brief (B## 310-12).  Thus, according to its own document, the government possessed the property sought, showed that property to Mr. Mohamed, and did so on an American airplane with F.B.I. agents but no French soldiers.

The defense continues to request the return of all the property specified in the government's own F.B.I. document or, in the alternative, a hearing, pursuant to Fed.R.Crim.P. 41(g).  The apparent

contradiction between the F.B.I. document and the government's present denial of possession of the property needs resolution.  That contradiction raises serious issues.

First, does the government actually possesses the property?

Second, does the government constructively possesses the property?  Rule 41(g) applies when the federal government has constructive possession, too. *Clymore v. U.S.*, 164 F.3d 569, 571 (10th Cir. 1999)(circumstances where the rule "can be used as a vehicle to petition for the return of property seized by state authorities, . . . constructive federal possession where the property was considered evidence in the federal prosecution, or instances where property was seized by state officials acting at the direction of federal authorities in an agency capacity."); *accord U.S. v. Bailey*, 700 F.3d 1149, 1153 (8th Cir. 2012); *U.S. v. Copeman*, 458 F.3d 1070, 1071 (10th Cir. 2006); *U.S. v. Obi*, 100 F. App'x 498, 499 (6th Cir. 2004); *U.S. v. Solis*, 108 F.3d 722, 722 (7th Cir. 1997).

Third, at the time of Mr. Mohamed's arrest, or thereafter, were French authorities, contrary to the government's assertion, "acting as agents of the United States government"? (*See* Gvt. Ans., at 63.)

Thus, the Court should order the government to return all this property or, in the alternative, hold a hearing, pursuant to Fed.R.Crim.P. 41(g).

## **Conclusion**

For the foregoing reasons and all the reasons set forth in the defense's original brief, the

Court should grant the defense motions.

DATED:      BROOKLYN, N.Y.
              August 27, 2015

                                 _/s/_____
                                 DOUGLAS G. MORRIS, ESQ.
                                 MILDRED WHALEN, ESQ.
                                 FEDERAL DEFENDERS OF NEW YORK, INC.
                                 ONE PIERREPONT PLAZA, 16TH FLOOR
                                 BROOKLYN, N.Y. 11201

                                 ATTORNEYS FOR THE DEFENDANT
                                 ALHASSANE OULD MOHAMED